UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CHARLES ROBINSON,<br><br>　　　　　　　　Plaintiff,<br>v.<br><br>TELESECTOR RESOURCES GROUP, INC. D/B/A<br>VERIZON SERVICES GROUP,<br><br>　　　　　　　　Defendant. | Civil Action No. 04-11964-NG |

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56(c) and Local Rule 56.1, the Defendant, Telesector

Resources Group, Inc. d/b/a Verizon Services Group ("Verizon"), respectfully moves the Court

to enter summary judgment for the Defendant on all Counts of Plaintiff's Complaint because

there are no genuine issues of material fact and Plaintiff has failed to present sufficient evidence

in support of his claims.

## I.    PRELIMINARY STATEMENT

This is a case about a long term employee who was laid off in August 2001 when his

employer, Verizon, decided to reduce the number of Team Leaders in its National Market Center

in Boston due to decreasing work volume. The Plaintiff, Charles Robinson, does not dispute the

need to reduce staff.  He simply contends that Team Leaders other than he should have been

terminated.  Plaintiff's dismay at his selection has led him to conjure a number of causes of

action, none of which can prevail in the light of the undisputed facts.[1]

---

[1]    In his Complaint, Plaintiff alleged the following claims: (1) "Breach of Contract for
Employment";  (2) "Breach of Contract for Year-to-Year Employment"; (3) "Breach of Contract"; (4)
"Wrongful Termination – Contract"; (5) "Negligent Breach of Contract - Term"; (6) "Wrongful
Termination – Tort"; (7) "Negligence"; and (8) age discrimination in violation of Mass. Gen. Laws ch.
151B.

Plaintiff's primary assertion is that he was terminated because of his age, 52, in violation of Mass. Gen. Laws ch. 151B, § 4.  In support of his claim, Plaintiff relies upon the following evidence, none of which is sufficient as a matter of law and undisputed fact to help him carry his burden of proof.  First, Plaintiff contends that a cartoon allegedly given to him by his manager, Hank Pilat, in August 2000, a full year before his termination, demonstrates age animus. Plaintiff alleges that the cartoon, depicting a unicorn named Charlie being "voted off" an island by other animals, demonstrates that management wanted to get rid of him.  The cartoon, however, makes no mention of age and cannot reasonably be viewed as referring to Plaintiff's age or suggest any impermissible bias.  Second, Plaintiff alleges that on three occasions Pilat asked him if he would take a retirement "package" if one were offered.   Pilat allegedly made those comments while expressing dissatisfaction with his own job, not long after the merger that created Verizon in June 2000 occasioned rumors of consolidations and "packages."   Plaintiff acknowledges that Pilat made no further retirement-related comments after August 2000, more than one year before the reduction in force that resulted in the termination of Plaintiff's employment.  Third, Plaintiff contends that in June 2001 Pilat sought to remove some of Plaintiff's job responsibilities and replace them with functions that were, to the Plaintiff, a "no-brainer."  The contemporaneous e-mail trail and Plaintiff's testimony, however, demonstrate that Pilat did not remove any of Plaintiff's duties and in any event there is nothing to suggest that Plaintiff's age played any role in this issue at all.  Finally, Plaintiff contends that "younger males" were given preferred assignments, ignoring the fact that he too was placed on special assignments in conjunction with his job.  Thus, even if credited, Plaintiff's allegations are insufficient to suggest that his termination was motivated by his age.[2]

---

[2]   Plaintiff's claim of age bias is further belied by additional undisputed facts, namely that: (1) Pilat, who made the decision to terminate Plaintiff, was the same manager who only fifteen months earlier

Plaintiff also alleges a number of contract claims, in which he claims that (1) he could only be let go for cause; (2) he had an "annually renewable contract"; (3) Verizon did not comply with its "policies" in its treatment of him; and (4) he was entitled to notice and an opportunity to cure any deficiencies before he was terminated. Further, Plaintiff claims that Verizon negligently failed to train him, resulting in his termination. These claims, too, must fail because it is undisputed that, at all relevant times, Plaintiff was an employee at will without any express or implied contracts of employment that would have prevented Verizon from deciding not to retain Plaintiff as a Team Leader.

Finally, Plaintiff alleges that he was wrongfully discharged in violation of public policy. This claim, too, must fail, because, although Massachusetts recognizes a limited cause of action for termination in violation of a clearly delineated public policy, there is no such public policy at issue here. Plaintiff alleges that he, along with other Team Leaders who were not terminated, complained internally about the proper processing of service orders. Because the conduct of which Plaintiff complains does not implicate a legally recognized protected public policy, Plaintiff's wrongful discharge claims must fail.

## II.    FACTUAL BACKGROUND[3]

### A.    <u>Hank Pilat Hires Plaintiff As A Team Leader</u>

Plaintiff began working for Verizon's predecessor on or about January 5, 1970. SOF ¶ 1. In April 2000, Plaintiff interviewed with second-level manager Henry Pilat ("Pilat") for a

---

had hired Plaintiff; (2) an employee older than Plaintiff and two additional employees over the age of 40 were retained; and (3) Plaintiff did not have the same level of relevant systems knowledge as the Team Leaders retained by Verizon. Moreover, Plaintiff's age claim was filed more than three years after the allegedly discriminatory act of which he complains and, accordingly, is barred by Mass. Gen. Laws ch. 151B, § 9, which sets forth the statute of limitations applicable to this claim.

[3]    The following summary of facts is fully supported by the Defendant's Statement of Undisputed Facts (hereafter referred to and cited as "SOF"), submitted herewith.

position as a Team Leader in Verizon's  National Markets Center – Complex Services

Department in Bowdoin Square in Boston (the "NMC").  SOF ¶ 4.  Plaintiff had previously

worked with Pilat and thought well of him.  Id.  During the interview, Pilat reviewed Plaintiff's

resume, which detailed Plaintiff's 30 years of experience at Verizon.  SOF ¶ 5.[4]  At the end of

the interview Pilat offered Plaintiff the position.  SOF ¶ 6.  Plaintiff accepted and began working

for Pilat in April 2000.  At the time Plaintiff was 50 years old.  Id.

### B.     The Function of the National Market Center

The purpose of the NMC was to process service requests primarily from Competitive

Local Exchange Carriers ("CLECs") seeking to use Verizon's networks and facilities in order to

service their (the CLECs') customers.  SOF ¶ 7.[5]  In summary, upon receiving a service order

request from a CLEC, an NMC service representative reviewed and verified the information

received, contacted the CLEC for missing or incomplete information, and entered the service

order information into one of several Service Order Provisioning Systems ("SOPs").  SOF ¶ 8.[6]

If the order was properly processed in the appropriate SOP system, the representative received

confirmation that the order was being "assigned" (i.e. that the SOP data entry was successful).

---

[4]  For approximately four years prior to 2000, Plaintiff held a staff position in Verizon's
Engineering and Construction department.  SOF ¶¶ 3-5.  While in Engineering and Construction, Plaintiff
had no supervisory responsibilities.  Id.  In the approximately nine years prior to April 2000, Plaintiff had
only supervised one clerk several years earlier.

[5]  CLECs provide to residential and commercial customers voice and data services similar to the
services provided by Verizon to its customers.  CLECs are thus competitors of Verizon.  SOF ¶ 7.
Verizon was required to lease to the CLECs parts of Verizon's networks and facilities in order to permit
the CLECs to compete with Verizon.

[6]  Different SOP systems existed for different states serviced by the NMC.  SOF ¶ 9.  None of the
SOP systems were identical, and thus a valid entry in one system might be invalid in another.  In addition,
each of the SOP systems had very specific formats for data entry in a given field.  Further, during 2000
and into 2001, the SOP systems lacked many up-front edits or guides to advise the user of input errors.
Consequently, data entries were regularly rejected, and the service representative would often be advised
by the system of an error only after typing in all of the requested data, requiring the representative to go
back to search for the invalid entry to resolve the problem.  If unable to resolve the issue, the
representative went to a Team Leader for assistance.  Id.

SOF ¶ 10.  Once the order was "assigned," the CLEC was sent a Firm Order Commitment ("FOC") confirming the order and advising the CLEC of the date by which the equipment installation or other necessary actions would take place.  Id.[7]

### C.  Plaintiff's Performance as a Team Leader

By early 2001, the NMC had grown from 80 to 160 service representatives managed by 12 Team Leaders, one of whom was the Plaintiff.  SOF ¶ 11.  Plaintiff and six other Team Leaders reported to Pilat, with the remainder reporting to second-level manager Claudia D'Amato ("D'Amato").[8]  As a Team Leader, Plaintiff directly supervised approximately 15 service representatives.  SOF ¶ 11.  Over time Plaintiff's manager, Pilat, observed that Plaintiff: (1) exhibited a negative attitude in meetings and on other occasions, SOF ¶ 25[9];  (2) had not made an effort to learn SOPs, Id.;[10] and (3) could not respond to questions from his staff.  SOF ¶ 26.[11]

---

[7]   NMC representatives were required to process CLEC orders and provide a FOC to the CLEC within 24 to 72 hours of receipt of all required information.  SOF ¶ 10.

[8]   Plaintiff's responsibilities included: managing his service representatives to ensure they were meeting FOC and other objectives; answering any questions related to processing CLEC service orders; and interfacing with certain CLECs assigned to him to ensure that the customer was satisfied.  SOF ¶ 11.

[9]   For example, on one occasion while Pilat was addressing the entire NMC regarding an impending strike, Plaintiff made comments to another Team Leader downplaying the importance of the message Pilat was attempting to deliver.  SOF ¶ 25.  On several occasions Pilat commented to Plaintiff about his attitude.  Id.

[10]   Prior to working in the NMC, Plaintiff had some knowledge of SOP systems.  SOF ¶ 13. However, prior to joining the NMC, Plaintiff had received no training in the SOPs.  Id. In addition, unlike some of the other Team Leaders, Plaintiff had not worked as a service representative or in any other position requiring regular use of the SOP systems.  Id. Plaintiff acknowledged, and Pilat recognized, that he was "not able to write a service order as proficient [sic] as the other Team Leaders."  Id.  Accordingly, Plaintiff "job shadowed" two fellow Team Leaders, Patrick Podolske ("Podolske") and Susan Rober ("Rober"), observing Podolske and Rober answering service representatives' questions. SOF ¶ 14. Plaintiff also job shadowed his own representatives in an attempt to better understand how to provide them with guidance.  Id.

[11]   Several times a day Plaintiff received questions from his representatives concerning SOP data entry and related processing issues.  SOF ¶12. Typical questions included why a particular order was not

### D.    Pilat Asks Plaintiff to Take on Assignment Duties

In June 2001, Pilat asked Plaintiff and the other Team Leaders to take over certain job assignment duties previously handled by a contractor.  Plaintiff agreed to do so.  SOF ¶ 16. However, shortly thereafter Plaintiff sent Pilat an e-mail message in which he described the assigning function as a "no brainer" and expressed concerns that he "may be being pushed aside."  Id.  On June 7 and 8, 2001, Plaintiff and Pilat exchanged several e-mail messages related to the assigning function, culminating in Pilat reiterating that the task of assigning work was in addition to Plaintiff's regular duties.  SOF ¶ 17.[12]

### E.    Verizon Reduces the Team Leader Staff

During 2000 and early 2001, the NMC grew as Verizon implemented new systems to service requests from CLECs.  SOF ¶ 18.  Over time, however, the mechanisms and procedures for processing orders were streamlined and the systems used for those activities became more automated.  Consequently, NMC work volume decreased significantly.  Id.  As a result of the decrease in work volume and an anticipated reduction in the non-management ranks,[13] in or around June 2001, NMC management determined that a reduction in force of the Team Leaders was necessary.  SOF ¶ 18.  In late June 2001, Pilat and D'Amato were told by their Director,

---

being "assigned" (i.e. had not been fully accepted in SOPs) or why an order was not assigning to the proper Central Office.  In responding to those questions, Plaintiff's typical response was "Pretend I am not here. Tell me what you would do in this situation" or words to that effect.  Id.  As a result of Plaintiff's repeated failure to answer their questions, a number of representatives turned to other Team Leaders for answers.  Pilat observed that Plaintiff "was everyone's buddy" but "when it came time for a business question or a performance issue, [Plaintiff] could not respond." SOF ¶ 26.

   [12]  In that e-mail message, Pilat also reminded Plaintiff of the importance of assisting his employees in the correct processing of service orders, reiterated that there was no formal training program for the Team Leader position, and identified job shadowing and new product training as ways Plaintiff could become more knowledgeable in his job.  SOF ¶ 17.

   [13]  In or around June 2001, the NMC decided to end the employment of 42 of the 160 service representatives in the NMC.  SOF ¶¶ 17-18.  Accordingly, in September 2001 the representative ranks were reduced by 26%, from 160 to 118.  Id

Patrick Stevens ("Stevens"), that they would need to eliminate one Team Leader position and determine which 11 of the 12 current Team Leaders to retain. SOF ¶ 19. After reviewing Verizon's "RIF Users' Guide" and consulting with Human Resources, Pilat and D'Amato decided that in making that decision they would rely on resumes created by the Team Leaders detailing their accomplishments as well as on their personal knowledge of each of the individuals. SOF ¶¶ 20-21.[14] In late June 2001 Pilat, D'Amato and Stevens advised the Team Leaders of the upcoming reduction and asked them to update their internal resumes. SOF ¶ 22.

After receiving the Team Leaders resumes, Pilat and D'Amato met to discuss the relative performance of the Team Leaders. SOF ¶ 24.[15] Ultimately, Pilat and D'Amato determined that Plaintiff was the least valuable of the Team Leaders. SOF ¶¶ 25-26. Specifically, Pilat identified Plaintiff's lack of systems knowledge, negative attitude, and inability to develop his workforce as three areas in which Plaintiff was relatively less valuable than his peers. SOF ¶¶ 25-26. Based on her observations of Plaintiff's performance, D'Amato agreed with Pilat's assessment and Director Patrick Stevens approved the decision. SOF ¶ 27. On July 30, 2001, Pilat advised Plaintiff that he had not been selected for one of the available Team Leader positions. SOF ¶ 29. Plaintiff did not secure an alternative position within Verizon, and his employment was terminated effective August 28, 2001. SOF ¶ 31. Plaintiff filed his Complaint in Suffolk Superior Court on August 17, 2004, and Verizon subsequently removed the action to this Court. SOF ¶ 37.

---

[14]    Reliance on these two sources of information was explicitly permitted by the RIF Users Guide. SOF ¶¶ 20-21.

[15]    In his resume, Plaintiff listed as the sole accomplishment in his time at the NMC that he had "helped Verizon enter the long distance market in Mass. by meeting key objective," an accomplishment shared by many other Verizon employees. SOF ¶ 23. The other Team Leaders provided more detail than Plaintiff concerning their specific accomplishments. Id.

## III.    ARGUMENT

Summary judgment is proper where, as here, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Once the moving party has made the required showing under Rule 56(c), the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial …." Fed. R. Civ. P. 56(e).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)(footnote omitted); Lawton v. State Mut. Life Assurance Co. of Am., 101 F.3d 218, 223 (1st Cir. 1996) (nonmovant has obligation to "offer the court more than steamy rhetoric and bare conclusions . . . [it] must produce specific facts, in suitable evidentiary form, sufficient to limn a trialworthy issue").   Of course, in deciding whether there is a genuine issue of material fact, courts draw all justifiable inferences in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

### A.    <u>Verizon is Entitled to Summary Judgment on Plaintiff's Age Discrimination Claim (Count VIII)</u>

In Count VIII, Plaintiff alleges that he was terminated because of his age.  Compl., at ¶¶ 39-41.  This Count must be dismissed because Plaintiff can offer no evidence by which a reasonable fact finder could conclude that he suffered any adverse action because of his age and because Plaintiff failed to file his claim within the limitations period set out in Mass. Gen. Laws ch. 151B §9.

### 1.    Plaintiff Cannot Establish a Prima Facie Case of Age Discrimination

Plaintiff can produce no evidence that his layoff occurred in circumstances that would raise a reasonable inference of age discrimination.[16]  In support of his claim, Plaintiff relies upon the following incidents to suggest age animus: (1) a cartoon in which a unicorn representing the Plaintiff is "voted off the island" by other animals representing Pilat, D'Amato and other NMC staff; (2) three isolated remarks allegedly made by Pilat a year before Plaintiff's termination in which Pilat asked Plaintiff if he would consider accepting a retirement "package" if one were offered;  (3) an alleged attempt by Pilat to reduce Plaintiff's job responsibilities; and (4) preferential treatment allegedly given by Pilat to "younger males."  None of these allegations, considered in light of the undisputed facts, suggests any inference of age bias.

Plaintiff's reliance on the "unicorn" cartoon is misplaced because it cannot reasonably suggest any age animus.[17]  Plaintiff contends that the cartoon evinces age discrimination because the unicorn, the animal associated with the Plaintiff, is an extinct or fantasy figure.  SOF Ex. 1, at 107-14.  From this, Plaintiff asserts that Pilat had a desire to get rid of him.[18]  However,

---

[16]    Where, as here, the plaintiff has failed to establish direct evidence of age discrimination, the Court applies the familiar burden-shifting analysis originally set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-805 (1973); Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 116-18 (2000).  For the Plaintiff to make out a prima facie case of age discrimination, he first must demonstrate that he: (1) was at least forty years of age; (2) performed his job at an acceptable level; (3) experienced an adverse employment action; and (4) there is some evidence that his layoff occurred in circumstances that would raise a reasonable inference of unlawful age discrimination.  Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 44-45 (2005). As discussed, Plaintiff cannot prove the fourth prong of his prima facie case.

[17]    In or around August 2000, Plaintiff received a cartoon portraying a unicorn and other animals standing on a beach.  Each of the animals was labeled with the name of a member of the NMC.  SOF ¶ 15. A lion, identified as Pilat, appears to be speaking to the unicorn, labeled "Charlie."  The caption of the cartoon states "We've voted you off the island."  Id.  Plaintiff displayed the cartoon in his cubicle and never complained that he was upset by it or believed it had anything to do with his age. Id.

[18]    Plaintiff asserts that Pilat gave him this cartoon, a fact which Pilat disputes.  However, this dispute over the original source of the cartoon is neither material nor relevant for summary judgment purposes because, as discussed below, regardless of the source there is no reasonable basis to conclude the cartoon had anything to do with Plaintiff's age.

Plaintiff fails to offer any evidence to suggest that his age is at all relevant to that supposed desire.  See Pilgrim v. Trs. of Tufts Coll., 118 F.3d 864, 871 (1st Cir. 1997) (plaintiff's "[subjective] perception is not evidence" of discriminatory intent, hence "not enough to withstand summary judgment" ).  Furthermore, Plaintiff's action in displaying the cartoon on the wall in his cubicle belies any assertion that it was taken by Plaintiff as anything other than what it was, a humorous cartoon.  SOF ¶ 15.  Finally, the cartoon was given to Plaintiff in August 2000, and thus, is too remote from the decisional process nearly a year later in July 2001 to be probative of anything.

Plaintiff also alleges that on three occasions more than one year before his termination, Pilat asked him "You're old enough, you would retire if an offer was made to you."  SOF Ex. 1, at 116-129.  These comments, even if made by Pilat, do not suggest any age bias in the reduction in force that took place a year later.  Stray and isolated remarks made by decision makers unrelated to any decisional process at issue are insufficient to prove age animus.  See Wynn & Wynn, P.C. v. Mass. Comm'n Against Discrimination, 431 Mass. 655, 667 (2000).  Questioning an employee about plans for retirement is not evidence of age animus.  Wallace v. O.C. Tanner Recognition Co., 299 F.3d 96, 100 (1st Cir. 2002) (statements made by employer concerning retirement were brief, stray remarks and not evidence of discrimination where there was no accompanying suggestion that employee's value to the company had diminished because of his age).  Such questioning is not surprising where, as here, these isolated comments were allegedly made in the context of Pilat complaining about his dissatisfaction with his own job shortly after Pilat selected Plaintiff in April 2000 and around the time of the merger of Bell Atlantic and GTE that formed Verizon.  SOF Ex. 1, at 121-122.; SOF Ex. 3, at 14.  Thus, taken in context, there is nothing from these ambiguous comments to suggest Pilat intended to discriminate against Plaintiff because of his age.

Moreover, these comments are so remote in time from the ultimate decision not to select Plaintiff for a Team Leader position as to be meaningless. All three of these comments were made prior to August 2000, more than one year before Plaintiff's termination.[19] SOF Ex. 1, at 125-127. Accordingly, they are of no use to the Plaintiff in demonstrating Pilat's mindset in July 2001. See Wallace, 299 F.3d at 100-101 (references regarding retirement made nine months before termination decision were too remote from the decisional process); Straughn v. Delta Airlines, 250 F.3d 23, 36 (1st Cir. 2001) (comments by decision makers have limited probative value when they are "temporally remote from the date of the employment decision, or . . . were not related to the employment decision in question . . . ."). Because such statements were made, if at all, at least one year before the RIF decision, they are too remote to be probative of age discrimination related to that decision.

Plaintiff's attempt to find age bias in Pilat's alleged attempt to reduce his job responsibilities is similarly misplaced and unsupported by the evidence. Rather, the evidence shows that Plaintiff and all of the other Team Leaders were asked to take on assignment duties in addition to his other tasks. SOF ¶¶ 16-17. Even if Plaintiff's version is credited and Pilat originally told Plaintiff that he was going to take away Plaintiff's employees, Plaintiff fails to offer any facts from which a fact finder could conclude that the proposed course of action was related to Plaintiff's age. An attempt to reduce Plaintiff's job responsibilities, in itself, is not probative of any age animus. And, in the end, Pilat did not remove any duties from the Plaintiff. The series of e-mail messages between Pilat and Plaintiff similarly fails to suggest that age

---

[19] Plaintiff testified that Pilat stopped making these comments after Plaintiff complained that he "had seen this line of questioning in the past and did not like it." SOF Ex. 1, at 116-120, 128-129. However, Plaintiff had not previously been subjected to these types of questions. SOF Ex. 1, at 116-117. Rather, approximately 15 years earlier Plaintiff was told by two laid off employees that they "were being asked to retire." SOF Ex. 1, at 118-120. Plaintiff did not hear the "questioning" himself and doesn't know what was said to those coworkers. Id.

played a role in Pilat's management decision to reassign work functions. Rather, these messages make clear that, at best, there was a miscommunication regarding the nature of the Plaintiff's new duties. Such a misunderstanding, however, is patently insufficient to help Plaintiff prove an inference of age discrimination in the decision not to select him for one of the remaining Team Leader positions.[20]

Plaintiff's claim that younger males received preferential treatment is similarly unavailing. Specifically, Plaintiff alleges that Team Leader Adam Aliberti traveled to New York to help open a new NMC office and Team Leader Matt Blais was involved in the testing of new service orders. SOF Ex. 1, at 156-159. Plaintiff fails to note that he too was given additional assignments. Plaintiff was the primary contact person for resolving service order processing issues for one of the largest CLECs, Covad Communications. SOF Ex. 1, at 196-200. Plaintiff also represented the NMC as part of an interdepartmental team that met in Maryland. SOF Ex. 2, at 163-164. Plaintiff can offer no evidence to suggest that the assignments to Aliberti and Blais were in any way "preferential" or out of proportion to the same assignments provided to him. Nor, ultimately, can he demonstrate that his age, or the ages of Aliberti and Blais, were in any way a factor in the assignment of these projects.

Finally, additional undisputed facts surrounding the Plaintiff's selection for layoff demonstrate that age was not a factor in the selection decision. First, there is a strong inference that Pilat's decision in July 2001 not to select Plaintiff for one of the remaining positions was not because of Plaintiff's age. It is well established that "[i]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span

---

[20]    Plaintiff also stated in one of these e-mail messages: "If I need to be trained in service orders to become of value to this organization then that is what I want," making clear that Plaintiff himself recognized that he lacked some of the SOPs skills required of him. SOF ¶ 16.

following the hiring, a strong inference exists that discrimination was not a determining factor

for the adverse action taken by the employer." <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 847

(1st Cir. 1993) (quoting <u>Proud v. Stone</u>, 945 F.2d 796, 797 (4th Cir. 1991)); <u>see also</u> <u>Washington</u>

<u>v. Milton Bradley Co.</u>, 340 F. Supp. 2d 69, 78 (D. Mass. 2004).  Here, Pilat selected Plaintiff for

a Team Leader position in April 2000 when Plaintiff was 50 years old, little more than one year

before Pilat subsequently selected Plaintiff for layoff.  SOF ¶ 6.[21]   In addition, Plaintiff cannot

escape the fact that one of the Team Leaders retained, Brenda Joy, was nearly 18 months older

than Plaintiff, and that two additional Team Leaders who were retained, Podolske and Rober,

were over the age of 40.  SOF ¶ 28.  Further, all of the individuals involved in the selection

decision were in the same protected class as Plaintiff.[22]   In light of these facts, the only inference

that reasonably can be drawn is that age did not play any role in any employment decision

relating to the Plaintiff.  <u>See</u> <u>Sullivan</u>, 444 Mass. at 44-45 (the "mere termination of a competent

employee when an employer is making cutbacks due to economic necessity is insufficient to

establish a prima facie case" of discrimination).  Because none of the above-referenced incidents,

taken alone or in the aggregate, are sufficient to permit a reasonable inference of unlawful age

discrimination, Plaintiff cannot prove his prima facie case and Count VIII should be dismissed.

> **2.    Plaintiff Cannot Establish That Verizon's Legitimate Non-Discriminatory Business Reason Is A Pretext**

Even if Plaintiff were somehow to establish a prima facie case of age discrimination,

Verizon has articulated a legitimate, nondiscriminatory reason for laying off Plaintiff.  <u>Anderson</u>

---

[21]    As noted above, Claudia D'Amato was also involved in the decision to select other Team
Leaders for retention.  However, this does not diminish the same actor inference.  All of Plaintiff's
allegations of age bias relate to Pilat, and he has failed to identify any facts to suggest that D'Amato, who
was only one year younger than Plaintiff, considered Plaintiff's age at all.  SOF Ex. 1, at 114-115, 189-190, 201.

[22]    As of July 30, 2001, Pilat was 45 years old, D'Amato was just days shy of her 51st birthday,
and Stevens, who concurred with Pilat's and D'Amato's decision, was 49 years old. SOF ¶ 30.

v. Home Depot U.S.A., Inc., 2004 U.S. Dist. LEXIS 145, at *9-10 (D. Mass. Jan. 8, 2004).[23]

Specifically, Plaintiff was laid off when Verizon, in its business judgment, decided to meet a decreasing workload by reducing the number of its Team Leaders.  SOF ¶ 18-25.  Thus, it is Plaintiff's burden to prove that Verizon's articulated reason is a pretext.  Abramian, 432 Mass. at 117; Lipchitz, 434 Mass at 504.  This he cannot do.

The crux of Plaintiff's claim is that he should have been selected for one of the Team Leader positions because he was a better performer than some of the Team Leaders retained. SOF Ex. 1, at 216-217.  It is well settled, however, that it is not the role of the Plaintiff or the Court to determine whether Verizon made the best employment decision.  See Mesnick v. Gen. Elec. Co., 950 F. 2d 816, 825 (1st Cir. 1991) (the court does not "sit as super personnel departments, assessing the merits – or even the rationality - of employers' nondiscriminatory business decisions"); Brunner v. Stone & Webster Eng'g Co. 413 Mass. 698, 703-74 (1992). Here, Verizon chose, as was its right, to compare the relative contributions of its Team Leaders and select those whose performance, as reflected in each Team Leader's resume and based on the personal knowledge of Pilat and D'Amato, demonstrated an ability to manage successfully in the NMC going forward.   As discussed above, the analysis undertaken by Pilat and D'Amato and the final selection of Plaintiff for layoff was not a mere mathematical exercise of calculating

---

[23]  If Plaintiff makes out a prima facie claim of discrimination, in the second stage Verizon must articulate a nondiscriminatory reason for its actions by stating "a lawful reason or reasons for its employment decision [and] producing credible evidence to show that the reason or reasons advanced were the real reasons."  Abramian, 432 Mass. at 116.  The employer's burden at stage two is one of production, not persuasion.  Blare v. Husky Injection Molding Sys. Boston, 419 Mass. 437, 442 (1995).  If the employer meets its burden of production at stage two, the presumption of discrimination drops from the case and the proceedings advance to the third stage, where the employee must show that the basis for the employer's decision was unlawful discrimination.  Abramian, 432 Mass. at 117.  At this stage, the plaintiff must produce evidence sufficient to disprove the employer's legitimate non-discriminatory reason.  Lipchitz v. Raytheon Co., 434 Mass. 493, 501 (2001).  "If the defendant's reasons are not discriminatory, and if the plaintiff does not prove that they are pretexts, the plaintiff cannot prevail." Matthews v. Ocean Spray Cranberries, 426 Mass. 122, 128 (1997).

length of service. Rather, Pilat and D'Amato sought the input of each of the Team Leaders, then compared that input to their own personal knowledge gained by observing the Team Leaders on a daily basis. Verizon management had more than sufficient information to conclude as they did that Plaintiff was the lowest ranked Team Leader. SOF ¶¶ 12-13, 23-27. Accordingly, Plaintiff's disagreement over the assessment of his performance by those charged with actually performing that assessment does not create a triable issue of fact and is insufficient to permit a finding of pretext. In sum, Plaintiff's entire age discrimination case rests on conjecture and surmise. The material, undisputed facts indicate that Plaintiff cannot produce sufficient evidence to support a rational finding that Verizon's reasons are false or that Plaintiff's age was the real reason for Verizon's actions. Accordingly, this Court should grant Verizon's motion for summary judgment as to Count VIII of Plaintiff's Complaint.

### 3.    Plaintiff's Age Discrimination Claim is Time Barred

Plaintiff's age discrimination claim must also be dismissed because he failed to file it within three years after the alleged unlawful practice occurred. See Mass. Gen. Laws ch. 151B § 9. Plaintiff filed his Complaint with the Massachusetts Superior Court on August 17, 2004. Thus, any claims arising prior to August 17, 2001 are time-barred. A cause of action accrues, triggering the statute of limitations period, when the plaintiff has notice of or learns of the event. Ching v. Mitre Corp., 921 F.2d 11, 14-15 (1st Cir. 1990). Where the notice is unequivocal, it is not necessary for the plaintiff to feel the full consequences of the event or for the event to be most painful for that action to accrue. Sch. Comm. v. Mass. Comm'n Against Discrimination, 423 Mass. 7, 11 n.8 (1996) (citing Del. State Coll. v. Ricks, 449 U.S. 250, 258 (1980)). The discriminatory act of which Plaintiff complains is Pilat's rejection of him for a Team Leader position, announced on July 30, 2001. At that time, Plaintiff "absolutely" believed that he was being terminated on the basis of age. SOF ¶ 29. Thus, the fact that Plaintiff had the opportunity

-15-

to seek other work for 30 days while he remained on the payroll does not extend the date on

which Plaintiff's claim accrued.  Adamczyk v. Augat, Inc., 52 Mass. App. Ct. 717, 721-722

(2001)(mere possibility of continued employment did not toll the statute of limitations for an age

claim under Chapter 151B); compare Wheatley v. Am. Tel. & Tel. Co., 418 Mass. 394, 396-399

(1994)(limitations period did not start to run until 10 days after termination, when plaintiff knew

or should have known that he had been or would be replaced by a person outside the protected

age group).  In addition, in his sworn Charge of Discrimination, Plaintiff admitted the last date of

discrimination was August 7, 2001. SOF Ex. 1, at 191; SOF ¶ 36.  Thus, even if this late date is

credited, a timely lawsuit would have to have been filed no later than August 7, 2004.  Because

Plaintiff failed to so, his ch. 151B claim must be dismissed.

### B.    Plaintiff Did Not Have Any Contracts of Employment With Verizon.

In Counts I, II, III, and V, Plaintiff alleges various claims of breach of contract, all arising

out of the termination of his employment and all of which fail as a matter of law.[24]  To state a

claim for breach of contract,  Plaintiff must show (1) there was a valid agreement supported by

consideration; (2) that Verizon breached its duties under the agreement, and (3) that the breach

caused Plaintiff damage.  Guckenberger v. Boston Univ., 974 F. Supp. 106, 150 (D. Mass. 1997).

Plaintiff cannot introduce competent evidence on any of these elements.

Plaintiff acknowledges that at all times he was an employee at will, that either Verizon or

he could terminate the relationship at any time with or without notice, and that he did not have

---

[24]    Specifically, Plaintiff alleges: (1) he could only be let go for cause (Count I); (2) that he had
an "annually renewable contract" (Count II);  (3) Verizon did not comply with its "policies" in its
treatment of him (Count III); and (4) that he was entitled to notice and an opportunity to cure any
deficiencies before he was terminated (Count V).  Count V, styled "Negligent Breach of Contract," must
be dismissed out of hand because there is no cause of action for negligent breach of contract in
Massachusetts.  See Ross v. Raytheon Co., 2001 Mass. Super. LEXIS 481, at *15 (Mass. Super. Ct. Nov.
1, 2001).  Moreover, an employer has no duty to provide an at-will employee with an opportunity to
remedy deficiencies.  See Wallace, 299 F.3d at 102.

any express employment contract with Verizon.  SOF ¶¶ 34-35; SOF Ex. 1, at 49-62.  Plaintiff

also received during the course of his employment several Codes of Conduct which reiterated

that, absent a written employment agreement signed by an authorized representative, all non-

union employees were employed at will.  Id.  Plaintiff has offered no facts to change this basic

reality or to demonstrate that Verizon and he reached a valid and binding agreement mandating

the length of his employment or the terms under which it could end.

Plaintiff relies heavily on his tenure with Verizon in an effort to alter his employment at-

will status to an employment contract running "from cradle to grave."  SOF Ex. 1 at 56-57.

According to Plaintiff, the terms of this lifetime "contract" were that he and Verizon would be

mutually loyal to each other.  SOF Ex.1, at 47-48, 62-66.  This theory is unavailing.  Mere

longevity with or professed loyalty to a company are insufficient to create a binding contract for

lifetime employment or create an implied contract of employment.  Reidy v. Travelers Ins. Co.,

928 F. Supp. 98, 106 (D. Mass. 1996) aff'd, 107 F.3d 1 (1997). [25]  Because Plaintiff had neither

an express or implied contract that precluded the termination of his employment, Counts I, II, III

and V fail as a matter of law and must be dismissed.

### C.    Plaintiff's Claims for Wrongful Discharge Fail as a Matter of Law.

In Counts IV and VI, Plaintiff alleges his employment relationship with Verizon was

wrongfully terminated in violation of public policy.[26]  Plaintiff, however, fails to allege any

---

[25]    Massachusetts law requires "strong proof" and particularly explicit expressions of intent to
establish the existence of a lifetime employment contract. Chesterton v. Chesterton, 1993 U.S. Dist.
LEXIS 19682, at *19-21 (D. Mass. 1993); O'Brien v. Analog Devices, Inc., 34 Mass. App. Ct. 905 (Mass.
App. Ct. 1993).  No proof, strong or otherwise, exists in the undisputed facts.

[26]    In Count IV, entitled "Wrongful Termination – Contract", Plaintiff alleges that Verizon
breached the implied covenant of good faith and fair dealing by terminating him "maliciously and in bad
faith" and in an "attempt to benefit financially at the plaintiff's expense."  Compl., at ¶¶ 25-26. An
employer breaches the implied covenant of good faith and fair dealing in the at-will employment
relationship when it terminates an employee in order to deprive the employee of compensation for past
service or where an employer's discharge of an employee is contrary to public policy.  Elicier v. Toys "R"

-17-

actionable public policy.  Within the well-established rule that  "[e]mployment at will is

terminable by either the employee or the employer without notice, for almost any reason or for

no reason at all," Massachusetts courts have carved out a very narrow exception for cases in

which "employment is terminated contrary to a well-defined public policy."  Wright v. Shriners

Hosp., 412 Mass. 469, 472 (1992) (citing Jackson v. Action for Boston Cmty. Dev., Inc., 403

Mass. 8, 9 (1988)).  In Wright, the Supreme Judicial Court held that "[r]edress is available for

employees who are terminated [1] for asserting a legally guaranteed right (e.g., filing workers'

compensation claim), [2] for doing what the law requires (e.g., serving on a jury), or [3] for

refusing to do that which the law forbids (e.g., committing perjury)."  Id. at 472-73 (citation and

internal quotations omitted).  The SJC also has recognized a fourth category of protected

activity: an employee cannot be discharged for complying with clear statutory expressions of

legislative policy.  See Flesner v. Technical Commc'ns. Corp., 410 Mass. 805, 811 (1991).

Nonetheless, "the public policy exception to the general rule . . . is quite narrow."  Mitchell v.

TAC Technical Servs., 50 Mass. App. Ct. 90, 93 (2000).

        The issue of whether a public policy violation exists is a question of law.  See Smith-

Pfeffer v. Superintendent of Walter E. Fernald State Sch. , 404 Mass. 145, 151 (1989); Mitchell,

50 Mass. App. Ct. at 93.  In support of his claim, Plaintiff alleges that he objected at a team

meeting to Pilat and D'Amato's request that the Team Leaders go "above and beyond the call of

---

Us, Inc., 130 F. Supp. 2d 307, 312 (D. Mass. 2001) (citing Upton v. JWF Businessland, 425 Mass. 756,
757 (1997); Fortune v. Nat'l Cash Register Co., 373 Mass. 96, 104-05 (1977)).  Because Plaintiff
concedes that Verizon has provided him all of the compensation earned during his employment, SOF Ex.
1, at 65, Plaintiff's claim for wrongful discharge under Count IV necessarily must be analyzed under the
public policy exception. Count VI, entitled "Wrongful Discharge – Tort",  alleges that Verizon's
termination of Plaintiff's employment and the course of dealings leading up to the termination were
"without cause" and in "bad faith," were "inconsistent with Plaintiff's justified expectations," and
violated public policy.  Compl., at ¶ 33.

duty" to correct errors made by the "CLEC arm" of Verizon, VADI.[27]  SOF Ex. 1, at 65-69, 82-84.  Plaintiff believed that this request was "out of the norm" and was not within his responsibility.  SOF Ex. 1, at 67-68, 82-84.  This single complaint about the proper processing of service orders is insufficient to state a valid public policy claim.  Indeed, the SJC has explicitly held that complaints to one's superiors about internal decision-making cannot create a public policy violation, and has further made clear that a company's decisions on how to operate administratively do not create an actionable violation.  Wright, 412 Mass. at 474-76; Smith-Pfeffer, 404 Mass. at 149-50.  The law is clear that "the internal administration, policy, functioning, and other matters of an organization cannot be the basis for a public policy exception to the general rule that at-will employees are terminable at any time with or without cause."  King v. Driscoll, 418 Mass. 576, 583 (1994); see also Perkins v. Commonwealth, 52 Mass. App. Ct. 175, 180 (2001).  In addition, even if Plaintiff were able to identify a valid public policy, the undisputed facts demonstrate that Plaintiff was not terminated for having made an objection.  Most telling is Plaintiff's testimony that other Team Leaders objected, yet were not laid off.  SOF Ex. 1, at 66-67.  Indeed, Plaintiff conceded at deposition that he did not know if his objection had anything at all to do with his layoff.  SOF Ex.1, at 67.  Accordingly, the undisputed facts and the well-established state of Massachusetts law compel the Court to grant summary judgment to Verizon on Counts IV and VI.

D.    **Plaintiff's Negligence Claim Fails as a Matter of Law and Undisputed Fact.**

In Count VII, Plaintiff contends that Verizon breached a duty of care owed to him by failing to use due care in evaluating him and making decisions about his "retention, promotion

---

[27]    Verizon Advanced Data Inc. ("VADI") was created as a condition of the merger of Bell Atlantic Corp. and GTE that formed Verizon in June 2000.  SOF ¶ 7.  During Plaintiff's employment as a Team Leader, the NMC processed requests from VADI to provide DSL service in a manner that paralleled the orders placed by CLECs.  SOF ¶ 7.

and tenure," resulting in his termination.  Compl., at ¶¶ 35-38.  At deposition, Plaintiff identified the sole breach of duty as Verizon's failure to train him in the SOP systems.  SOF Ex. 1, at 69-70.  This claim, like those that precede it, must be dismissed.   First, there is no duty on an employer to train and evaluate employees.  Treadwell v. John Hancock Mut. Life Ins. Co., 666 F. Supp. 278, 288 (D. Mass. 1987).  Second, any negligent act by Verizon in training or evaluating Plaintiff necessarily occurred before July 30, 2001, the date Plaintiff was told that he was not selected for a Team Leader position.  Because Plaintiff did not file this action until August 17, 2004, any claim for negligence is barred by the three-year tort statute of limitations,  Mass. Gen. Laws ch. 260 § 2A.  Moreover, to the extent that Plaintiff claims that he suffered personal injuries as a result of Verizon's actions arising out of and in the course of his employment, Plaintiff's claim is barred by the exclusivity provisions of the Massachusetts Workers' Compensation Statute, Mass. Gen. Laws ch. 152 § 24.  Green v. Wyman-Gordon Co., 422 Mass. 551, 558-60 (1996).  Finally, Plaintiff himself acknowledges that Pilat provided him with job shadowing opportunities at which Plaintiff was able to observe other Team Leaders answer SOP-related questions. SOF ¶ 14.  For all of these reasons, Plaintiff's negligence claim fails as a matter of law and undisputed fact, and should be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Verizon respectfully requests the Court grant its Motion for Summary Judgment on all counts of Plaintiff's Complaint.

Respectfully submitted,

The Defendant,
TELESECTOR RESOURCES GROUP, INC.
D/B/A VERIZON SERVICES GROUP,
By its attorneys,


/s/ John P. McLafferty
John P. McLafferty, BBO #639179
Felix J. Springer (pro hac vice)
DAY, BERRY & HOWARD LLP
 One International Place
 Boston, Massachusetts 02110
 (617) 345-4600

DATED: October 21, 2005


## CERTIFICATE OF SERVICE

I, John P. McLafferty, do hereby certify that on this 21st day of October, 2005, I caused a true copy of the foregoing to be hand delivered to Frank L. Fragomeni, Jr., Esquire, 15 Broad Street, Suite 501, Boston, Massachusetts 02109.


/s/ John P. McLafferty
John P. McLafferty