# UNREPORTED CASES

LEXSEE 2004 US DIST LEXIS 145

**WILLIAM ANDERSON, Plaintiff, v. HOME DEPOT U.S.A., INC., Defendant.**

**CIVIL ACTION NO. 02–11000–DPW**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*2004 U.S. Dist. LEXIS 145*

**January 8, 2004, Decided**

**DISPOSITION:** [*1] Defendant's Motion for Summary Judgment was granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, an at–will employee, was terminated from the job following his operation of a forklift without a spotter. He sued defendant employer, alleging it discriminated against him on the basis of age in violation of Mass. Gen. Laws. ch. 151B, and was estopped from firing him based on a written provision that a forklift violation would not result in termination. The employer moved for summary judgment on the claims.

**OVERVIEW:** The employee presented as evidence of discrimination against him the fact that when he was transferred, at his own request, and lost his status as a department head; however, he conceded his pay did not change. He also alleged stray discriminatory remarks, such as "you can't teach an old dog new tricks," but those comments were not sufficient to demonstrate an impermissible bias in the workplace, and the comments were not made by anyone with the authority to fire him. He was fired for failing to use a spotter while operating a forklift inside the store. Although there was a manual that contained a written warning that violating the forklift rule the first time would result in only minor discipline and not termination, the issue of whether the employer followed its own regulation was not relevant. The employee failed to show that the employer's motive in firing him was pretextual, or related in any way to his age. Also, the employee had no reasonable right to rely on the printed regulation as a promise that he would not be fired for violating the rule the first time.

**OUTCOME:** The motion for summary judgment was granted as to all claims.

**CORE TERMS:** termination, spotter, regulations, forklift, pretext, summary judgment, department head, demotion, mixed–motive, notice, discriminatory intent, prima facie case, discriminatory, terminated, deposition, at–will, employment decision, motive, promissory estoppel, license, unambiguous, played, safety violation, additionally, garden, disability, pretextual, terminate, spotting, customer

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it has the potential to affect the outcome of the suit under the applicable law, and a genuine issue is one that may reasonably be resolved in favor of either party.

*Labor & Employment Law > Discrimination > Age Discrimination > Other Laws*
[HN2] See Mass. Gen. Laws ch. 151B, § 4(1)(B).

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*
*Labor & Employment Law > Discrimination > Age Discrimination > Other Laws*
[HN3] For cases arising under Mass. Gen. Laws ch. 151B, Massachusetts courts have adopted the analytical framework used in federal employment discrimination cases arising under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., and the Age Discrimination in Employment Act, *29 U.S.C.S. § 621* et seq. Under the framework, a court can analyze a disparate treatment case in one of two ways: The first uses the burden–shifting pretext framework set forth in McDonnell Douglas Corporation v. Green, and the second involves the so–called mixed–motive analysis.

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*
[HN4] The McDonnell Douglas–Burdine framework in-

volves a three-step analysis consisting of a shifting allocation of evidentiary burdens. In the first step, the plaintiff has the initial burden of establishing a prima facie case by showing: (1) he or she is a member of a class protected by Mass. Gen. Laws ch. 151B; (2) he or she performed his job at an acceptable level; (3) he or she was terminated; and (4) his or her employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's. Once the employee has established a prima facie case, a burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Finally, if the employer offers such a reason, the burden shifts back to the plaintiff who bears the ultimate burden of proof of showing that the employer's proffered reason is mere pretext for unlawful discrimination.

***Labor & Employment Law > Discrimination > Age Discrimination > Defenses & Exceptions***
[HN5] The Age Discrimination in Employment Act does not stop a company from discharging an employee for any reason, fair or unfair, or for no reason, so long as the decision to fire does not stem from the person's age.

***Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis***
[HN6] To sustain the burden of persuasion on pretext, a discrimination plaintiff must demonstrate either that his or her dismissal was (1) more likely motivated by discrimination than by the explanation proffered by the defendant, or (2) the proffered explanation is unworthy of credence.

***Labor & Employment Law > Discrimination > Disability Discrimination > Proof of Discrimination***
[HN7] Under the mixed-motive analysis of alleged employment discrimination, a plaintiff need not show that the reason given by the employer is pretextual but rather need only show that an impermissible motive played a part in the employment decision.

***Labor & Employment Law > Discrimination > Disability Discrimination > Proof of Discrimination***
[HN8] The mixed-motive analysis of alleged employment discrimination is limited to those infrequent cases in which a plaintiff can demonstrate with a high degree of assurance that the employment decision of which he or she complains was the product of a mixture of legitimate and illegitimate motives. Thus, to warrant a mixed-motive analysis, a plaintiff must offer strong evidence that proscribed criteria played a motivating part in the employment decision. In other words, a plaintiff must provide evidence that if believed, results in an inescapable, or at least highly probable, inference that a forbidden bias was present in the workplace.

***Labor & Employment Law > Discrimination > Age***

***Discrimination > Proof of Discrimination***
[HN9] Stray remarks in the workplace, statements by people without the power to make employment decisions, and statements made by decision makers unrelated to the decisional process itself do not suffice to satisfy the plaintiff's threshold burden that a forbidden bias was present in the workplace. Stray remarks suggestive of impermissible bias do not constitute the sort of evidence that places a case in the mixed motive category and requires the employer to prove that its decision was made only on the basis of legitimate criteria.

***Civil Procedure > Summary Judgment > Supporting Papers & Affidavits***
***Labor & Employment Law > Discrimination > Age Discrimination > Proof of Discrimination***
[HN10] Although discrimination claims often turn on issues which are ordinarily jury questions, like motive or intent, summary judgment is appropriate where the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.

***Labor & Employment Law > Employment Relationships > At-Will Employment***
[HN11] The general rule is that an at-will employee may be terminated at any time for any reason or for no reason at all.

***Labor & Employment Law > Employment Relationships > At-Will Employment***
***Contracts Law > Consideration > Promissory Estoppel***
[HN12] To avoid the entry of summary judgment on an estoppel claim, a plaintiff at-will employee must show that he or she reasonably relied on an unambiguous promise.

***Contracts Law > Consideration > Promissory Estoppel***
[HN13] A promise is a manifestation of an intention to act or refrain from acting in a specified way, so as to justify a promisee in understanding that a commitment has been made.

**COUNSEL:** For William Anderson, Plaintiff: William F. Green, LEAD ATTORNEY, Flynn & Clark, Cambridge, MA.

For Home Depot U.S.A., Inc., Defendant: Robert P. Joy, LEAD ATTORNEY, Morgan, Brown & Joy, Boston, MA.

**JUDGES:** DOUGLAS P. WOODLOCK, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** DOUGLAS P. WOODLOCK

**OPINION:**

## MEMORANDUM AND ORDER

This suit arises out of plaintiff William Anderson's termination of employment with defendant Home Depot U.S.A., Inc. ("Home Depot"). Anderson's Complaint alleges that in firing him, Home Depot discriminated on the basis of both age and disability in violation of Mass. Gen. Laws. ch. 151B ("Chapter 151B"); the Complaint also alleged claims of breach of contract and promissory estoppel. Home Depot has moved for summary judgment on all counts, and Anderson opposes the motion only as to the age discrimination and promissory estoppel claims. n1 I will grant Home Depot's motion and accordingly dismiss all counts.

> n1 In his opposition brief, Anderson states: "Mr. Anderson does not argue his contract, and disability/perceived disability counts." Plaintiff's Opposition to Defendant's Motion for Summary Judgment, at 16. At the hearing, Anderson's counsel acknowledged that he was not pursuing the contract or disability claims as his opposition suggests. I note Home Depot has moved to strike as untimely Anderson's Opposition Memorandum and his Statement of Material Facts in Dispute. However, I choose to address Anderson's opposition on the merits and deny Home Depot's motion to strike.

[*2]

## I. BACKGROUND

Unless otherwise noted, the following facts are undisputed. Anderson began working 'at Home Depot in November 1992 as a sales associate in Home Depot's Somerville, Massachusetts store. Defendant's Statement of Material Facts as to Which There is No Genuine Dispute Ex. ("DE") 1, at 26. Anderson never had a written employment contract with Home Depot, and he understood that his employment was at-will and for an indefinite period of time. n2 Id. at 38, 45–46. Anderson was originally hired in the Building Department of the Somerville store, but shortly after beginning work he was transferred to the Garden Department, where he was promoted to department head in 1997. Id. at 26–27.

> n2 The Home Depot 1992 Orientation Guide/Handbook ("Handbook"), which Anderson acknowledges set forth the guidelines for his employment, DE 1, at 45, stated:
>
> > Employment with Home Depot is by mutual agreement between each employee and the Company. This employment may continue as long as both par-

ties agree and it may be terminated by either party without notice to the other. DE 10.

Anderson also signed an "Acknowledgment Form" on November 21, 1992, which provided, in part:

> Neither the Handbook nor any provisions of the Handbook is an employment contract or any other type of contract.
>
> ...
>
> I understand that my employment will be for no definite term, such that I will enjoy the right to terminate my employment at any time, at my convenience, with or without cause or reason. I further understand that Home Depot will have the same right. This status can only be modified if such modification is in writing and signed by both me and the President of the Company.

DE 11.

Anderson disputes that he read and understood the terms outlined in the Handbook when he signed the form. Plaintiff's Statement of Material Fact in Dispute and Statement of Additional Material Facts that Preclude Summary Judgment, at 2–3. However, in his deposition, he acknowledged that he understood at the time of his employment with Home Depot that he was an at-will employee. DE 1, at 46.

[*3]

In April of 1998, Home Depot, at Anderson's own request, transferred Anderson from the Somerville store to the Tewksbury, Massachusetts store. Id. at 67–68. Anderson was classified as a sales associate, rather than as department head, in the Tewksbury store. n3 Id. at 68. Anderson believed that he had been transferred as a department head, and he inquired with Jason Carter, the Tewksbury store manager, why Carter did not acknowledge his department head position. Carter told Anderson that he would make Anderson department head as soon as Anderson registered for the position on the Home Depot job database in accordance with company procedure. Id. at 79–81. Anderson, however, refused to register because he believed he never had lost the position and therefore should not be required to reapply for it. Id. at 80.

n3 Anderson contends that this change in classification was a de facto demotion. Plaintiff's Statement of Material Fact in Dispute and Statement of Additional Material Facts that Preclude Summary Judgment, at 5. However, in his deposition, he conceded that his pay did not change as a result of the position change. DE 1, at 80–81.

[*4]

On March 21, 2001, Anderson and Doug Romaine, the head of the Garden Department, unloaded an 18-wheel truck in the parking lot using a forklift. DE 2, at 39. On that day, Debra Sheiner, then the Director of Safety for Home Depot's New England Division, happened to be in the Tewksbury store to discuss safety and loss prevention issues with Susan O'Farrell, then the Controller for Home Depot's New England Division. n4 DE 3, at 36. At some point that day, Sheiner and O'Farrell were in or around the Garden section of the store, and they observed Anderson operating a forklift in the Garden department. Id. at 45. Under Home Depot policy, personnel using a forklift are required to have a "spotter" when inside the building. n5 O'Farrell did a thorough search of the surrounding area but did not find any associates who could have been acting as a spotter. DE 4, at 6.

n4 Sheiner and O'Farrell are currently a Regional Loss Prevention Manager and the Vice President of Finance for the Central Division, respectively.

n5 In February 2001, Home Depot set forth regulations stating that violation of the spotter policy would result in immediate termination. Anderson disputes that these new regulations ever were properly distributed to the New England stores, and he contends that the March 2000 regulations were still in effect in March 2001. DE 15. The March regulations contained a three-step process for spotter violations in which the first violation resulted in a written warning, the second resulted in a final written warning and loss of license for 30 days, and the third violation resulted in termination. DE 14. I discuss the specifics of the spotter policy and its discipline procedures as they relate to specific claims below.

[*5]

Sheiner and O'Farrell reported the incident to Carter who in turn questioned Anderson. Anderson claimed that Romaine and Katie Grenda, another employee, were at various times spotting him. DE 2, at 65–66.

Later, Carter told Greg Morris, an assistant manager, to obtain Anderson's forklift license while the incident was investigated further. Id. 79, 81–82. Morris took Anderson's license and also prepared an "Associate Performance Notice" indicating that Anderson's license was suspended, that Anderson would attend forklift recertification classes, and that any further violations would result in his termination from employment. n6 DE 17.

n6 Anderson claims Sheiner took him directly to Morris, not Carter. Affidavit of William Anderson, P 33. Additionally, the parties dispute whether Carter instructed Morris to prepare the form. Anderson apparently believes that the issuance of the notice, which in essence is a warning, undermines the legitimacy of Carter's subsequent decision to terminate him for the same violation. Carter, however, testified that he did not know Morris had issued the notice when he decided to terminate Anderson, DE 2, at 82–83, and Morris testified that Carter did not instruct him to prepare the form and he did so out of "habit." DE 6, at 78–79. Anderson testified at his deposition that Morris told him that Carter had instructed Morris to prepare the form. That testimony, however, is hearsay, and I do not consider it for the purposes of this motion. This dispute, in any event, does not materially affect the summary judgment motion.

[*6]

Carter interviewed Grenda and Romaine, and according to Carter, both stated that they were not spotting Anderson at the time Sheiner and O'Farrell saw him operating the forklift. DE 2, at 116–18, 139–40. Both Grenda and Romaine prepared written statements to that effect. n7 DEs 18, 19. On March 27, 2001, Carter prepared a second "Associate Performance Notice" notifying Anderson that his employment had been terminated:

On March 27, 2001 after investigation, it has been determined that Bill had no spotter while operating a forklift on 3/21/01 in the outside garden area. In violation of company policy, Bill is being terminated for safety violation. (Lift equipment safety standards.)

DE 20. At the time of his termination, Anderson was 54 years old. DE 1, at 9.

n7 Romaine wrote that he had been unloading with Anderson and had been acting as a spotter but that he had left the area before Sheiner and O'Farrell walked by. DE 18. He stated that he had

seen Grenda and thought she could or would spot Anderson during his absence. Id. Grenda, on the other hand, stated that although she had been in the area, she left the area to help a customer before Sheiner and O'Farrell came into the area, assuming that Romaine was spotting Anderson. DE 19.

[*7]

Anderson brought this action in April of 2002 in the Massachusetts Superior Court. Home Depot thereafter removed the case under diversity jurisdiction grounds.

## II. DISCUSSION

### A. Standard of Review

[HN1] Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)*, and a "genuine" issue is one that "may reasonably be resolved in favor of either party." *Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997)*.

### B. Age Discrimination

Chapter 151B states that [HN2] it shall be unlawful practice:

> For an employer in the private sector, by himself or his agent, because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment [*8] such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

Mass. Gen. Laws ch. 151B § 4(1)(B).

[HN3] For cases arising under Chapter 151B, Massachusetts courts have adopted the well-established analytical framework used in federal employment discrimination cases arising under *Title VII* and the *Age Discrimination in Employment Act*. See *Wynn & Wynn, P.C. v. Mass. Comm'n Against Discrimination, 431 Mass. 655, 729 N.E.2d 1068 (2000)*. Under the framework, a court can analyze a disparate treatment case in one of two ways: The first uses the burden-shifting "pretext"

framework set forth in *McDonnell Douglas Corporation v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*, and in *Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252–53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*. See *Wheelock Coll. v. Mass. Comm'n Against Discrimination, 371 Mass. 130, 355 N.E.2d 309 (1976)* (adopting McDonnell Douglas-Burdine framework for Chapter 151B cases). The second involves the so-called "mixed-motive" analysis established [*9] in *Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)*. See *Wynn, 431 Mass. 655, 729 N.E.2d 1068* (using "mixed-motive" analysis).

Which analysis—"pretext" or "mixed-motive"—applies depends on the type of evidence the plaintiff offers to prove discriminatory intent. If the plaintiff can demonstrate some direct evidence of discriminatory intent, the latter applies, but if the plaintiff can muster only indirect, circumstantial evidence of discrimination the former applies. *Wynn, 431 Mass. at 665–66*. I find that under either analysis, Anderson has not adduced sufficient evidence to create a genuine issue of material fact as to his Chapter 151B age discrimination claim.

#### (1) Pretext Model

[HN4] The McDonnell Douglas-Burdine framework involves a three-step analysis consisting of a triple allocation of evidentiary burdens. *Wynn, 431 Mass. at 665*. In the first step, the plaintiff has the initial burden of establishing a prima facie case by showing: (1) he is a member of a class protected by Chapter 151B; (2) he performed his job at an acceptable level; (3) he was terminated; n8 and (4) his employer sought to fill the plaintiff's [*10] position by hiring another individual with qualifications similar to the plaintiff's. *Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441, 646 N.E.2d 111 (1995)*. Once the employee has established a prima facie case, a burden of production shifts to the employer to "articulate a legitimate, nondiscriminatory reason" for the adverse employment action. Id. Finally, if the employer offers such a reason, the burden shifts back to the plaintiff who bears the ultimate burden of proof of showing that the employer's proffered reason is mere "pretext" for unlawful discrimination. *Id. at 442*.

n8 Anderson at various points refers to his alleged demotion from department head to sales associate upon his transfer to the Tewksbury store. Given that in his Complaint, Anderson alleged discrimination only with regard to his termination, he cannot rely on the alleged demotion as a basis for his age discrimination claim, I find the "demotion" adds no other weight to his Complaint.

2004 U.S. Dist. LEXIS 145, *10

Here, while **[*11]** he can demonstrate the first three elements of a prima facie case, n9 Anderson has not offered any evidence that Home Depot sought to fill his position. Anderson confusingly argues that this element is not relevant to his case because his de facto demotion from department head to sales associate did not involve a specific position but merely involved a change in title. Insofar as his claims concern his termination, rather than his alleged demotion, see supra note 8, Anderson's arguments are misplaced. Accordingly, his claims fail because he has not established the fourth element of a prima facie case.

n9 Home Depot argues that Anderson has not established the second element—that he performed the job at an acceptable level—because he violated established safety policy. Home Depot, however, confuses its burden to produce a legitimate, nondiscriminatory reason for termination with the job qualification prong of Anderson's prima facie case. Anderson had been an employee at Home Depot for a number of years and had even become a department head at the Somerville store. Thus, I find that his performance was acceptable and that he satisfies the second element of his prima facie case.

**[*12]**

Even assuming that Anderson can establish a prima facie case, his claim fails in substance because he has not adduced sufficient evidence of Home Depot's discriminatory intent to survive the defendant's well-founded motion for summary judgment. Home Depot has offered a legitimate, nondiscriminatory reason for Anderson's termination: it contends that the reason for his termination was his failure to comply with the forklift safety procedures. Anderson has not produced any evidence that this reason was pretextual and that the real basis for his termination was Home Depot's age discriminatory animus.

Anderson contends that Home Depot's decision to terminate him was not justified for a number of reasons. First, he argues that he did not have proper notice of the new February 2001 safety regulations under which a single violation was grounds for immediate termination. n10 He additionally argues that he did in fact have spotters during the incident leading to his termination and, moreover, that the spotter policy did not even apply to the situation in the first place because its purpose was to protect customers and there were no customers in the area at the time.

n10 The parties have submitted a barrage of papers related to this issue. Home Depot submitted with its summary judgment motion the affidavit of Aron King, a Home Depot trainer in the Tewksbury store. King stated in his affidavit that in February 2001, he conducted forklift license re-certification classes at the Tewksbury store in which employees were notified of the February 2001 standards and that he specifically recalled that Anderson attended two of those classes. In his opposition brief, Anderson disputed Home Depot's contention that the February 2001 standards were implemented as to him or any other employees in the Tewksbury store, and he has moved pursuant to *Fed. R. Civ. P. 56(f)* to depose King. Home Depot submitted with its reply brief the affidavits of Kevin Flynn and Lee Anne Dunfey, employees of the Tewksbury store who stated that they attended the certification trainings held by King. Anderson has moved to depose Flynn and Dunfey and to file with his opposition motion the affidavit of Joseph Bucchio who rebuts King's statement. Home Depot in turn has moved to strike Bucchio's affidavit.

Each of these affidavits and motions concern the same issue: whether Anderson (and other Tewksbury store employees) were given adequate notice of the February 2001 standards. Drawing all inferences in favor of Anderson, I assume for the purposes of this motion that he did not have proper notice prior to the March 2001 incident leading to his termination. Even having made such an assumption, I find that summary judgment is appropriate and there is no need to resolve each of the individual motions pertaining to this issue.

**[*13]**

Even ignoring that such contentions lack evidentiary support, they entirely miss the mark. There is no evidentiary dispute that Sheiner and O'Farrell claimed to have observed Anderson using a forklift without a spotter, which constituted grounds for immediate termination under the safety standards dated February 2001. n11 It is also undisputed that Romaine and Grenda, who Anderson claimed were his spotters at the time made written statements that they were not spotting him at the time. Furthermore, Carter testified in his deposition that in firing Anderson he was aware of and acted pursuant to the February 2001 regulations, which authorized immediate termination for a firsttime spotter violation. Indeed the written performance notice informing Anderson of his termination explicitly stated that his termination resulted from his violation of the forklift safety policy.

n11 Home Depot's "New England Division Safety Standards for Lift Equipment—Revised February 2001" states:
A spotter must be utilized at all times

when operating lift equipment inside store, outside garden and all loading/unloading customer traffic zones. Spotters' responsibilities include insuring the 10 ft zone of safety around all lift equipment. This is applicable to all hours the store is open.

...

*** ANY VIOLATION OF THE ABOVE STANDARDS WILL RESULT IN IMMEDIATE TERMINATION***

[*14]

Whether Anderson had adequate notice of the safety regulations—or whether Home Depot properly applied the regulations to the incident at issue—does not go toward satisfying Anderson's burden of showing that the reason Home Depot has offered is pretext for discrimination. n12 Even if Home Depot's application of its forklift safety policy was not fair—and drawing all inferences in Anderson's favor I will assume it was not—Anderson has not offered any evidence to show the reason was pretextual; in other words, Anderson has not shown that the safety violation was not the real reason that Home Depot fired him and that his age was. See *Freeman v. Package Mach. Co., 865 F.2d 1331, 1341 (1st Cir. 1988)* [HN5] ("[ADEA] does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision to fire does not stem from the person's age.").

n12 Such questions, however, will be taken up as to Anderson's promissory estoppel claim, as discussed below.

Anderson [*15] argues that Home Depot's discriminatory intent is evidenced both by his alleged demotion from department head to sales associate and by remarks several Home Depot managers made with regard to age. As to the demotion, it is unclear how the change in title—even if it was, as Anderson contends, wholly unjustified—is evidence of discriminatory animus. Anderson, of course, contends that the alleged demotion itself resulted from age discrimination but such conclusory allegations cannot be the evidentiary basis supporting his termination claim. As to the discriminatory remarks, Anderson has identified the following statements:

(a) Eric Brenner, a co-manager of the Somerville store stated, "You can't teach an old dog new tricks." DE 1, at 89.

(b) Jim Farrell, a department head in the Somerville store and a "guy named John" stated, "All we hire is relics around here." Id. at 90-92.

(c) Chuck Lemphure, a district manager, stated before Anderson's transfer that he did not like department heads over the age of thirty. n13 Id. at 70.

(d) Romaine, in the Tewksbury store referred to Anderson as a "friggin' old fart." Id. at 85.

(e) Greg Morris, an assistant [*16] manager of the Garden Department in the Tewksbury store repeatedly called Anderson "grumpy." Id. at 87.

n13 Anderson alleges that Lemphure became the district manager over the Tewksbury store in 1998.

These remarks, however, do not support the conclusion that the safety violation reason was mere pretext for discrimination. [HN6] To sustain his burden of persuasion on pretext, Anderson must demonstrate either that his dismissal was (i) "more likely motivated" by discrimination than by the explanation proffered by Home Depot, or (ii) the proffered explanation is "unworthy of credence." *Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 35 (1st Cir. 2001)* (quoting *Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).* The remarks are sufficient to do neither.

The evidence in the record indicates that Carter was the sole decision maker with regard to Anderson's termination, and Anderson has not shown that any the remarks were in any way connected to [*17] Carter's decision. While they may be evidence of general discriminatory animus in the workplace, the remarks do not show that discriminatory intent played any role in Anderson's termination, and thus, they are insufficient to prove that Home Depot's proffered reason for Anderson's termination was pretextual. *Straughn, 250 F.3d at 36* (" Mere generalized 'stray remarks,' arguably probative of bias against a protected class, normally are not probative of pretext absent some discernible evidentiary basis for assessing their temporal and contextual relevance."); *McMillan v. Mass. Soc. for Prevention of Cruelty To Animals, 140 F.3d 288, 301 (1st Cir. 1998),* cert. denied, *525 U.S. 1104, 142 L. Ed. 2d 772, 119 S. Ct. 870 (1999)* (Probativeness of remarks for pretext inquiry is "circumscribed if they

were made in a situation temporally remote from the date of the employment decision, or if they were not related to the employment decision in question or were made by nondecisionmakers" (citations omitted)). I therefore find that Anderson's Chapter 151B claim does not survive summary judgment under a pretext model analysis.

### (2) Mixed–Motive Model [*18]

[HN7] Under the mixed–motive analysis, a plaintiff need not show that the reason given by the employer is pretextual but rather need only show that an impermissible motive played a part in the employment decision. *Wynn, 431 Mass. at 666.* Anderson argues that under such an analysis he has adduced sufficient evidence to survive summary judgment because the discriminatory remarks made by Anderson's fellow employees, noted above, show that there was discriminatory intent played a role in his termination.

[HN8] The mixed–motive analysis, however, is limited "to those infrequent cases in which a plaintiff can demonstrate with a high degree of assurance that the employment decision of which [he] complains 'was the product of a mixture of legitimate and illegitimate motives.'" Id. (quoting *Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (1st Cir. 1999).* Thus, to warrant a mixed–motive analysis, a plaintiff must offer strong evidence that proscribed criteria played a motivating part in the employment decision. *Wynn, 431 Mass. at 667.* In other words, a plaintiff must provide evidence that "if believed, results in an inescapable, or at [*19] least highly probable, inference that a forbidden bias was present in the workplace." Id. (quoting *Johansen v. NCR Comten, Inc., 30 Mass. App. Ct. 294, 300, 568 N.E.2d 611 (1991),* cert. denied, *410 Mass. 1102, 573 N.E.2d 984 (1991).*

Anderson has not provided such evidence. Just as the discriminatory remarks to which he points were not sufficiently tied to the decisional context to demonstrate animus for the purposes of pretext analysis, neither do they constitute direct evidence of discriminatory intent for the purposes of a mixed–motive analysis. *Wynn, 431 Mass. at 667* [HN9] ("Stray remarks in the workplace, statements by people without the power to make employment decisions, and statements made by decision makers unrelated to the decisional process itself do not suffice to satisfy the plaintiff's threshold burden in these cases."); *Johansen, 30 Mass. App. Ct. at 302* ("Stray remarks suggestive of impermissible bias do not constitute the sort of evidence that places a case in the mixed motive category and requires the employer to prove that its decision was made only on the basis of legitimate criteria.").

[HN10] Although discrimination claims often turn [*20] on issues which are ordinarily jury questions, like motive or intent, summary judgment is appropriate where "the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990); Vesprini v. Shaw Indus., Inc., 221 F. Supp. 2d 44, 53 (D. Mass. 2002),* aff'd, *315 F.3d 37 (1st Cir. 2002);* see also *Brunner v. Stone & Webster Eng'g Corp., 413 Mass. 698, 603 N.E.2d 206 (1992)* (summary judgment for defendant where plaintiff failed to offer evidence sufficient to carry burden of persuasion on employer's discriminatory motive); *McKenzie v. Brigham & Women's Hosp., 405 Mass. 432, 541 N.E.2d 325 (1989)* (same). I find that this is such a case, and accordingly, I grant Home Depot's motion for summary judgment as to Anderson's Chapter 151B age discrimination claim.

### C. Promissory Estoppel

It is clear that Anderson was an at–will employee of Home Depot. Anderson signed an "Acknowledgment Form" on November 21, 1992, which provided, in part:

> I understand that my employment will be for no definite term, such that [*21] I will enjoy the right to terminate my employment at any time, at my convenience, with or without cause or reason. I further understand that Home Depot will have the same right. This status can only be modified if such modification is in writing and signed by both me and the President of the Company.

DE 11. Additionally, Anderson acknowledged at his deposition that he understood the at–will nature of his employment.

[HN11] The general rule is that an at–will employee may be terminated at any time for any reason or for no reason at all. *Upton v. JWP Businessland, 425 Mass. 756, 682 N.E.2d 1357 (1997); Folmsbee v. Tech Tool Grinding & Supply, Inc., 417 Mass. 388, 394, 630 N.E.2d 586 (1994).* [HN12] To avoid the entry of summary judgment against him on his estoppel claim, Anderson must show that he reasonably relied on an unambiguous promise. *Upton, 425 Mass. at 760.* I find that he can show neither that Home Depot made an unambiguous promise not to fired him for his first spotter violation nor that he reasonably relied on what he viewed as such a promise.

Anderson contends that the February 2001 safety standards, under which a first-time spotter violation would be grounds [*22] for immediate termination, did not apply to him in March 2001 because the standards had not been implemented in the Tewksbury store and he therefore did not have adequate notice of the new standards. It is

clear, however, that given the at–will nature of Anderson's employment, Home Depot was not required to give him notice of the change in the grounds for termination, as it could have fired him for no cause at all. Anderson nevertheless contends that by implementing "Critical Operating Safety Standards" in March 2000, which set forth a three-step disciplinary procedure with termination as the third step, Home Depot made an unambiguous promise to him that it would follow that procedure. n14 This argument is entirely without merit.

n14 Home Depot maintains that even under the March 2000 regulations it had the authority to terminate an employee for a single spotter violation. The standards, however, state that:

> violations of [spotter standard] *will result* in the following: (Up to and including immediate termination)

| | |
|---|---|
| * 1st Violation = | Written Warning |
| * 2nd Violation = | Final Written Warning & Loss Of License For 30 Days. |
| * 3rd Violation = | Termination |

DE 14 (emphasis added). Drawing all inferences in Anderson's favor, I find that the issue of whether the March 2000 standards warrant termination for a first–time spotter violation is, at the very least, disputed.

[*23]

Nothing in the March 2000 standards indicates a promise on the part of Home Depot. The March 2000 standards merely set forth several safety guidelines and disciplinary procedures. Nowhere do they state or imply that the standards will apply unless proper notice is given to employees of any changes. [HN13] A promise is a "manifestation of an intention to act or refrain from acting in a specified way, so as to justify a promisee in understanding that a commitment has been made." *Rhode Island Hosp. Trust Nat'l Bank v. Varadian, 419 Mass. 841, 849–50, 647 N.E.2d 1174 (1995).* I find no evidence of such manifestation of intention in the March 2000 standards.

Even if an unambiguous promise can be read into the March 2000 standards, Anderson's reliance on such a promise would not have been reasonable. n15 Anderson knew that his employment was at–will. In seeking employment with Home Depot, Anderson submitted a signed application form which stated, in part:

> I hereby further acknowledge that I am expected to abide by all company rules and regulations, written or unwritten, promulgated

by the Company, my Store Manager or my supervisor, but that such rules and regulations do not create a contract [*24] between me and the Company or otherwise restrict the right of either me or the company to terminate the employment relationship. I understand these rules and regulations may be subject to change at any time.

DE 9. Additionally, after Home Depot hired him, Anderson signed an "Acknowledgment Form," which stated, in part:

> I understand and agree that the Company may change and modify policies or procedures relating to employment matters without notice to me. I understand and agree these policies and procedures are to be interpreted and applied by the Company in its sole discretion, whose decision in this regard will be final.

DE 11. Finally, in his deposition, Anderson acknowledged that he knew of a prior instance in which an employee had been terminated for a first violation of the spotter guideline. n16 DE 1, at 154.

n15 I note here that from a public policy perspective, Anderson's argument is quite unattractive. In essence, he contends that in relying on the standards set forth by Home Depot he should have been able freely to violate the spotter policy with the assurance that he would get at least one more chance

2004 U.S. Dist. LEXIS 145, *24

before termination.

[*25]

n16 Home Depot also contends that as a result of a safety violation in 1997, Anderson had been informed in an "Associate Performance Notice" that subsequent safety violations would result in immediate termination. However, the notice states: "Any further instances will result in immediate termination!" DE 12. Because it is unclear whether "instances" refers to the particular type of violation that gave rise to the notice or to safety violations generally, I do not consider it probative for present purposes.

Given this background, Anderson's reliance on the March 2000 standards as an assurance that he would not be terminated for a first–time spotter violation was not reasonable. Thus, I find that Anderson's promissory estoppel claim fails as a matter of law.

**III. CONCLUSION**

For the reasons set forth more fully above, Home Depot's Motion for Summary Judgment on all counts is GRANTED.

/s/ Douglas P. Woodlock

UNITED STATES DISTRICT JUDGE

LEXSEE 14 MASS. L. REP. 27

**Joseph S. Ross v. Raytheon Company**

**CA 99-5530**

**SUPERIOR COURT OF MASSACHUSETTS, AT MIDDLESEX**

*14 Mass. L. Rep. 27; 2001 Mass. Super. LEXIS 481*

**November 1, 2001, Filed**

**DISPOSITION:** [*1] Defendant's motion for summary judgment was granted as to Counts IV and V and was granted, in part, as to Counts III and VI. Defendant's motion for summary judgment was denied as to Counts I and II and denied, in part, as to Counts III and VI.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee filed suit against defendant employer for age discrimination, breach of contract, negligent breach of contract terms, negligent misrepresentation, and promissory estoppel. The employer moved for summary judgment.

**OVERVIEW:** The employee did not file his complaint with the Massachusetts Commission Against Discrimination until over a year after learning of the final act of discrimination. The employee argued that the statute of limitations must be tolled because the employer held out the possibility of further employment and actually promised him employment. The superior court concluded that the statute was tolled as to both discrimination claims because of the promises made to the employee. The employer argued that the promise made by the vice president was unenforceable. The court found a genuine issue of fact as to what was promised, however, the dispute was not material. The promise of an unspecified position on unspecified terms was too indefinite and ambiguous to be enforceable as a matter of law. However, with respect to the two alleged promises for specific positions, there are genuine issues of material fact. The court noted that negligent breach of contract terms was not a recognized cause of action in Massachusetts. Finally, the court found the employer's argument that the employee's submissions were devoid of evidence of any pecuniary loss persuasive.

**OUTCOME:** The employer's motion for summary judgment was denied as to the claims of age discrimination and promise of specific positions. The motion was allowed as to claims for the breach of contract, negligent breach of contract terms, negligent misrepresentation, and promissory estoppel.

**CORE TERMS:** summary judgment, statute of limitations, terminated, breach of contract, conditions precedent, promissory estoppel, matter of law, enforceable, termination, promised, negligent misrepresentation, age discrimination, moving party, unenforceable, six-month, tolled, contingent, condition precedent, pecuniary loss, indefinite, transition, genuine, tolling, issues of material fact, statute of limitations period, doctrine of equitable tolling, enforceable contract, limitations period, cause of action, triable issue

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] Summary judgment is appropriate when no material facts are in dispute and the moving party is entitled to judgment as a matter of law. *Mass. R. Civ. P. 56(c)*.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
[HN2] The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and showing that the summary judgment record entitles the moving party to judgment as a matter of law. If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a material fact in order to defeat the motion.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
[HN3] To maintain a claim for age discrimination under Mass. Gen. Laws ch. 151B, a complaint must be filed with the Massachusetts Commission Against Discrimination within six months after the alleged act of discrimination. *Mass. Gen. Laws ch. 151B, § 5*. However, the six-month statute of limitations may be tolled based on the doctrine of equitable tolling. Equitable tolling is applicable where the prospective plaintiff did not have and could not have

had with due diligence, the information to bring suit in order to assert his legal rights.

### Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses

[HN4] The statute of limitations in an age discrimination case is only triggered by an unequivocal discharge, and that an individual is not unequivocally discharged if an employer continues to hold out the possibility of employment.

### Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses

[HN5] Defendant's representations of possible future employment within the company may toll the statute of limitations under the doctrine of equitable estoppel when these representations lull the employee into an untimely filing.

### Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses
### Labor & Employment Law > Discrimination > Age Discrimination > Other Laws

[HN6] To prevail on an age discrimination claim under the Massachusetts Equal Rights Act, *Mass. Gen. Laws ch. 93, §§ 102, 103*, the plaintiff must also comply with the procedural requirements of Mass. Gen. Laws ch. 151B. The procedural requirements include the filing of the initial complaint with the Massachusetts Commission Against Discrimination within the six–month statute of limitations period. *Mass. Gen. Laws ch. 151B, § 5.*

### Contracts Law > Breach > Causes of Action

[HN7] To prevail on a claim for breach of contract, the plaintiff must establish that there was a valid and enforceable contract between the parties. The court must determine whether the terms of an alleged agreement are too indefinite to constitute an enforceable contract. The interpretation of a contract and whether it is legally enforceable in light of indefinite terms is a question of law for the court.

### Contracts Law > Consideration > Enforcement of Promises

[HN8] All conditions precedent must be satisfied in order to enforce a contract. A condition precedent defines an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract. A contract will not be enforceable if the conditions precedent are unfulfilled.

### Contracts Law > Contract Interpretation > Interpretation Generally

[HN9] Uncertainty is not necessarily fatal to a contract's enforceability. Courts are willing to impute terms into a contract if the parties have specified formulae and procedures that can narrow any uncertainties to the point that

an agreement is binding.

### Torts > Business & Employment Torts > Negligent Misrepresentation

[HN10] In order to recover for negligent misrepresentation, a plaintiff must prove that the defendant, in the course of its business, negligently supplied false information for the guidance of another, causing pecuniary loss to the other by his justifiable reliance upon the information. In a claim for negligent misrepresentation, the plaintiff is only entitled to traditional out of pocket or pecuniary losses, not to the benefit of the bargain.

### Contracts Law > Consideration > Promissory Estoppel

[HN11] A claim for promissory estoppel permits recovery if: (1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise. An action for promissory estoppel is analogous to a contract action. The plaintiff, in an action for promissory estoppel, must prove all the elements that would be necessary to satisfy a contract claim except for consideration. Accordingly, the promise that is allegedly relied upon by the plaintiff must rise to the level of an enforceable promise in the contractual sense.

**JUDGES:** Raymond J. Brassard Justice of the Superior Court.

**OPINIONBY:** Raymond J. Brassard

**OPINION:** MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause of action arises out of the plaintiff Joseph S. Ross's ("Ross") inability to obtain further employment within the defendant Raytheon Company ("Raytheon") and his subsequent termination. Ross alleges that his failure to secure certain positions within Raytheon constitutes claims for age discrimination under G.L.c. 151B (Count I), age discrimination under *G.L.c. 93, §§ 102* and *103* (Count II), breach of contract (Count III), negligent breach of contract terms (Count IV), negligent misrepresentation (Count V), and promissory estoppel (Count VI). Raytheon now moves for summary judgment on all counts pursuant to *Mass.R.Civ.P. 56*. For the following reasons, Raytheon's motion for summary judgment is *ALLOWED* in part and *DENIED* in part.

### BACKGROUND

Ross [*2] began working for Raytheon in 1964. He

Case 1:04-cv-11964-NG    Document 20-2    Filed 10/21/2005    Page 14 of 26

Page 3

14 Mass. L. Rep. 27; 2001 Mass. Super. LEXIS 481, *2

worked as a quality control engineer from 1964–1972. In 1972, Ross left Raytheon to pursue his own business venture. Ross later returned to Raytheon and was employed as a Senior Engineer of Quality Control in the Quality Assurance Department from 1985–1987. From 1987–1990, Ross worked as a Program Manager. Beginning in 1990, Ross began work as a manager on Raytheon's Trident Missile Program. In 1995, Ross began seeking other positions within the company because Raytheon had lost out on a contract to continue working on the Trident Missile Program. Ross alleges that Raytheon undertook efforts to help him in finding a new position from 1996–1998, and that two specific positions in Raytheon's Quincy offices were actually offered to him. Ross further alleges that Raytheon was fully aware that he lacked an Associate's Degree.

Ross alleges that three promises were made to him concerning positions within Raytheon in 1997. The first was a promise made by Thomas Ligon ("Ligon"), Vice President of Raytheon. Ross alleges that Ligon promised to find him another job if he continued to work on the close-out of the Trident Missile contract.

The second [*3] promise involved a position at Raytheon's Quincy plant. In early 1997, Ross alleges that Larry Potter ("Potter") offered him the position of Program Manager. Ross alleges that Potter had full authority to offer him the position, and that the offer was contingent only on budgetary approval. Subsequently, Ross accepted the offer. Ross contends that a Bachelor's Degree was never a requirement for the position and that Potter's offer to him is proof of his qualifications. Ross further alleges that Potter told him in June 1997 that he could no longer hire Ross because he had to hire "a young engineer out of Bedford."

The third promise was that Ross was offered a job as a Quality Control Engineer in Quincy in July 1997. Ross contends that a Bachelor's Degree was not a requirement for this position and that the offer was not contingent on any further approval. He did not immediately start in this position. Ross was instead sent to Portsmouth, Rhode Island in August 1997 to work on a special project. The project ended in mid-November, and Ross returned to Quincy to inquire about the status of his job. Ross was informed that he had turned down the job offer, however Ross alleges that he [*4] never rejected the offer. In November 1997, Ross learned that a younger person had been hired for the position. Ross continued to apply for positions within Raytheon for the next year. He was not offered any further employment. In August 1998, Raytheon informed Ross that he would be terminated effective September 4, 1998.

## DISCUSSION

### I. Standard of Review

[HN1] Summary judgment is appropriate when no material facts are in dispute and the moving party is entitled to judgment as a matter of law. *Mass.R.Civ.P. 56(c)*; *Highlands Ins. Co. v. Aerovox, Inc., 424 Mass. 226, 232, 676 N.E.2d 801 (1997)*. [HN2] The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and showing that the summary judgment record entitles the moving party to judgment as a matter of law. *Pederson v. Time, Inc., 404 Mass. 14, 16–17, 532 N.E.2d 1211 (1989)*. If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a material fact in order to defeat the motion. *Pederson, 404 Mass. at 17.*

### II. G.L.c. 151B

[HN3] To maintain [*5] a claim for age discrimination under G.L.c. 151B, a complaint must be filed with the Massachusetts Commission Against Discrimination ("MCAD") "within six months after the alleged act of discrimination." *G.L.c. 151B, § 5.* Ross did not file his complaint with MCAD until November 1998, over a year after learning of the final act of alleged discrimination. However, the six–month statute of limitations may be tolled based on the doctrine of equitable tolling. Equitable tolling is applicable where the prospective plaintiff did not have and could not have had with due diligence, the information to bring suit in order to assert his legal rights. *Wynn & Wynn, P.C. v. Massachusetts Comm'n Against Discrimination, 431 Mass. 655, 673, 729 N.E.2d 1068 (2000).*

Ross does not dispute that the alleged discrimination occurred in November 1997. Therefore, without the assistance of the equitable tolling doctrine, the statute of limitations would have run in April 1998. However, Ross argues that the statute of limitations in the present case must be tolled because Raytheon not only held out the possibility of further employment within the company, but actually [*6] promised him employment. Ross contends that it would be illogical for an employee to file a complaint with the MCAD when the prospect of further employment was still a possibility. Ross urges that the filing of the complaint could have prejudiced him with respect to Raytheon's decisions on Ross's applications for other positions between November 1997 and November 1998.

Case 1:04-cv-11964-NG    Document 20-2    Filed 10/21/2005    Page 15 of 26

Page 4

14 Mass. L. Rep. 27; 2001 Mass. Super. LEXIS 481, *6

Ross relies on the Supreme Judicial Court's analysis in *Wheatley v. American Tel. & Tel. Co.*, 418 Mass. 394, 636 N.E.2d 265 (1994), to assert his argument based on the doctrine of equitable tolling. The central issue in *Wheatley* was the timing of the unequivocal discharge of the plaintiff, because the discharge itself was the subject of the age discrimination inquiry. *Id. at 397*. The Supreme Judicial Court held that the statute of limitations was not triggered at an earlier date because the plaintiff had not been effectively discharged at that time despite the employer's statements that the plaintiff would be terminated if he could not find another position within the company by a later date. *Id. at 398*. However, in the instant case, Ross does not contend that [*7] he was terminated because of his age, but rather that he was passed over for positions in three specific instances in 1997 because of his age. *Wheatley* holds that [HN4] the statute of limitations is only triggered by an unequivocal discharge, and that an individual is not unequivocally discharged if an employer continues to hold out the possibility of employment. *Id. at 398*. *Wheatley* does not stand for the proposition, as Ross argues, that an individual who is discriminated against in a specific instance can toll the limitations period because he does not want to file a complaint that might prejudice his employer against him in future endeavors. If the law were otherwise, an individual who was the victim of discrimination made unlawful by G.L.c. 151B might choose to wait several years, until the time he parted with his employer, to file a complaint with the MCAD. That kind of delay would clearly contravene the policies which underlie the short six-month statute of limitations.

However, in a footnote in *Wheatley*, the Supreme Judicial Court stated:

We note that *McConnell v. Gen. Tel. Co. of California*, 814 F.2d 1311, 1317 (9th Cir. 1987), [*8] cert. denied, 484 U.S. 1059, 108 S. Ct. 1013, 98 L. Ed. 2d 978 (1988), also treats a "termination" notice that offers the possibility of other employment within the company as tolling the limitation period. See notes 6 and 7, *supra*. Because we conclude that the trial judge erred in allowing [defendant's] motion for summary judgment, we need not discuss the issue of tolling. We comment, however, that a reasonable person who has been informed that his or her employment would be terminated on a specified date if he or she did not obtain another position within the organization by that date might not file an employment discrimination claim during this "transition period" because "the filing of such a charge may prejudice any pending reconsideration of the [termination] decision." *Delaware State Coll. v. Ricks*, 449 U.S. 250, 266 n. 2, 101 S. Ct. 498, 508 n. 2, 66 L. Ed. 2d 431 (1980) (Stevens, J., dissenting).

*Wheatley, supra, at 399 n. 8*.

In *McConnell*, the court held that the [HN5] defendant's representations of possible future employment within the company may toll the statute of limitations under the doctrine of equitable estoppel [*9] when these representations lull the employee into an untimely filing. *McConnell v. Gen. Tel. Co. of California*, 814 F.2d 1311, 1317 (9th Cir. 1987). Additionally, Justice Stevens's dissent in *Delaware State Coll.* argued that an alleged victim of discrimination should not be required to file a complaint during the time period between notice of termination with the possibility of future employment and the actual date of termination. *Delaware State Coll. v. Ricks*, 449 U.S. 250, 266, 66 L. Ed. 2d 431, 101 S. Ct. 498 (1980) (Stevens, J., dissenting). This court concludes that the period between November 1997 and September 1998 is not unreasonably long and should be considered a transition period during which the statute of limitations is tolled. In light of Ross's continued attempts at employment within Raytheon during this transition period and the possibility that Ross may have prejudiced his employment efforts had he filed his claim with the MCAD, the limitations period should be tolled until September 4, 1998, the date of his termination. This result is consistent with the reality of the situation: if Ross had been successful in obtaining other [*10] employment with Raytheon, it is highly unlikely that he would have brought a discrimination claim. Ross filed his complaint with the MCAD in November 1998, well within the six-month statute of limitations period. Accordingly, Raytheon's motion for summary judgment as to Count I is *DENIED*.

III. G.L.c. 93

[HN6] To prevail on an age discrimination claim under the Massachusetts Equal Rights Act ("MERA"), *G.L.c. 93, §§ 102* and *103*, the plaintiff must also comply with the procedural requirements of G.L.c. 151B. *Charland v. Muzi Motors, Inc.*, 417 Mass. 580, 582–83, 631 N.E.2d 555 (1994). The procedural requirements include the filing of the initial complaint with MCAD within the six-month statute of limitations period. *G.L.c. 151B, § 5*. The purpose of this rule is to ensure that plaintiffs do not attempt to circumvent the filing requirements of G.L.c. 151B by simply filing claims under MERA. *Jancey v. School Comm. of Everett*, 421 Mass. 482, 498 n. 14, 658 N.E.2d 162 (1995). Ross is permitted to assert his MERA claim because, as discussed in the previous section, he has complied with the procedural [*11] requirements of G.L.c. 151B and its statute of limitations provision. As such, Raytheon's motion for summary judgment as to Count II is *DENIED*.

Case 1:04-cv-11964-NG    Document 20-2    Filed 10/21/2005    Page 16 of 26

Page 5

14 Mass. L. Rep. 27; 2001 Mass. Super. LEXIS 481, *11

## IV. Breach of Contract

[HN7] To prevail on a claim for breach of contract, the plaintiff must establish that there was a valid and enforceable contract between the parties. *Lafayette Place Assoc. v. Boston Redevelopment Auth., 427 Mass. 509, 517, 694 N.E.2d 820 (1998).* The court must determine whether the terms of an alleged agreement are too indefinite to constitute an enforceable contract. *Id.* The interpretation of a contract and whether it is legally enforceable in light of indefinite terms is a question of law for the court. *Suffolk Constr. Co., Inc. v. Lanco Scaffolding Co., Inc., 47 Mass. App. Ct. 726, 729, 716 N.E.2d 130 (1999).*

In addition, [HN8] all conditions precedent must be satisfied in order to enforce a contract. *Mass. Mun. Wholesale Elec. Co. v. Town of Danvers, 411 Mass. 39, 45, 577 N.E.2d 283 (1991).* "A condition precedent defines an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract." *Id.* A [*12] contract will not be enforceable if the conditions precedent are unfulfilled. *Id.*

Raytheon argues that the promise made by Ligon is unenforceable. It asserts that Ligon only promised to aid Ross in finding further employment, while Ross alleges that Ligon actually promised him a position. There is a genuine issue of fact as to what was promised to Ross. However, this dispute is not material. Even if the court assumes the truth of Ross's allegations, this agreement is still unenforceable as a matter of law. [HN9] Uncertainty is not necessarily fatal to a contract's enforceability. *Lafayette Place Assoc., 427 Mass. at 517.* Courts are willing to impute terms into a contract if the parties have specified formulae and procedures that can narrow any uncertainties to the point that an agreement is binding. *427 Mass. at 518.* However, no formula or procedure was ever decided on by *Raytheon and Ross. See 427 Mass. at 518* (holding that price to be paid for parcel of land was absent from the contract, but imputed by the court because the agreement had provided a pricing formula). The promise of an unspecified position on unspecified terms is too indefinite and ambiguous to be enforceable as [*13] a matter of law.

Raytheon also argues that the two promises made to Ross for specific positions in Quincy are unenforceable on two different theories. The first theory is that Ross was an at will employee, and could therefore have been terminated at any time. This argument is unavailing because the issue is whether Raytheon's failure to follow through on its offer to Ross was a breach of contract. Ross was not terminated as an at will employee in either position because he was never allowed to begin working in either of the

two positions. If Ross had begun to work in one of those positions, he may well have continued to do so until the present time. The hypothetical ability of Raytheon to have terminated Ross at any point has no bearing, therefore, on the breach of contract claim that Ross has asserted.

Raytheon's second theory is that the two promises are unenforceable because the conditions precedent were never satisfied. Raytheon argues that the offer to Ross for the position of Program Manager in Quincy was contingent on further approval. Ross alleges that the only further approval that was necessary was budgetary in nature. He argues that this condition was satisfied [*14] because the position was filled immediately. Therefore, there are genuine issues of material fact as to whether any condition precedent for the offer to become Program Manager had been satisfied. Raytheon also argues that the promise of a job as Quality Control Engineer in Quincy was contingent on further approval from the department that Ross had been working in previously. Ross argues that no such condition existed. He also asserts that the "further approval" suggested by Raytheon was merely commonplace negotiations that had to occur between the two departments in order to determine the date that his transfer would actually occur. Ross alleges that his previous department could not bar his transfer to his new position in Quincy by withholding approval. There are genuine issues of material fact as to whether the condition precedent for the offer to become Quality Control Engineer ever existed.

The promise to find Ross further employment is not enforceable as a matter of law due to the uncertainty and ambiguity of the terms. However, with respect to the two alleged promises for specific positions in Quincy, there are genuine issues of material fact as to whether the conditions [*15] precedent existed (Quality Control Engineer) or were satisfied (Program Manager). Raytheon's motion for summary judgment on Count III is *ALLOWED* as to the promise made by Ligon to find Ross further employment and *DENIED* as to the two promises for specific positions in Quincy.

## V. Negligent Breach of Contract Terms

This is not a recognized cause of action in the Commonwealth of Massachusetts. Therefore, Raytheon's motion for summary judgment as to Count IV is *ALLOWED.*

## VI. Negligent Misrepresentation

[HN10] In order to recover for negligent misrepresentation, a plaintiff must prove that the defendant, in the course of its business, negligently supplied false informa-

Case 1:04-cv-11964-NG    Document 20-2    Filed 10/21/2005    Page 17 of 26

Page 6

14 Mass. L. Rep. 27; 2001 Mass. Super. LEXIS 481, *15

tion for the guidance of another, causing pecuniary loss to the other by his justifiable reliance upon the information. *Fox v. F&J Gattozzi Corp., 41 Mass. App. Ct. 581, 587–88, 672 N.E.2d 547 (1996).* In a claim for negligent misrepresentation, the plaintiff is only entitled to traditional "out of pocket" or pecuniary losses, not to the benefit of the bargain. *Danca v. Taunton Savings Bank, 385 Mass. 1, 8, 429 N.E.2d 1129 (1982); Anzalone v. Strand, 14 Mass. App. Ct. 45, 49, 436 N.E.2d 960 (1982).* [*16]

Ross needs to provide evidence that his reliance on Raytheon's promises caused him to suffer some pecuniary loss. Raytheon argues that Ross's submissions are devoid of evidence of any pecuniary loss that he has suffered. This court finds Raytheon's argument persuasive. Accordingly, Raytheon's motion for summary judgment as to Count V is *ALLOWED.*

VII. Promissory Estoppel

[HN11] A claim for promissory estoppel permits recovery if: 1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, 2) the promise does induce such action or forbearance, and 3) injustice can be avoided only by enforcement of the promise. *Loranger Constr. Corp. v. E.F. Hauserman Co., 6 Mass. App. Ct. 152, 154, 374 N.E.2d 306 (1978).* An action for promissory estoppel is analogous to a contract action. *R.I. Hosp. Trust Nat'l Bank v. Varadian, 419 Mass. 841, 850, 647 N.E.2d 1174 (1995).* The plaintiff, in an action for promissory estoppel, must prove all the elements

that would be necessary to satisfy a contract claim except for consideration. *Id.* Accordingly, the promise [*17] that is allegedly relied upon by the plaintiff must rise to the level of an enforceable promise in the contractual sense. *Vakil v. Anesthesiology Assoc. of Taunton, Inc., 51 Mass. App. Ct. 114, 121, 744 N.E.2d 651 (2001).* Therefore, the issues that need to be evaluated are whether the first promise made by Ligon was too vague and uncertain to be enforceable, and whether the conditions precedent existed and were satisfied in Raytheon's promises to Ross for positions in Quincy. This is the same analysis set forth above concerning Ross's breach of contract claim. The principles and arguments are identical for both claims, and thus the same conclusion must be reached. Raytheon's motion for summary judgment on Count VI is *ALLOWED* as to the promise made by Ligon to find Ross further employment and *DENIED* as to the two promises for specific positions in Quincy.

ORDER

For the foregoing reasons, defendant's motion for summary judgment is *ALLOWED* as to Counts IV and V and *ALLOWED* in part as to Counts III and VI. Defendant's motion for summary judgment is *DENIED* as to Counts I and II and *DENIED* in part as to Counts III and VI.

 [*18]  Raymond J. Brassard

Justice of the Superior Court

DATED: October 2001

LEXSEE 1993 US DIST LEXIS 19682

**ARTHUR CHESTERTON, Plaintiff, v. JAMES D. CHESTERTON, RICHARD T. MCDERMOTT, JOHN CARROLL, RICHARD DALY, A. W. CHESTERTON COMPANY and CHESTERTON INTERNATIONAL, B.V., Defendants.**

**CIVIL ACTION NO. 89–2854–GN**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*1993 U.S. Dist. LEXIS 19682*

**December 30, 1993, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, officers and directors of a family business, filed a motion for partial summary judgment regarding counts I, II, and III of the complaint brought by plaintiff, a former executive employee of the business, which alleged breach of contract.

**OVERVIEW:** After the officers and directors of the family business learned that the former executive employee owned undisclosed investments, minority stock of another corporation, they elected to terminate his position with the business. The former executive employee argued that he had a reasonable expectation of lifetime employment because he was a family member and performed his job satisfactorily, and that this expectation created an implied employment contract. The court disagreed, found no genuine issue of material fact regarding the existence of a lifetime employment contract, and granted the officers' and directors' motions for partial summary judgment. The court held that the by-laws of the family business authorized termination without cause and that the articles of the family business did not create an implied employment contract. Furthermore, the former executive employee failed to detail the circumstances under which an officer or director with apparent authority offered him a lifetime employment contract.

**OUTCOME:** The court granted the officers' and directors' motion for partial summary judgment and dismissed counts I, II, and III of the former executive officer's complaint.

**CORE TERMS:** by-laws, lifetime, employment contract, summary judgment, shareholder, breach of contract, termination, conflict of interest, satisfactory, reasonable expectation, partial, employing, stock, contractual, stockholder, purportedly, verified, intentional interference, removal, ratified, articles of incorporation, genuine issue of material fact, breach of fiduciary duty, employment status, written notice, deposition, ownership, undisclosed, terminated, fiduciary

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Supporting Papers & Affidavits*
[HN1] In the event a complaint is verified, it is appropriate to consider factual averments based on personal knowledge therein as the equivalent of an affidavit for purposes of summary judgment.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN2] In a diversity case, a federal court applies the choice of law rules of the state in which it sits.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN3] Summary judgment is permissible when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). Inferences are drawn in favor of plaintiff, the nonmoving party. In deciding whether a factual dispute is genuine, this court must determine whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing substantive law.

*Business & Corporate Entities > Corporations > Governance > Articles of Incorporation & Bylaws*
[HN4] A corporation's articles of incorporation, similar to its by-laws, regulate the manner in which a company's officers and directors must conduct the company's business.

*Contracts Law > Types of Contracts > Employment Contracts*
[HN5] Massachusetts law requires strong proof to estab-

1993 U.S. Dist. LEXIS 19682, *

lish the existence of a lifetime employment contract. A finding of a lifetime employment contract thus demands particularly explicit expressions of intent. Moreover, plaintiff bears the burden of proof to show that the contract was either made or ratified by an officer or officers having authority to bind the corporation.

**JUDGES:** [*1] BOWLER

**OPINIONBY:** MARIANNE B. BOWLER

**OPINION:**

**REPORT AND RECOMMENDATION RE: CHESTERTON COMPANIES' MOTION FOR PARTIAL SUMMARY JUDGMENT (DOCKET ENTRY # 99)**

BOWLER, U.S.M.J.

Pending before this court is a motion for partial summary judgment (Docket Entry # 99) filed by A. W. Chesterton Company ("AWC") and Chesterton International, B.V. ("International") (collectively: "the companies"). Plaintiff Arthur W. Chesterton ("plaintiff"), a former executive level employee of the companies, opposes the motion. (Docket Entry # 112).

On October 21, 1993, this court held a hearing and took the motion for partial summary judgment (Docket Entry # 99) under advisement.

BACKGROUND

In August 1990 plaintiff filed a verified amended complaint against his cousin, James D. Chesterton ("JDC"), currently the President and a Director of both of the companies, Richard T. McDermott ("McDermott"), a former president of both of the companies, John Carroll ("Carroll"), a Director of AWC, Richard Aly, also a Director of AWC, and the companies (collectively: "defendants"). (Verified Amended Complaint ("VA"), No Docket Entry Number Assigned). The companies move for partial summary judgment with respect to counts I, II and [*2] III in the verified amended complaint. n1 These counts all allege a breach of contract, to wit: (1) breach of contract against AWC based on the claim that plaintiff's termination resulted from his engaging in conduct which is expressly sanctioned in the Articles of Incorporation of AWC ("the Articles") (Docket Entry # 113, Ex. 26; Docket Entry # 103, Ex. J) (Count I); (2) breach of contract against AWC resulting from defendants' termination of plaintiff's employment at AWC (Count II); n2 and (3) breach of contract against International resulting from defendants' termination of plaintiff's employment at International (Count III). n3 (VA, PP 71–89).

n1 [HN1] In the event a complaint is verified, it is appropriate to consider factual averments based on personal knowledge therein as the equivalent of an affidavit for purposes of summary judgment. *Sheinkopf v. Stone, 927 F.2d 1259, 1262–1263 (1st Cir. 1991).*

n2 In Count II, plaintiff maintains he "worked diligently and faithfully for [AWC] for over 25 years and had a reasonable expectation that he would continue to be employed by [AWC] for the rest of his life." (VA, P 76). Plaintiff's reasonable expectation of employment together with the Articles and AWC's employment policies and practices purportedly created a contract, presumably an employment contract, between plaintiff and AWC. Defendants' termination of plaintiff allegedly breached that contract. (VA, PP 77–80).

[*3]

n3 Count III tracks the language of Count II. In Count III, plaintiff asserts he had a reasonable expectation of continued employment for the rest of his life at International. Defendants' termination of plaintiff without cause purportedly violated International's contract with plaintiff. (VA, PP 81–89).

Plaintiff also alleges that his employment at International was governed, in part, by the employment laws of Ireland and Holland. (VA, P 84). He contends that, upon information and belief, he is entitled to certain procedural rights prior to termination and to other unidentified benefits under Dutch and Irish law. (VA, P 88). Plaintiff fails to elaborate or note these assertions in his opposition papers. (Docket Entry # 112; Plaintiff's Supplemental Memorandum in Opposition to the Chesterton Company Defendants' Motion for Partial Summary Judgment, No Docket Entry Number Assigned, filed October 28, 1993 ("supplemental memorandum")).

[HN2] In a diversity case, a federal court applies the choice of law rules of the state in which it sits, i.e., Massachusetts choice of law rules. *Gates v. Formed Fibre Products v. Plasti–Vac, Inc., 687 F. Supp. 688, 689 (D.Me. 1988).* The record fails to contain factual evidence that plaintiff's implied contract of employment is governed by Dutch or Irish law. Absent evidence or argument to the contrary, Massachusetts has the most significant relationship to the contract at issue. Massachusetts

law therefore applies to plaintiff's alleged contract with International. See, e.g., *Brennan v. Carvel Corporation, 929 F.2d 801, 806 (1st Cir. 1991)* (Massachusetts law governed deposit agreement entered into in Massachusetts which pertained to store located in Massachusetts).

[*4]

The companies move for partial summary judgment on counts I, II and III arguing that: (1) neither the Articles, the By-Laws of AWC ("the By-Laws") nor the employment practices and policies of the companies created a binding employment agreement between plaintiff and the companies; and (2) plaintiff could not have had a reasonable expectation of lifetime employment because the By-Laws provide that plaintiff was an employee at will. (Docket Entry # 100). Accordingly, the threshold issue with respect to the companies' motion for partial summary judgment is whether plaintiff was an employee at will of the companies.

In opposition, plaintiff argues he was not an employee at will because there is a longstanding practice at AWC of employing family members for their entire working careers. Plaintiff maintains there is an "explicit understanding" that qualified family members can work at the companies and will remain employed at the companies provided they perform their job in a satisfactory manner. Plaintiff also emphasizes that his claims arise from the Articles. n4 Viewing the record in the light most favorable to plaintiff with respect to his employment status with the companies, this [*5] court finds the following facts for purposes of summary judgment.

n4 Plaintiff additionally argues that his relationship with the companies was not merely an employee/employer one. Rather, plaintiff points out that he was a shareholder in a closely held corporation and submits that this distinction is critical because a duty of good faith applies to shareholders in a closely held corporation. (Docket Entry # 112, pp. 16–18). Plaintiff also cites language in the March 1993 Memorandum and Order of the district judge (Docket Entry # 63) which purportedly supports his position.

Defendants correctly point out, however, that plaintiff filed a breach of fiduciary duty claim against JDC and McDermott (Count IV) and that his arguments regarding the duty of good faith between shareholders in a closely held corporation relate to Count IV rather than counts I, II or III. In addition, the language cited by plaintiff in the March 1993 Memorandum and Order (Docket Entry # 63) con-

cerns Carroll and Daly's motion for summary judgment as to Count VI, plaintiff's claim of intentional interference with contractual relations. The district judge rejected the argument that plaintiff was terminated in violation of public policy. (Docket Entry # 23). Consequently, plaintiff's argument that he was malevolently discharged (Docket Entry # 112, pp. 16–18) is not particularly germane to the dispositive issue of whether he was an employee at will vis-a-vis counts I, II and III.

[*6]

Plaintiff's grandfather, Arthur Wellington Chesterton, founded AWC in or around 1984. AWC manufactures and distributes industrial mechanical pumps and seals. It remains a family business with family members owning the majority of stock. International, a company formed in 1972, manufactures and sells AWC's products in Europe. The identical management team and Board of Directors operate both AWC and International. (AC; Docket Entry # 101; Docket Entry # 113, Daly Deposition, Vol. I).

AWC has a total of 14 shareholders, 13 of whom are members of the Chesterton family. Plaintiff, the largest shareholder, owns approximately 27% of the stock in the companies. JDC owns the next largest block of stock, holding approximately 20% of the stock in the companies. (AC; Docket Entry # 101).

AWC has a longtime practice of employing family members. Plaintiff's grandfather worked for AWC throughout his life. Plaintiff's father, Devereaux Chesterton, similarly worked for AWC throughout his life, except for an undetermined period of time when he worked for another business because of a disagreement with his father. JDC's father worked for AWC throughout his life. JDC has worked for the companies for [*7] a long period of time and his son began working at the companies approximately five years ago. (Docket Entry # 113, JDC Deposition, Vol. 5 & 7).

Prior to his termination in May 1989, plaintiff was a member of the Board of Directors and had been employed at the companies for approximately 25 years. From 1972 to 1988, plaintiff held the titles of Treasurer and Vice President of Manufacturing. Plaintiff's most recent position was Vice President of Strategic Planning. (Docket Entry # 113, Ex. 6: Daly Deposition, Vol. 4; Carroll Deposition, Vol. 4).

Plaintiff performed his job in a satisfactory manner shortly before his termination. In particular, from December 1988 to May 1989, JDC was satisfied with plaintiff's performance at the companies and characterized him as a "constructive participant" at board meetings.

(Docket Entry # 113, JDC Deposition, Vol. 4). Similarly, both Carroll and Daly described plaintiff's performance as Vice President of Manufacturing in terms denoting a satisfactory performance. (Docket Entry # 113, Carroll Deposition, Vol. 4 & Daly Deposition, Vol. 4).

Paul D. Chesterton ("PDC"), an attorney and shareholder in the companies, avers that as a result of attending [*8] shareholder meetings and having discussions with AWC representatives, he understands he:

> could become employed at [AWC], for as long as he wished, so long as [he] performed [his] job in a reasonably satisfactory manner. It is also [his] understanding that this same opportunity is and has been available to any and all [family members].

(Docket Entry # 113, Ex. 6). PDC, however, has never worked for either AWC or International and is licensed to practice law in Missouri. (Docket Entry # 113, Ex. 6).

Thomas W. Chesterton ("TWC") attests that "there has never been too much specifically said" about the practice of employing family members. He further testified there is an understanding that:

> preference should be given to family members, at least to have an opportunity to see if they might be in a position to contribute to the corporate well-being, but I believe it has never been the case that anybody was guaranteed a position with the company, irrespective of performance or interest or any other such items.

(Docket Entry # 113, TWC Deposition; Docket Entry # 123, Ex. A).

Adele Forman ("Forman"), plaintiff's sister, testified that if she were in "that position," presumably [*9] referring to a position to hire employees for the companies, she "would try to find [family members] a job that was suitable to their abilities." (Docket Entry # 113, Forman Deposition; Docket Entry # 123, Ex. B).

At his deposition, JDC stated that all family members who have expressed an interest in working at the companies have been hired. Nevertheless, he refused to characterize this "fact" as a "tradition." JDC pointed out that a number of other family members do not work at the companies. He also insisted that plaintiff "did not have a right to automatic employment." (Docket Entry # 113, JDC Deposition; Docket Entry # 123, Ex. C).

Until the summer of 1988, McDermott served as President of the companies. Also during this time, McDermott, JDC, a longtime Vice President of International Sales, and plaintiff served as directors of the companies. (AC, P 19; Docket Entry # 63; Docket Entry # 113, AWC Deposition & McDermott Deposition). Prior to the summer of 1988, plaintiff was a vocal critic of JDC's compensation package, which was tied to gross international sales. (AC, PP 27 & 34–36; Docket Entry # 63; Docket Entry # 113, Ex. 16, 17 & JDC Deposition, Vol. 4).

In the summer of 1988 [*10] the companies' stockholders resolved to select a new board of directors. (Docket Entry # 63). A committee appointed to pick the directors selected Carroll and Daly as new board members. (VA, P 54; Docket Entry # 63). At or around this time, JDC alerted the Board that he wanted to discuss the topic of replacing plaintiff in his position as Vice President of Manufacturing. (Docket Entry # 113, JDC Deposition, Vol. 2).

At the October 3, 1988 Board meeting, the Board formally elected JDC as President and McDermott as Chairman of AWC. (AC, P 46; Docket Entry # 113, Ex. 18). At the December 12, 1988 Board meeting, the Board authorized JDC to recommend a new individual for the position of Vice President of Manufacturing. The Board also concluded that it could not offer plaintiff the position of Vice President of Manufacturing. Rather, the Board decided it could offer plaintiff the staff position of Vice President of Internal Consulting. (Docket Entry # 63; Docket Entry # 113, Ex. 19).

On December 19, 1988, plaintiff filed suit in Massachusetts Superior Court against JDC, Carroll and Daly, alleging that they improperly removed him from his position as Vice President of Manufacturing. (Docket [*11] Entry # 63; Docket Entry # 113, Ex. 21). In February 1989 the parties settled the suit and agreed to appoint plaintiff to the position of Vice President of Strategic Planning. At the February 13, 1989 Board meeting, the Board appointed plaintiff Vice President of Strategic Planning. (Docket Entry # 63; Docket Entry # 113, Ex. 22 & 23).

In April 1989 the Board learned that plaintiff had invested in Sprague Metal Bellows, Inc. ("Sprague"), a company which provided AWC with bellows in 1986 and 1987. n5 (Docket Entry # 63; Docket Entry # 113, Carroll Deposition, Vol. 3, Daly Deposition, Vol. 2 & Hoyle Deposition, Vol. 2). The Articles provide, in part, that:

> Ownership or beneficial interest in a minority of stock or securities of another corporation, joint stock company, trust, firm or association

shall not be deemed to constitute an interest adverse to this corporation in such other corporation, joint stock company, trust, firm or association and need not be disclosed.

(Docket Entry # 113, Ex. 26, p. 6B). n6

n5 The circumstances of plaintiff's involvement with Sprague are described in greater detail in the March 1993 Order of the district judge (Docket Entry # 63).

[*12]

n6 The Articles also permit AWC to enter into business with its directors, officers and stockholders and with corporations in which such individuals may:

> become interested as directors, officers, shareholders . . . as though such adverse interest did not exist . . .; and no such . . . director, officer or stockholder shall be held liable to account to the corporation for any profit or benefit realized by him through any such contract or transaction by reason of such adverse interest . . .; provided (in the case of directors and officers but not in the case of any stockholder who is not a director or officer of the corporation) the nature of the interest of such director or officer, though not necessarily the details or extent thereof, be known by or disclosed to the directors.

(Docket Entry # 23; Docket Entry # 113, Ex. 26, pp. 6A & 6B).

In May 1989 the Board voted to remove plaintiff from his position as Vice President of Strategic Planning because of his undisclosed investments in Sprague. The minutes of the May 24, 1989 Board meeting reflect that the Board voted to remove plaintiff, [*13] in part, because of his alleged breach of the conflict of interest "provisions of the Personnel Policies and Procedures Manual" and his usurpation of a corporate opportunity. (Docket Entry # 63; Docket Entry # 113, Ex. 25). On June 27, 1989, the shareholders voted to approve the Board's actions in removing plaintiff as an employee of "the corporation." (Docket Entry # 23; Docket Entry # 113, Ex. H).

The By-Laws expressly govern removals of AWC directors and officers. Article XIX states that:

> Except as otherwise provided in the articles of organization or by these by-laws, directors and officers elected by stockholders, including persons elected by directors to fill vacancies in the board or in such offices, may be removed from their respective offices with or without cause [emphasis added] by the vote of the holders of a majority of shares entitled to vote in the election of such officers and directors.

(Docket Entry # 103, Ex. I). The Articles and By-Laws fail to contain language negating the above provision that directors and officers may be removed with or without cause. The Articles, which take precedence over conflicting provisions in the By-Laws, *ER Holdings, Inc. v. Norton Company, 735 F. Supp. 1094, 1097 (D. Mass. 1990),* [*14] simply provide, in part, that:

> All provisions of these by-laws for the regulation and management of the affairs of the corporation shall be subject to such provisions in regard thereto, if any, as are set forth in the articles of organization as from time to time amended.

(Docket Entry # 103, Ex. I).

## DISCUSSION

The companies move for summary judgment. (Docket Entry # 99). [HN3] Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* Inferences are drawn in favor of plaintiff, the nonmoving party. *Space Master International, Inc. v. City of Worcester, 940 F.2d 16 (1st Cir. 1991); Herbert W. Price v. General Motors Corporation, 931 F.2d 162 (1st Cir. 1991).*

In deciding whether a factual dispute is genuine, this court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986);* accord [*15] *Aponte-Santiago v. Lopez-Rivera, 957 F.2d 40, 41 (1st Cir. 1992)* (citing Anderson). A fact is "material" if it might affect the outcome of the suit under the governing substantive law. *Beck v. Somerset Technologies, 882 F.2d 993 (5th Cir. 1989)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)).*

## I. Count I

Count I is a breach of contract claim based on the provision in the Articles pertaining to an officer's or director's ownership of minority stock of another corporation. The companies argue that Count I is barred because the count is either: (1) a disguised shareholder derivative action which is barred by prior orders of the district judge (Docket Entry ## 23 & 38); or (2) a breach of employment contract claim which is barred because plaintiff is an employee at will. (Docket Entry ## 100 & 131). The companies are correct.

The express language of Article XIX of the By-Laws negates plaintiff's argument that the Articles' conflict of interest provision creates an implied, binding contract prohibiting AWC from [*16] firing an officer or director because of his undisclosed minority interest in a supplier. Article XIX of the By-Laws explicitly authorizes AWC to terminate an officer's or director's employment "with or without cause." On its face, Article XIX of the By-Laws does not conflict with the Articles' conflict of interest provision. Rather, as noted by the district judge in a prior Order, the conflict of interest provision relied upon by plaintiff "simply validates certain transactions that might otherwise be challenged and insulates fiduciaries from liability for self-dealing." n7 (Docket Entry # 23, p. 11).

> n7 In dismissing counts VII and VIII of the original verified complaint (Docket Entry # 12) which, similarly to Count I, were based on the Articles' conflict of interest provision, the district judge stated the following:
>
>> The defendants argue that the provision does not restrict the corporation's inherent power to fire. I agree. On its face, the provision simply validates certain transactions that might otherwise be challenged and insulates fiduciaries from liability for self-dealing. It does not preclude review of an officer's loyalty or business judgment. Read in context, the sentence relied on by the plaintiff does not strip the board of the power to fire any director for his undisclosed conflicts of interest, just as it does not touch the corporation's power to fire for no cause at all. At best, the quoted provision supports the plaintiff's claim for breach of contract.
>
> (Docket Entry # 23, pp. 10–11).

Upon further review and aided by the additional submissions, it is apparent that the provision does not even support a breach of contract claim. In the event a company can fire an officer at will, it is illogical to find that a conflict of interest provision supports a breach of contract claim. As previously noted, the district judge rejected the claim that plaintiff was terminated in violation of public policy. (Docket Entry # 23).

Rather, the conflict of interest provision is relevant to plaintiff's breach of fiduciary duty claim (Count IV) and plaintiff's intentional interference of contractual relations claim (Count VI). For example, acting contrary to the provisions of the by-laws of a corporation, and presumably its articles of incorporation as well, may be relevant to a claim that a defendant/officer breached his fiduciary obligations. See *Jessie v. Boynton, 372 Mass. 293, 361 N.E.2d 1267, n.1 & 1270 (Mass. 1977);* see *Cain v. Cain, 3 Mass. App. Ct. 467, 334 N.E.2d 650, 654–655 (Mass.App.Ct. 1975);* see also *Wilson v. Jennings, 344 Mass. 608, 184 N.E.2d 642 (Mass. 1962).* Similarly, such actions may provide evidence of improper conduct in a shareholder derivative suit or of improper motive in an intentional interference with contractual relations suit.

[*17]

To the extent Count I constitutes a disguised derivative action, the count is without merit. In the Order of October 2, 1990, the district judge ruled that plaintiff does not fairly and adequately represent the interests of the shareholders under *Rule 23.1, Fed. R. Civ. P.* (Docket Entry # 38, pp. 4–8).

Plaintiff attempts to avoid the effect of Article XIX of the By-Laws by relying exclusively on the Articles. The Articles do not, however, create an implied employment contract. Plaintiff accurately represents that [HN4] a corporation's articles of incorporation, similar to its by-laws, "regulate the manner in which a company's officers and directors must conduct the company's business." *ER Holdings, Inc. v. Norton Co., 735 F. Supp. at 1097.* Plaintiff, however, fails to cite any Massachusetts case standing for the principle that a corporation's articles of incorporation can give rise to implied contractual obligations sufficient to create a breach of contract action, other than a shareholders' derivative action, which is available to a terminated employee at will. Nor can this court locate such a case. Cf. *Finley v. Giacobbe, 827 F. Supp. 215, 220–222 (S.D.N.Y. 1993)* [*18] (hospital by-laws created implied contractual terms which could form basis of breach of employment contract claim under New York law). Rather, the most that can be said is that under

1993 U.S. Dist. LEXIS 19682, *18

Massachusetts law corporate by–laws constitute a general contract between the owners of the corporation (the share-holders) and the managers of the corporation (the Board of Directors). *ER Holdings, Inc. v. Norton Co., 735 F. Supp. at 1097* (collecting cases).

In sum, the conflict of interest provision at issue simply permits an AWC director or officer to own stock in an outside corporation in certain circumstances without disclosing such ownership to the Board. The Articles do not contain language creating a binding employment agreement between plaintiff and AWC. Nor do the Articles permit an employee at will to file suit individually against AWC based on a breach of contract theory. n8 The By-Laws expressly negate the existence of any implied employment contract between plaintiff and AWC. For reasons more fully explained in Count II infra, plaintiff was an employee at will. AWC could therefore terminate his employment for any reason, including the purportedly sham reason [*19] of plaintiff's violation of the Articles' conflict of interest provision. Count I therefore fails to survive summary judgment.

n8 As explained in the previous footnote, however, whether an AWC officer or director acted outside the parameters of the Articles' conflict of interest provision may be relevant with respect to plaintiff's breach of fiduciary duty count (Count IV) or to his intentional interference of contractual relations count (Count VI).

## II. Count II

In Count II, plaintiff contends that he had a reasonable expectation of lifetime employment at AWC. He submits there was an explicit understanding among family members that they would retain their position at AWC as long as their performance was satisfactory. He bases his argument for contractual rights on the Articles and AWC's employment policies and practices. (VA, P 77; Docket Entry # 112; Supplemental Memorandum).

[HN5] Massachusetts law requires "strong proof" to establish the existence of a lifetime employment contract. *Gregory v. Raytheon Service Company, 27 Mass. App. Ct. 1170, 540 N.E.2d 694, 695* [*20] (Mass.App.Ct.), review den., *545 N.E.2d 43 (Mass. 1989).* A finding of a lifetime employment contract thus demands "particularly explicit expressions of intent." *O'Brien v. Analog Devices, Inc., 34 Mass. App. Ct. 905, 606 N.E.2d 937, 939 (Mass.App.Ct. 1993).* Moreover, plaintiff bears the burden of proof to show that "the contract was either made or ratified by an officer or officers having authority to bind the corpo-

ration." *Rydman v. Dennison Manufacturing Company, 373 Mass. 855, 366 N.E.2d 763, 763 (Mass. 1977)* (setting aside jury verdict inasmuch as company officials' assurances of lifetime job until retirement if employee performed in satisfactory manner failed to create binding contract); accord *Goldman v. First National Bank of Boston, 985 F.2d 1113, 1121 (1st Cir. 1993)* (lifetime employment contract requires showing that it was made or ratified by company official with actual or apparent authority to bind corporation); see, e.g., *Boleman v. Congdon & Carpenter Company, 638 F.2d 2, 4* (1st Cir.), [*21] cert. den., *454 U.S. 824, 70 L. Ed. 2d 98, 102 S. Ct. 113 (1981)* (reversing lower court and finding evidence insufficient to establish binding offer of lifetime employment inasmuch as lifetime agreement is extraordinary and requires strongest proof of official's authority to bind corporation).

To support his claim of a reasonable expectation of lifetime employment, plaintiff cites AWC's longtime policy of employing family members and AWC's policy of employing family members for life if they perform their job in a satisfactory manner. The record as detailed supra, however, fails to set forth the requisite proof to establish a genuine issue of material fact regarding whether plaintiff had a lifetime employment contract. PDC's averment that he understood family members could be employed at AWC as long as they performed their job in a reasonably satisfactory manner does not create a genuine issue of material fact. PDC was never an employee of AWC. In addition, the deposition testimony of TWC and Forman evidences that AWC simply gave preference to family members when making hiring decisions. When viewed in the context of [*22] the express language in the By-Laws directly contradicting the existence of a lifetime employment contract, plaintiff's "proof" falls apart. n9

n9 In ascertaining the nature of a plaintiff's employment status, this court generally looks to the conduct of the parties, the subject matter of the contract, the relation between and the situation among the parties, and the surrounding circumstances. See *Stevens v. G.I. Rugo & Sons, 209 F.2d 135, 138 (1st Cir. 1954).*

To reiterate, the By-Laws authorize termination with or without cause. "The hallmark of employment at will is its termination by 'either the employee or the employer without notice, for almost any reason or for no reason at all.'" *Pearson v. John Hancock Mutual Life Insurance Company, 979 F.2d 254, 257–258 (1st Cir. 1992)* (also noting that concept of at will employment "enables either party to scrap the relationship at any time, without notice or cause"). In addition, the Articles fail to expressly

[*23] mention the duration of plaintiff's employment, a circumstance which infers an employment at will arrangement. *O'Brien v. Anolog Devices, Inc., 606 N.E.2d at 939*. Finally, plaintiff fails to detail the circumstances under which an AWC official with apparent or actual authority offered plaintiff a lifetime employment contract. Summary judgment is therefore appropriate.

As an additional argument, the companies submit that plaintiff's employment "contract" fails to meet the requirements set forth in the line of cases interpreting employment manuals as creating binding employment contracts. While this court doubts that the Pearson line of cases apply to a claim based on the Articles, n10 this court finds that plaintiff nevertheless fails to satisfy all prongs of the Pearson test. As noted in Pearson, "when an employee seeks to show that a personnel manual forms the basis of an employment contract, Massachusetts law requires him to 'establish all of the elements ordinarily necessary for the formation of a contract.'" *Pearson v. John Hancock Mutual Life Insurance Company, 979 F.2d at 256–257* (citation [*24] omitted). Plaintiff admits that he fails to satisfy the sixth factor in Pearson. (Supplemental Memorandum, p. 8). Plaintiff is correct. The Articles fail to specify the term of his employment. Nor do the Articles contain some other form of definitive limit on plaintiff's employment status inconsistent with an employment at will arrangement. Accordingly, plaintiff fails to establish all factors sufficient to create an implied contract of lifetime employment based on the Articles.

n10 In the event Pearson does not apply to plaintiff's breach of contract claim based on the Articles, plaintiff's breach of contract claim fails to withstand summary judgment for the reasons already discussed.

III. Count III

As previously noted, n11 Count III tracks the language of Count II. Count III alleges that plaintiff had a reasonable expectation of employment at International for "the rest of his life." (VA, P 83). The Articles and the employment policies and practices purportedly created a contract between plaintiff [*25] and International. (VA, P 85). Accordingly, plaintiff alleges that International's termination of plaintiff "without cause" violated his contract with International. (VA, P 87).

n11 See footnote number three.

The companies maintain that Count III mirrors Count

II and summary judgment is therefore appropriate for the same reasons. (Docket Entry # 11, n. 3). The companies do not elaborate upon their argument. Plaintiff similarly fails to distinguish his employment relationship with International from his employment relationship with AWC. (Docket Entry ## 112 & Supplemental Memorandum).

The By-Laws of International (Docket Entry # 103, Ex. K) differ from the By-Laws of AWC (Docket Entry # 103, Ex. I) in an important respect. The By-laws of International do not contain a provision regarding the removal of officers corresponding to Article XIX of the By-Laws of AWC. As discussed supra, Article XIX permits the removal of AWC officers "with or without cause." (Docket Entry # 103, Ex. I, p. 9). In contrast, the By-Laws [*26] of International provide that "any officer may resign at any time upon written notice to the corporation," and any director "may resign at any time upon written notice to the corporation." n12 (Docket Entry # 103, Ex. K, pp. 6 & 9).

n12 The By-Laws of AWC fail to contain a corresponding provision permitting a director or officer to resign "upon written notice to the corporation."

Though the By-Laws of International lack removal provisions similar to those contained in the By-Laws of AWC, Massachusetts law nevertheless requires "strong proof" to establish a lifetime employment contract as discussed in part II supra. To establish the existence of a lifetime employment contract, plaintiff also must show that an officer or agent of International with actual or apparent authority made or ratified plaintiff's lifetime employment contract with International. *Goldman v. First National Bank of Boston, 985 F.2d at 1121*. Plaintiff fails to put forth such a showing. Assuming arguendo that [*27] International had an implicit policy of employing family members as long as they performed their job in a satisfactory manner, such an implicit policy is insufficient to withstand summary judgment. See *Rydman v. Dennison Manufacturing Company, 366 N.E.2d at 763;* see also *Goldman v. First National Bank of Boston, 985 F.2d at 1121*.

Because this court finds no genuine issue of material fact regarding the existence of a lifetime employment contract with International, this court need not address the companies' alternative argument based on Pearson. Moreover, this court notes that neither party submitted the Articles of Incorporation of International as an exhibit to its pleadings. Therefore, this court is at a disadvantage in evaluating whether the Articles of Incorporation of

International satisfy the six factors enunciated in Pearson. As noted supra, however, plaintiff admits that he fails to satisfy the sixth prong of Pearson. (Supplemental Memorandum, p. 8).

As a final matter, plaintiff asserts that the companies' motion for partial summary judgment is untimely. This court disagrees. The companies [*28] represent that they completed the deposition of Ann Lih Chung on July 30, 1993. (Docket Entry # 123). The companies therefore filed their August 9, 1993 motion within 15 days of the completion of discovery in accordance with the scheduling order. (Docket Entry # 90).

CONCLUSION

For reasons stated above, this court **RECOMMENDS** n13 that the companies' motion for partial summary judgment (Docket Entry # 99) be **ALLOWED** and that counts I, II and III of plaintiff's amended verified complaint be dismissed.

n13 Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order. *United States v. Escoboza Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).*

[*29]

**MARIANNE B. BOWLER**

United States Magistrate Judge