UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                          )
CHARLES ROBINSON,                          )
                                                          )
                        Plaintiff,                 )
v.                                                        )      Civil Action No. 04-11964-NG
                                                          )
TELESECTOR RESOURCES GROUP, INC. D/B/A )
VERIZON SERVICES GROUP,                )
                                                          )
                        Defendant.              )
_____)

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL
FACTS AS TO WHICH THERE ARE NO GENUINE ISSUES TO BE TRIED[1]**

Pursuant to Fed. R. Civ. P. 56(c) and Local Rule 56.1, the Defendant, Telesector

Resources Group, Inc. d/b/a Verizon Services Group ("Verizon"), respectfully submits its

Statement of Undisputed Facts As To Which There Are No Genuine Issues To Be Tried in

Support of Its Motion for Summary Judgment, filed herewith.

1.      The Plaintiff, Charles Robinson, was born in 1949.[2]  Deposition of Charles

Robinson, dated March 23, 2005 ("Robinson Dep."), attached hereto as Exhibit ("Ex.") 1, at 9.

2.      Plaintiff began working for Verizon's predecessor on or about January 5, 1970 as a

cable splicer, a position he held for about 15 years.  Robinson Dep., Ex. 1, at 26-27.  Plaintiff

subsequently held positions as a foreman and in various management level positions.  Robinson

Dep., Ex. 1, at 27-29.

---

[1] Pursuant to Local Rule 5.3(A), exhibits attached hereto have been redacted to protect the
personal privacy of individuals, including dates of birth and social security numbers.

[2] Pursuant to Local Rule 5.3(A)(3), the Defendant refers herein only to the Plaintiff and other
individuals' years of birth.  If required by the Court, the Defendant is prepared to file under seal the actual
dates of birth.

3.      For approximately four years prior to 2000, Plaintiff held a staff position in
Verizon's Engineering and Construction department.  Robinson Dep., Ex. 1, at 30-32.  During his
four years in Engineering and Construction, Plaintiff had no supervisory responsibilities.
Robinson Dep., Ex.1, at 30-31.  Rather, Plaintiff wrote methods and procedures to be used by
management and technicians in the field.  Robinson Dep., Ex. 1, at 30.  During the approximately
nine years prior to April 2000, Plaintiff had only supervised one clerk several years earlier while
working in the Planning department.  Robinson Dep., Ex. 1, at 30-31, 34.

4.      In or around April 2000, Plaintiff interviewed with second-level manager Henry
Pilat ("Pilat") for a Team Leader position in Verizon's  National Markets Center – Complex
Services Department at 6 Bowdoin Square in Boston, Massachusetts (the "NMC").  Robinson
Dep., Ex. 1, at 36, 42-44.  While in Engineering, Plaintiff had previously worked with Pilat in
resolving inventory issues and thought well of Pilat.  Robinson Dep., Ex. 1, at 39-40.

5.      During the interview, Pilat reviewed Plaintiff's resume, which detailed Plaintiff's
30 years of experience at Verizon.  Robinson Dep., Ex. 1, at 42-43;  Deposition of Henry Pilat,
dated May 17, 2005 ("Pilat Dep."), attached hereto as Ex. 2, at 22-23.  Because the Team Leader
position required the supervision of 12 to 15 service representatives, Pilat was initially concerned
that Plaintiff did not have any recent management experience.  Pilat Dep., Ex. 2, at 22-23.
Plaintiff, however, convinced Pilat that because he had managed a crew early in his career, he
could handle the position.  Pilat Dep., Ex. 2, at 22-23.

6.       At the end of the interview, Pilat offered Plaintiff the Team Leader position.
Robinson Dep., Ex. 1, at 44;  Pilat Dep., Ex.2, at 22.  Plaintiff accepted and began working for
Pilat in or around April 2000.  Pilat Dep., Ex. 2, at 22.  Plaintiff did not interview with any other
Verizon personnel for the Team Leader job.  Robinson Dep., Ex.1, at 44.  Pilat was the sole

person involved in the decision to select Robinson for the Team Leader position.  Affidavit of

Henry Pilat ("Pilat Aff."), attached hereto as Ex. 3, at ¶ 4.  At the time Pilat decided to offer

Plaintiff the position, Pilat knew that Plaintiff had been with Verizon for over 30 years. Id. at ¶¶

3-4.  Pilat was born in 1956, and was 43 years old at the time he offered the Team Leader position

to Plaintiff.  Id. at ¶ 1.  At the time, Plaintiff was 50 years old.  Robinson Dep., Ex. 1, at 9.

       7.      The purpose of the NMC was to process requests for service primarily from

Competitive Local Exchange Carriers ("CLECs") seeking to use Verizon's networks and facilities

in order to service their (the CLECs') customers.  Pilat Dep., Ex. 2, at 152;  Pilat Aff., Ex. 3, at ¶

5; Affidavit of Patrick J. Stevens ("Stevens Aff."), attached hereto as Ex. 4, at ¶ 3.  CLECs

provided telecommunications services similar to those provided by Verizon, namely voice and

data services to residential and commercial customers.  Pilat Aff., Ex. 3, at ¶ 5. Verizon was

required to lease to the CLECs parts of Verizon's networks and facilities in order to permit the

CLECs to compete with Verizon.  Pilat Aff., Ex. 3, at ¶ 5; Stevens Aff., Ex. 4, at ¶ 3.  In addition,

the NMC processed requests from Verizon Advanced Data Inc. ("VADI") to provide DSL (digital

subscriber line) service in a manner that paralleled the orders placed by CLECs.  Id.   VADI was

created as a condition of the merger of Bell Atlantic Corp. and GTE that formed Verizon in June

2000.  VADI was thus in competition with the CLECs.  Id.

       8.      In summary, upon receiving a service order request from a CLEC (or VADI), the

NMC service representative would initially validate the information received.  Pilat Aff., Ex. 3, at

¶ 6.  The representative reviewed the information on the service order, and contacted the CLEC

for missing or incomplete information (for example, the CLEC may be seeking service that

Verizon could not provide or omitted the type of service needed).   Robinson Dep., Ex. 1, at 88-

90; Pilat Aff., Ex. 3, at ¶ 6.  The representative would also verify (using a system known as

LIVEWIRE) that the CLEC was seeking service to a valid address within the maximum distance to a Verizon Central Office housing the necessary network equipment. Pilat Aff., Ex. 3, at ¶ 6. Next, the representative would perform a "loop qualification" to determine if facilities (such as cable and open switching equipment) existed in the field to service the request. Id. Loop qualifications were typically performed automatically upon initial input of the service order, but occasionally had to be performed manually by the representative by accessing another Verizon system, REQUEST/NET. Id. Assuming the representative was able to verify all the necessary information, he or she would then begin inputting the service order information into one of several Service Order Provisioning Systems ("SOPs"). Robinson Dep., Ex. 1, at 85-86, 88-90; Pilat Aff., Ex. 3, at ¶ 6.

9.      Different SOPs systems existed for different states or areas serviced by the NMC. Robinson Dep., Ex. 1, at 81; Pilat Dep., Ex. 2, at 93. None of the SOP systems were identical, and thus a valid entry in one system might be invalid in another. Pilat Aff., Ex. 3, at ¶ 7. In addition, each of the SOP systems had very specific formats for data entry in a given field. Id. Further, during 2000 and into 2001, the SOP systems lacked many up-front edits or guides to advise the user of input errors. Id. Consequently, data entries were regularly rejected by the system, and the service representative would often be advised by the system of an error only after typing in all of the requested data, requiring the representative to go back to search for the invalid entry to resolve the problem. Id. If unable to resolve the issue, the representative would go to a Team Leader for assistance. Robinson Dep., Ex. 1, at 87-88; Pilat Aff., Ex. 3, at ¶ 7.

10.     If the order was properly processed in the appropriate SOP system, the representative would receive confirmation that the order was being "assigned." Pilat Aff., Ex. 3, at ¶ 8. This meant that the SOP system data entry was successful. Id. The SOP system would

then transmit the service order through several other Verizon systems to the appropriate field personnel to coordinate installation of the necessary equipment, either at a Verizon central office or at the site of the CLEC's or VADI's customer. Id. Once the SOP system "assigned" the order, the CLEC or VADI was sent a Firm Order Commitment ("FOC") which confirmed the order and advised the CLEC or VADI of the date by which the equipment installation or other necessary actions would take place. Id. Pursuant to various federal and state regulations, NMC representatives were required to process CLEC or VADI orders so that a FOC was issued to the CLEC or VADI within 24 to 72 hours of receipt of all required information. Id. On average, a service representative processed between 30 and 35 service orders per day. Id.

11.    At the time Plaintiff was hired into the NMC in April 2000, the NMC had approximately 80 service representatives. Pilat Aff., Ex. 3, at ¶ 9. By early 2001, the NMC had grown to 160 service representatives managed directly by 12 Team Leaders, one of whom was the Plaintiff. Id. Plaintiff and six other Team Leaders reported to Pilat, with the remainder reporting to second-level manager Claudia D'Amato ("D'Amato"). Pilat Dep., Ex. 2, at 29. As a Team Leader, Plaintiff directly supervised approximately 15 service representatives. Pilat Aff., Ex. 3, at ¶ 9. Plaintiff's responsibilities included: managing his service representatives to ensure they were meeting FOC and other requirements; answering any questions related to processing CLEC or VADI service orders; and interfacing with certain CLECs assigned to him to ensure that the customer was satisfied. Robinson Dep., Ex. 1, at 84; Pilat Aff., Ex. 3, at ¶ 10; RIF Guided Staffing Group Elimination Form ("Form B"), attached hereto as Ex. 5.

12.    Several times a day Plaintiff received questions from his representatives concerning SOP data entry and related processing issues. Robinson Dep., Ex. 1, at 84-85; Pilat Dep., Ex. 2, at 37. Typical questions included why a particular order was not being "assigned"

(i.e. was not being accepted by the SOP system) or why an order was not assigning to the proper Central Office. Robinson Dep., Ex. 1, at 84-85. In responding to those questions, Plaintiff's typical response was "Pretend I am not here. Tell me what you would do in this situation" or words to that effect. Robinson Dep., Ex. 1, at 175-79; Affidavit of Patrick Podolske ("Podolske Aff."), attached hereto as Ex. 6, at ¶ 4; Affidavit of Susan Rober ("Rober Aff."), attached hereto as Ex. 7, at ¶ 4. As a result of Plaintiff's consistent refusal to answer their questions, a number of representatives turned to the other Team Leaders for answers. Pilat Dep., Ex. 2, at 104; Podolske Aff., Ex. 6, at ¶ 4; Rober Aff., Ex. 7, at ¶ 4.

13.    Prior to joining the NMC, Plaintiff had some knowledge of SOP systems from his work in Engineering. Pilat Dep., Ex. 2, at 36-37. However, prior to joining the NMC, Plaintiff had received no training in the SOP systems. Robinson Dep., Ex. 1, at 38-39. In addition, unlike some of the other Team Leaders, Plaintiff had not worked as a service representative or in any other position requiring regular use of the SOP systems. Robinson Dep., Ex. 1, at 26-29; Pilat Dep., Ex.2, at 35. Plaintiff acknowledged that he was "not able to write a service order as proficient [sic] as the other Team Leaders." Robinson Dep., Ex. 1, at 70.

14.    Pilat suggested that Plaintiff familiarize himself with the SOP systems and procedures by "job shadowing" other Team Leaders or his service representatives. Robinson Dep., Ex. 1, at 72-73; Pilat Dep., Ex. 2, at 37, 112, 145-47. Plaintiff sat with two fellow Team Leaders, Patrick Podolske ("Podolske") and Susan Rober ("Rober"). Robinson Dep., Ex. 1, at 73-77; Pilat Dep., Ex. 2, at 112; Podolske Aff, Ex. 6, at ¶ 5; Rober Aff., Ex. 7, at ¶ 5. Plaintiff job shadowed Podolske over three or four days in the first few months after Plaintiff transferred to the NMC, and sat with Rober on several occasions during his time in the NMC. Robinson Dep., Ex. 1, at 74-76; Podolske Aff., Ex. 6, at ¶ 5; Rober Aff., Ex. 7, at ¶ 5. During this job shadowing,

Plaintiff observed Podolske and Rober answering service representatives' questions.  Robinson Dep., Ex. 1, at 78-80; Podolske Aff., Ex. 6, at ¶ 5; Rober Aff., Ex. 7, at ¶ 5.  Robinson also job shadowed his own representatives, in an attempt to better understand how to provide them with guidance.  Robinson Dep., Ex. 1, at 94-95.

15.    In or around August 2000, Plaintiff received a cartoon portraying a unicorn and other animals standing on a beach.  Robinson Dep., Ex. 1, at 107-08; Cartoon, attached hereto as Ex. 8.  According to Plaintiff, when he received the cartoon, each of the animals was labeled in handwriting with the name of a member of the NMC.  Robinson Dep., Ex. 1, at 111-14.  Plaintiff was the unicorn and Pilat was a lion that appeared to be speaking to the unicorn.  Cartoon, Ex. 8.  The caption of the cartoon stated "We've voted you off the island."  Id.  Plaintiff subsequently hung the cartoon up in his cubicle and never complained during the remainder of his employment with Verizon that  he was upset by the cartoon or that he believed it had anything to do with his age.  Robinson Dep., Ex. 1, at 109-10, 113; Podolske Aff., Ex. 6, at ¶ 6; Rober Aff., Ex. 7, at ¶ 6.

16.    In June 2001, Pilat asked Plaintiff and the other Team Leaders to take over certain job assignment duties previously handled by a contractor.  Robinson Dep., Ex. 1, at 131-39, 160-66; Pilat Dep., Ex. 2, at 74-76.   Those assignment duties were delegated to all of the Team Leaders, including Plaintiff.  Pilat Dep., Ex. 2, at 74-75, 116-117.  On or about June 6, 2001, Plaintiff told Pilat that he would take on the assignment duties.  Robinson Dep., Ex. 1, at 131-133.  The next morning, Plaintiff sent Pilat an e-mail message in which he described the assigning function as a "no brainer" and expressed concerns that he "may be being pushed aside."  E-mail messages to and from C. Robinson and H. Pilat dated June 7 and 8, 2001 (the "Assignment E-mails"), attached hereto as Ex. 9.  Plaintiff also stated in the e-mail: "If I need to be trained in service orders to become of value to this organization then that is what I want."  Id.

17.    On June 7 and 8, 2001, Plaintiff and Pilat exchanged several e-mail messages related to the assigning function.  Robinson Dep., Ex. 1, at 136-38; Assignment E-mails, Ex. 9.  In the final e-mail message on June 8,  Pilat reiterated that the task of assigning work was to be in addition to Plaintiff's regular duties.  Assignment E-mails, Ex. 9.  In that e-mail message, Pilat also reminded Plaintiff of the importance of assisting associates in the correct processing of service orders, reminded Plaintiff that there was no formal training program for the Team Leader position, and identified job shadowing and new product training as ways Plaintiff could become more knowledgeable in his job.  Id.

18.    During 2000 and into early 2001, the NMC had grown as Verizon implemented new systems in order to service CLEC service requests.  Stevens Aff., Ex. 4, at ¶¶ 3-4.  In early 2001, the NMC had approximately 160 service representatives, of which 42 were temporary hires.  Pilat Aff., Ex. 3, at ¶¶ 9, 11.  Over time, the mechanisms and procedures for processing orders from CLECs was streamlined and the systems used for those activities became more automated.  Stevens Aff., Ex. 4, at ¶ 4.  As a result, the NMC workload decreased significantly, reducing the number of service representatives required to input orders, correct errors, and perform other duties.  Id.  In or around June 2001, NMC management decided that it would need to reduce the number of service representatives significantly.  Id.  In or around September 2001, the NMC terminated the services of the 42 temporary hires, reducing its service representative ranks by approximately 26%, from approximately 160 to 118.  Stevens Aff., Ex. 4, at ¶ 4; Pilat Aff., Ex. 3, at ¶ 11.  Eleven of the 42 temporary employees found other employment within Verizon, while 31 temporary employees were terminated.  Pilat Aff., Ex. 3, at ¶ 11.  Plaintiff was aware that these service representatives would be released and understood that the management ranks would also need to be reduced.  Robinson Dep., Ex. 1, at 179-181.

19.     Throughout the first half of 2001, Verizon conducted various reductions in force throughout the company.  Robinson Dep., Ex. 1, at 179-84; Pilat Aff., Ex. 3, at ¶ 14.  As a result of the decrease in work volume and anticipated reduction in the non-management ranks, in or around June 2001, NMC management determined that a reduction in force of the Team Leaders was necessary.  Stevens Aff., Ex. 4, at ¶¶ 4-5.  In or around June 2001, Director Patrick Stevens, who was responsible for the entire NMC operation and who was the direct supervisor of Pilat and D'Amato, advised Pilat and D'Amato that there was going to be a reduction in force among the Team Leaders.  Pilat Dep., Ex. 2, at 81-82;  Pilat Aff., Ex. 3, at ¶ 12; Stevens Aff., Ex. 4, at ¶ 5; Affidavit of Claudia D'Amato ("D'Amato Aff."), attached hereto as Ex. 10, at ¶ 7.  Pilat and D'Amato were told by Stevens that they would be losing one Team Leader position and would consequently need to determine which eleven of twelve current Team Leaders to retain. Pilat Dep., Ex. 2, at 117-120; Pilat Aff., Ex. 3, at ¶ 12; D'Amato Aff., Ex. 10, at ¶ 7.

20.     In order to assist management in performing a reduction in force, Verizon published a "RIF Users Guide."  See RIF Users Guide, attached hereto as Ex. 11.  The  RIF Users Guide provided, inter alia, guidance on how to conduct a reduction in force involving a partial work group elimination.  Id.  Specifically, the RIF Users Guide provided that a "guided staffing process" was to be performed" in which the department gathers "appropriate employee performance-related data" in order to "select the best candidates for the positions remaining."  Id. at 4.  The business unit conducting the RIF has the discretion to choose from a number of options the "employee performance-related data" it will consider.  Id. at 13-14.

21.     After reviewing the RIF Users Guide and consulting with Human Resources Business Partner Susan Powderly,  Pilat and D'Amato decided that they would rely on resumes created by the Team Leaders as well as on their personal knowledge of each of the individuals to

determine which Team Leaders to retain.  Pilat Dep., Ex. 2, at 9-10; Pilat Aff., Ex. 3, at ¶ 12;

D'Amato Aff., Ex. 10, at ¶ 9.  Both "resumes" and "personal knowledge" were explicitly

identified in the RIF Users Guide as appropriate sources of "employee performance-related data."

RIF Users Guide, Ex. 11, at 12-14.

22.     In late June or July 2001, Pilat, D'Amato and Stevens advised the Plaintiff and the

other Team Leaders that a reduction in force would be taking place in the NMC.  Robinson Dep.,

Ex. 1, at 181-85;  Pilat Dep., Ex. 2, at 139-40; D'Amato Aff., Ex. 10, at ¶ 8; Stevens Aff., Ex. 4,

at ¶ 6.  Stevens told the Team Leaders that one of their positions would be eliminated and that

they were all at risk.  Robinson Dep., Ex. 1, at 184-185; Stevens Aff., Ex. 4, at ¶ 6.  Team Leaders

were also advised to update their internal Verizon resumes to reflect their recent

accomplishments, as those resumes would be considered in the selection process.  Pilat Dep., Ex.

2, at 47-48; D'Amato Aff., Ex. 10, at ¶ 8; Stevens Aff., Ex. 4, at ¶ 6.

23.     On or about July 10, 2001, knowing that the reduction in force was coming,

Plaintiff submitted his updated resume.  Robinson Dep., Ex. 1, at 195-96; Resume of C. Robinson

("Robinson resume"), attached hereto as Ex. 12.  In that resume, Plaintiff identified as his  sole

accomplishment in his current assignment in the NMC that he "helped Verizon enter the long

distance market in Mass. by meeting key objectives."  Robinson Dep., Ex. 1, at 197; Robinson

resume, Ex. 12.  Plaintiff recognized that Verizon's entry into the long distance market in

Massachusetts, however, was a company-wide objective realized through the efforts of "a lot of

people."  Robinson Dep., Ex. 1, at 200.  Each of the other eleven Team Leaders submitted

resumes as well.  See Resumes of NMC Team Leaders, attached hereto as Ex. 13.  In all cases,

the other Team Leaders provided far more detailed descriptions of their recent accomplishments.

Id.

24.     After receiving the Team Leaders' resumes, Pilat and D'Amato met to discuss the relative performance of the Team Leaders.  Pilat Dep., Ex. 2, at 7-10, 28-29; Pilat Aff., Ex. 3, at ¶ 12; D'Amato Aff., Ex. 10, at ¶ 9.  Pilat and D'Amato compared the Team Leaders against each other based on their review of the Team Leaders' resumes created for the RIF process and on their personal knowledge of the Team Leaders. Pilat Dep., Ex. 2, at 7-10, 28-29, 40, 86-88; RIF Form B, Ex. 5.  Employee's dates of birth, ages, length of service, and personnel files were not considered in the selection process.  Pilat Dep., Ex. 2, at 10, 142-143;  D'Amato Aff., Ex. 10, at ¶ 10.

25.     Ultimately, Pilat and D'Amato determined that Plaintiff was the least valuable of the Team Leaders.  Pilat Dep., Ex. 2, at 9, 28, 31-34, 76-77; D'Amato Aff., Ex. 10, at ¶ 9. Specifically, Pilat identified Plaintiff's lack of systems knowledge, negative attitude, and inability to develop his workforce as three areas in which Plaintiff was relatively less valuable than his peers.  Pilat Dep., Ex. 2, at 34-35, 89-91.  With regard to systems knowledge, Pilat believed that Plaintiff lacked the expertise possessed by the other Team Leaders in SOPs and other systems. Id. at 93-95.  Pilat had also concluded that, compared to the other 11 Team Leaders, Plaintiff had the most negative attitude.  Id. at 100.  Pilat observed Plaintiff's negative attitude in meetings and on other occasions when Plaintiff  rejected other people's ideas and refused to make constructive suggestions.  Id. at 33, 99-101.  In addition, on one occasion while Pilat was addressing the entire NMC regarding an impending strike, Plaintiff made comments to another Team Leader downplaying the importance of the message Pilat was attempting to deliver.  Id. at 33.  On several occasions Pilat commented to Plaintiff about his attitude.  Id. at 101-02.

26.     Further, Pilat had concerns about Plaintiff's ability to properly manage his employees and develop his direct reports.  Pilat Dep., Ex. 2, at 104-106, 166.  Based on Pilat's

experiences and observations, he believed that Plaintiff had not made an effort to learn SOPs  and hence could not respond to questions from his staff.  Id. at 104.  Pilat also observed that Plaintiff "was everyone's buddy."  Id. at 165-66.  However, when it came time for a business question or a performance issue, "[Plaintiff] could not respond."  Id. at 166.

27.     Based on her observations of Plaintiff's performance, D'Amato agreed with Pilat that Plaintiff was, relative to the other Team Leaders, the least valuable member of the NMC management team.  D'Amato Aff., Ex. 10, at ¶ 9.  Patrick Stevens, Pilat's and D'Amato's Director, concurred with the decision not to select Plaintiff.  Stevens Aff., Ex. 4, at ¶ 7.

28.     One of the Team Leaders that Pilat and D'Amato chose to retain, Brenda Joy, was born in 1948 and was nearly 18 months older than Plaintiff.  Listing of NMC Team Leaders, Ages, and Career Bands ("NMC Listing"), attached hereto as Ex. 14; Pilat Dep., Ex. 2, at 60-61.  Joy is currently employed by Verizon.  Pilat Dep., Ex. 2, at 106-07.  In addition, both Podolske and Rober were over forty years old at the time.  NMC Listing, Ex. 14;  Podolske Aff, Ex. 6, at ¶ 1; Rober Aff., Ex. 7, at ¶ 1.

29.     On or about July 30, 2001, Pilat advised Plaintiff that he had not been selected for one of the available Team Leader positions.  Robinson Dep., Ex. 1, at 179, 185-86, 191-94, 200-03; Pilat Dep., Ex. 2, at 129-30.  At that time, Plaintiff "absolutely" believed that he was being terminated on the basis of his age.  Robinson Dep., Ex. 1, at 186-195, 201-03.

30.     D'Amato was born in 1950.  D'Amato Aff., Ex. 10, at ¶ 1.  As of July 30, 2001, the date Plaintiff was notified that he had not been selected for one of the remaining Team Leader positions, D'Amato was one day shy of her 51st birthday.  Id.  At that same time, Plaintiff had just turned 52 years old, Pilat was 45 years old, and Stevens was 49 years old.  Robinson Dep., Ex. 1, at ¶ 9; Pilat Aff., Ex. 3, at ¶ 1; Stevens Aff., Ex. 4, at ¶ 1.

31.    Pursuant to Verizon policy, employees who are not identified for retention during a reduction in force have a thirty day opportunity to apply for available vacant positions to avoid termination.  Pilat Dep., Ex. 2, at 132-33.  Plaintiff did not secure any such positions, and his employment with Verizon was terminated effective August 28, 2001.  Robinson Dep., Ex. 1, at 214.

32.    Plaintiff's position was not replaced, and his duties were absorbed by the remaining Team Leaders.  Pilat Dep., Ex. 2, at 73-74, 115.

33.    Following his termination from Verizon, Plaintiff was provided with all of the compensation to which he was entitled, and he is not owed any additional compensation for work performed at Verizon.  Robinson Dep., Ex. 1, at 65.

34.    At all relevant times, Plaintiff understood that either he or Verizon could terminate his employment for any reason at any time with or without notice.  Robinson Dep., Ex. 1, at 54-55.  Plaintiff did not have any written agreements that modified his at-will relationship with Verizon.  Id. at 56-57.

35.    During the course of his employment at Verizon and its predecessors, Plaintiff received copies of several Codes of Business Conduct.  Robinson Dep., Ex. 1, at 50-53, 57-59.  Each of those Codes provided, *inter alia*, that unless stated otherwise in a collective bargaining agreement or written agreement signed by an authorized representative of the company, that all employees were employed at will.  Robinson Dep., Ex. 1, at 50-61; Bell Atlantic Code of Business Conduct, attached hereto as Ex. 15; Verizon Code of Business Conduct, attached hereto as Ex. 16.

36.    Plaintiff filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination on or about October 10, 2001.  MCAD Charge of Discrimination,

attached hereto as Ex. 17.  In that Charge, Plaintiff alleged that he was terminated because of his

age.  Id.  Plaintiff also stated that the most recent act of discrimination took place on August 7,

2001.  Id.; Robinson Dep., Ex. 1, at 191.

      37.    Plaintiff filed this lawsuit against Verizon in Suffolk Superior Court on August 17,

2004, more than three years after the last act of discrimination complained of in his MCAD

Charge.  See Certified Copy of Superior Court Docket, attached hereto as Ex. 18.

                  Respectfully submitted,

                  The Defendant,
                  TELESECTOR RESOURCES GROUP, INC.
                  D/B/A VERIZON SERVICES GROUP,
                  By its attorneys,


                  /s/ John P. McLafferty
                   John P. McLafferty, BBO #639179
                  Felix J. Springer (pro hac vice)
                  DAY, BERRY & HOWARD LLP
                   One International Place
                   Boston, Massachusetts 02110
                   (617) 345-4600

DATED: October 21, 2005


### CERTIFICATE OF SERVICE

      I, John P. McLafferty, do hereby certify that on this 21st day of October, 2005, I caused a
true copy of the foregoing to be hand delivered  to Frank L. Fragomeni, Jr., Esquire, 15 Broad
Street, Suite 501, Boston, Massachusetts 02109.


                  /s/ John P. McLafferty
                  John P. McLafferty