# EXHIBIT 1

Pursuant to Local Rule 5.3(A), exhibits attached hereto have been redacted to protect the personal privacy of individuals, including dates of birth and social security numbers.

Charles Robinson
March 23, 2005

# ORIGINAL

1          VOLUME:      I
           PAGES:       1-222
2          EXHIBITS:    1-9

3

          UNITED STATES DISTRICT COURT
4          DISTRICT OF MASSACHUSETTS
            C.A. No. 04-11964-NG

5
6  CHARLES ROBINSON,

           Plaintiff

7
   vs.

8
   TELESECTOR RESOURCES
9  GROUP, INC., D/B/A
   VERIZON SERVICES GROUP,
10         Defendant

11

12

13      DEPOSITION OF:  CHARLES ROBINSON, taken on
14  behalf of the Defendant, before CAROL A. CARPENTIER,
15  Notary Public and Court Reporter, pursuant to the
16  applicable rules of the Federal Rules of Civil
17  Procedure, at the offices of Day, Berry & Howard,
18  260 Franklin Street, Boston, Massachusetts, on
19  March 23, 2005, commencing at 10:00 a.m.

20

21

22

23          Kaczynski Reporting
           72 Chandler Street, Suite 3
24          Boston, Massachusetts  02116

Charles Robinson
March 23, 2005

1  in any other lawsuit?

2      A.    No.

3      Q.    Okay.  Anyone in your family been a party

4  to a lawsuit other than yourself in this lawsuit?

5      A.    To the best of my knowledge, no.

6      Q.    Okay.  What's your social security

7  number, sir?

8      A.

9      Q.    And your date of birth?

10     A.        49.

11     Q.    Have you spoken to any current or former

12 Verizon employees since you left Verizon on

13 August 28th of 2001 with regard to any of the claims

14 you are making in this lawsuit?

15     A.    No.

16     Q.    You hesitated a bit.  Is that because

17 you've spoken to them but not about the claims in

18 this lawsuit?

19     A.    That's correct.

20     Q.    Who is Paul Lynch?

21     A.    Paul Lynch is a Verizon employee.

22     Q.    Okay.  Have you spoken to him about the

23 claims in this lawsuit?

24     A.    The claims, no.

Redacted

Charles Robinson
March 23, 2005

1    companies?

2        A.    I really didn't leave them.  They didn't

3    provide me forty hours' work.

4              I did leave them to go to Utility

5    Consultants.

6        Q.    Which did provide you forty hours?

7        A.    That's correct.

8        Q.    Okay.  Just briefly, if you would, sir,

9    tell me your positions prior to April of 2000 at

10   Verizon and its predecessors.  You started working

11   there at what point?

12       A.    1/5/70.

13       Q.    Okay.

14             MR. FRAGOMENI:  Is it January 5th of

15   1970.

16             THE WITNESS:  Yes.

17       Q.    (By Mr. Springer)  And was this the first

18   full-time job you had had?

19       A.    No.  It was not.

20       Q.    Okay.  Where did you work previously?

21       A.    I worked at the Post Office.

22       Q.    For a few years?

23       A.    I don't know exactly.

24       Q.    Okay.  And prior to the Post Office,

Charles Robinson
March 23, 2005

1   you'd been attending college and going to high

2   school; is that correct?

3        A.   And high school, yes.

4        Q.   Okay.  And again then, just describe your

5   history, your employment history at Verizon with --

6   to the extent that you can dates and positions at

7   Verizon and its predecessors prior to the year 2000,

8   April of 2000.

9        A.   Okay.  I may as well start from the

10  beginning.

11       Q.   Sure.

12       A.   For the first, I believe approximately

13  fifteen years, I was a cable splicer.  After that, I

14  was a high tech foreman for approximately five

15  years.  After that, I was in Planning for Verizon.

16  After that, I was on the staff, Engineering and

17  Construction staff, and after that, that's it.

18       Q.   Okay.  When you say Planning for Verizon,

19  how long were you doing that?

20       A.   I'd say approximately five years also.

21       Q.   Okay.  And where were you located?

22       A.   On Hancock Street in Quincy.

23       Q.   Okay.  Do you remember who your

24  supervisor was?

28

Charles Robinson
March 23, 2005

1      A.    Yes, I do, a few of them.

2           I had Richard Andrade, Jeffrey Ross and

3   Paul Diotalevi (phonetic spelling).

4      Q.    Okay.  And then after you spent five

5   years in Planning, you then went to Engineering and

6   Construction?

7      A.    Staff.

8      Q.    The staff?  And how many years did you

9   work there?

10      A.    Oh, prior to that, I'm -- I was in

11   Engineering also for Verizon in between there

12   somewhere.

13      Q.    Okay.  And then you went to Engineering

14   and Construction when they were combined?

15      A.    Actually, they were always combined and

16   then there was a short time they --

17      Q.    They separated?

18      A.    -- they separated and then they were

19   back.

20      Q.    Okay.  And how many years did you work in

21   Engineering and Construction?

22      A.    Well, basically all of those jobs, even

23   from the time that I was a splice -- so thirty

24   years, I mean.

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

```
 1          Q.   Sure.  And when you were on the
 2    Engineering and Construction staff, how long did you
 3    work on that staff?
 4          A.   I -- again, I -- approximately three,
 5    four, years.
 6          Q.   Okay.  And who was your supervisor at
 7    that point?
 8          A.   I had David DeLorie, and, I believe,
 9    Cathy Werner (phonetic spelling).  I don't believe
10    there was anybody else.
11          Q.   Okay.  Who did you work with?  Did you
12    work with people like Ed Sherman or was he in a
13    different place?
14          A.   He was a different place.
15          Q.   Okay.
16          A.   He was in the field.
17          Q.   And who were -- who was the supervisor
18    for David DeLorie and Cathy Werner?
19          A.   It -- I don't recall their names right
20    now.
21          Q.   Okay.  Was Glenn Beasley the Vice
22    President at that point?
23          A.   I've heard the name Glenn Beasley.
24          Q.   Okay.  But you don't remember if he was
```

30

Charles Robinson
March 23, 2005

1    the Vice President at that time?

2        A.    That's correct.

3        Q.    Okay.  And you don't remember who their

4    supervisor was?

5        A.    Not at this time.

6        Q.    Okay. What did you do in the Engineering

7    and -- by the way, were you on the Engineering and

8    Construction staff before you became a Team Leader

9    under Hank Pilat?

10       A.    That's correct.

11       Q.    Okay.  What did you do on the Engineering

12   and Construction staff?

13       A.    I wrote methods and procedures for the

14   field.

15       Q.    Were those the techs out in the field?

16       A.    No, also for management people.

17       Q.    Okay.  What else did you do?

18       A.    I attended meetings.

19       Q.    Okay.  What else?

20       A.    That's all I recall right now.

21       Q.    Okay.  Did you supervise anyone?

22       A.    On the staff, no.

23       Q.    Okay.  Prior to being on the staff, did

24   you supervise anyone when you were working five

Charles Robinson
March 23, 2005

1   years in planning for Verizon?

2          A.   Yes.

3          Q.   Okay.  And who did you supervise there?

4          A.   I supervised one clerk.

5          Q.   Okay.  And when you were a high-tech

6   foreman, did you supervise anyone?

7          A.   Absolutely yes.

8          Q.   And how many people did you supervise at

9   that point?

10         A.   I would say anywhere from ten to twenty.

11         Q.   Okay.  And were those techs that you

12  supervised?

13         A.   Yes.

14         Q.   Okay.  And tell me your duties as

15  foreman, if you would?

16         A.   It was to ensure that -- first of all, to

17  get the work done, make sure that the employees were

18  doing their job and to make sure that I provided

19  service to all of our customers, both internal and

20  external.

21         Q.   And what did your supervisory duties

22  entail; that is, what did you instruct your techs to

23  do?

24         A.   Whatever the -- I had a unique position.

Charles Robinson
March 23, 2005

1   My position was that I not only built a high-tech

2   network but I maintained it, so depending on the

3   workload, that's how I dispatched my people.

4       Q.   Okay.  So you would determine what the --

5       A.   That's correct.

6       Q.   Just let me finish --

7            You would determine what jobs they did?

8       A.   That's --

9       Q.   Is that correct?

10      A.   -- correct?

11      Q.   And you'd have work assignments for them

12  on a daily basis, depending on what needed to be

13  done?

14      A.   Yes.

15      Q.   And then you spent fifteen years as a

16  cable splicer and you were out in the field?

17      A.   That's correct.

18      Q.   Okay.  And when you were fifteen years as

19  cable splicer, you were working for a foreman?

20      A.   That's correct.

21      Q.   Do you remember who that was?

22      A.   Numerous foreman over those years.

23      Q.   What area were you in?

24      A.   I was a Dorchester-Roxbury area.

Charles Robinson
March 23, 2005

1       Q.   Okay.  So is it fairs to say before you

2   became a Team Leader for -- under Mr. Pilat's

3   supervision that you had only supervised one clerk

4   for the previous nine or so years; is that correct?

5       A.   Yes.

6       Q.   And on the Engineering and Construction

7   staff, what was the function of the staff, if you

8   could describe it generally; what services did you

9   provide?

10      A.   The staff basically -- I was basically

11  involved always with the latest technologies, so

12  again, my function was to understand what was going

13  on with these new technologies and how they related

14  to the field and to provide that documentation for

15  the field to follow in order to have a standard

16  product throughout the whole Verizon footprint.

17      Q.   And what did that footprint encompass,

18  just the northeast or was it also New York?

19      A.   It was New York also.

20      Q.   Okay.  And New Jersey at that point?

21      A.   To.

22      Q.   Okay.

23      A.   To the best of my recollection no.

24      Q.   Okay.  What was your salary, if you

Charles Robinson
March 23, 2005

1      A.    That's correct.

2      Q.    Okay.  Tell me why.

3      A.    Why did I enjoy it?

4      Q.    Sure.

5      A.    Because I was brought up in -- throughout

6    Verizon my whole career basically starting from the

7    bottom and my knowledge that I obtained -- I

8    attained throughout my career led me to enjoy the

9    job because I knew that I could make a contribution

10   on the staff.

11     Q.    Anything else?

12     A.    Not that I -- no.

13     Q.    At some point you came to leave the

14   Engineering and Construction staff; is that correct?

15     A.    That's correct.

16     Q.    How did that happen?

17     A.    There was a job that was available at the

18   NMC and I thought that that would be a good move for

19   me.

20     Q.    Just so the record's clear, tell me and

21   the court reporter what the NMC is.

22     A.    It was the Network Market Center.

23     Q.    Okay.  And why did you think that would

24   be good for you?

Charles Robinson
March 23, 2005

1        Q.    What were those entities?

2        A.    Again, every department within the phone

3   company -- when I say every department, I'm talking

4   on the Engineering and Construction side the

5   Installation side, all of those departments I

6   interfaced with and basically that would have also

7   been part of the NMC -- how -- the work flow.

8        Q.    Had you previously worked with the

9   CLEC's?

10       A.    I had never worked for the CLEC's, no.

11       Q.    CLEC's by the way are Competitive Local

12  Exchange Carriers?

13       A.    Exchange Carriers.

14       Q.    Had you had any training in SOPS?

15       A.    Service Order Provisioning System?

16       Q.    Yes.

17            MR. FRAGOMENI:  Say that again.

18            THE WITNESS:  It's a service order

19  provisioning system.

20            MR. SPRINGER:  Okay.

21       Q.    (By Mr. Springer)  Had you had any

22  training in SOPS?

23       A.    No, I never had training in SOP.

24       Q.    So prior to taking the job in the NMC,

Charles Robinson
March 23, 2005

1   you had not had any training in SOP?

2       A.   That's correct.

3       Q.   Okay.  What did you understand -- what

4   did you know about the job that you were being hired

5   or -- withdraw that.

6            What did you know about the opening in

7   NMC?  What did you know about the nature of that

8   position?

9       A.   I knew that the nature of the position

10  was such that I, with my engineering background that

11  I would be an asset to, to the NMC.

12      Q.   What --

13      A.   Because --

14      Q.   Go ahead.

15      A.   Okay.  Because of the fact I had been

16  interfacing with the NMC and I realized that there

17  were specific processes that could be put in place

18  to resolve issues.

19      Q.   Had you interfaced at all with Mr. Pilat

20  before you had gone over to work at the NMC?

21      A.   Yes, I had.

22      Q.   Had you gotten along with him?

23      A.   Yes.

24      Q.   Interfaced well with him?

Charles Robinson
March 23, 2005

1      A.   Yes.

2      Q.   Thought well of him?

3      A.   Yes.

4      Q.   Okay.  In what way did you interface with

5  him prior to going over to the NMC?

6      A.   What happened was the inventory builds.

7  In order for service orders to process, inventory

8  has to be there for the service order to process --

9  inventory meaning facilities.

10     Q.   And you worked with Mr. Pilat on that?

11     A.   That's correct.

12     Q.   In what way?

13     A.   They would have a problem and I was on

14  the staff, and if they had a problem, I would make

15  sure that inventory was built properly.

16     Q.   And how did you do that?

17     A.   I would analyze, again, that wasn't my

18  specific job for the inventory, but again

19  Engineering is the one that has to provide that

20  information to the LFACS staff and I would make sure

21  that that information was -- existed and if it

22  didn't exist, I would make sure that it was built.

23     Q.   And just again, so we keep the court

24  reporter in -- LFACS is L-F-A-C-S and it stands

Charles Robinson
March 23, 2005

1   assignments on the staff was interfacing -- when I

2   say interfacing with the CLEC's, interfacing with

3   the various departments to provide CLEC's with

4   methods and procedures and again, this was basically

5   at the end of line actually interfacing with the

6   CLEC's.

7        Q.    That is the NMC interfaced with the

8   CLEC's?

9        A.    That's correct -- via -- yes, that's

10  correct.

11       Q.    Well, you would get calls, would you not,

12  from --

13       A.    Yes, I would, that's correct and that's

14  why, you know, I just wanted to make sure I said it

15  properly.

16       Q.    Okay.  Just so I can finish my

17  question --

18            You would get calls from CLEC's like

19  COVAD on occasion, would you not?

20       A.    That's absolutely correct.

21       Q.    Okay.  We'll talk about those in a little

22  bit.

23            You interviewed with Mr. Pilat prior to

24  getting the NMC position; is that correct?

43

Charles Robinson
March 23, 2005

1      A.    That's correct.

2      Q.    And describe that interview as best you

3   can, if you remember.

4      A.    I really don't remember.  I provided him

5   my resume.

6      Q.    Okay.

7      A.    And I sat down and he thought I would be

8   excellent at the job also.

9      Q.    Did he say that to you?

10      A.    He gave me the job.

11      Q.    Okay.  But I'm what do you remember --

12      A.    He never said that -- to the best of my

13   recollection absolutely not.

14      Q.    Okay.  Tell me then if you remember

15   anything that was said in that interview -- by him

16   or you.

17      A.    Just basically -- no, I don't.

18      Q.    Okay.  Did he do things that one would

19   assume were done like describe the position to you

20   and you would -- what your duties and

21   responsibilities would be?

22      A.    I would imagine so, yes.

23      Q.    But you don't have any specific memory?

24      A.    No.

Charles Robinson
March 23, 2005

1        Q.    Is that correct?

2        A.    That's correct.

3        Q.    Okay.  And do you remember any of the

4    questions that he asked you?

5        A.    No, I don't.

6        Q.    Okay.  At the end of the interview, did

7    -- did he offer you the job or did he say I'll --

8    you know, I need to think about this and I'll get

9    back to you?

10        A.    I don't recall, but I -- I don't recall.

11        Q.    Okay.  How soon after the interview do

12    you remember being offered the job?

13        A.    I believe it was right then and there; I

14    am not positive, but to the best of my recollection,

15    it was right then and there that I was offered the

16    job.

17        Q.    Okay.  Did anybody provide

18    recommendations for you at your request?

19        A.    I know that I -- I talked to a couple of

20    people, but again, I don't know specifically who.

21        Q.    Did you interview with anyone other than

22    Mr. Pilat?

23        A.    No, I didn't.

24        Q.    Okay.  And you'd said you had gotten

Charles Robinson
March 23, 2005

1        Q.    Okay.  Do you work with her on the NMC

2    staff at all?

3        A.    No.

4        Q.    Did you know Ruth Linda Rober prior to

5    coming over on the NMC staff?

6        A.    Yes, I did.

7        Q.    Okay.  Describe your relationship.

8        A.    We were friends.

9        Q.    How did you come to be friends?

10       A.    I don't remember.

11       Q.    And why do you call yourself -- why did

12   you call yourself a friend of her, or why did you

13   say you were friends with her?

14       A.    We were friends.  I mean I don't know

15   what -- we were friends.

16       Q.    We'll get back to that in a minute.

17            In this lawsuit you are claiming, are you

18   not, Mr. Robinson, that you had a contract of

19   employment with Verizon?

20       A.    Yes.

21       Q.    Okay.  Can you tell me what the terms of

22   that contract were?

23       A.    The terms were basically that when I had

24   my reviews and I was told that I was doing a good

Charles Robinson
March 23, 2005

1    job and basically that was the contract.

2         Q.    Just in your words, were there any more

3    terms or conditions to the employment contract you

4    had with Verizon other than what you've just said?

5         A.    Well, over the course of my plus-years,

6    thirty-one years, I believe that it was a mutual

7    contract with myself and Verizon.

8         Q.    Okay.  And what was the nature of that

9    contract?

10        A.    That contract was that I would be loyal

11   to them, I would provide my services to them and be

12   honest in all my dealings.

13        Q.    Okay.  And what did they have to give you

14   in return in your view in that contract?

15        A.    I would think that I would be given

16   loyalty back.

17        Q.    Anything else?

18        A.    Naturally be compensated.

19        Q.    Okay.  Anything else?

20        A.    Not that I can think of right now.

21        Q.    Other than the fact that you worked for

22   thirty or thirty-one years for Verizon, was this

23   contract written down in any place?

24        A.    I never had a written contract.

Charles Robinson
March 23, 2005

1     Q.   Okay.  Did you understand the concept of

2  at-will employment?

3     A.   I had never been told at-will employment.

4     Q.   Okay.  Had you ever -- do you remember

5  ever having read it anywhere?

6     A.   No, I do not.

7     Q.   Do you have an understanding of what

8  at-will employment is?

9     A.   Not really.

10     Q.   Okay.  Do you remember receiving a code

11  of conduct when you were a Bell Atlantic employee

12  before the merger with Verizon?

13     A.   I don't know specifically Bell Atlantic.

14     Q.   Okay.  Do you remember receiving a code

15  of conduct?

16     A.   Yes.

17     Q.   How often did you receive a code of

18  conduct if you remember?

19     A.   I don't know the specifics.

20     Q.   Okay.  Do you remember receiving any

21  training with regard to the code of conduct?

22     A.   Training for the code of conduct -- no, I

23  don't.

24     Q.   Okay.  Could you have received some and

Charles Robinson
March 23, 2005

1    just not remember it?

2         A.   Yes, I could have.

3         Q.   You got a lot of training at Verizon?

4         A.   That's correct.

5         Q.   Okay.  Let me see if I can refresh your

6    recollection here.

7                   MR. SPRINGER:  (Handing.)

8                   (Short interruption.)

9                   MR. SPRINGER:  Back on the record.

10                  (C. Robinson Exhibit No. 1, Code of

11                  Conduct, marked for identification.)

12        Q.   (By Mr. Springer)  Mr. Robinson, have you

13   ever seen that document before?

14        A.   Again, not in this format if I did.

15        Q.   Well, in a booklet format?

16        A.   Possibly yes.

17        Q.   Okay.  And did you -- when you were given

18   the code of conduct, do you remember reading it?

19        A.   Verbatim probably not.

20        Q.   What was your understanding of what was

21   contained in the code of conduct?

22        A.   Basically to treat people that I want --

23   the way that I wanted to be treated.

24        Q.   Okay.  Anything else that you remember in

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

| | |
|---|---|
| 1 | the code of conduct? |
| 2 | A. Nothing specific. |
| 3 | Q. Okay. And the code of conduct was an |
| 4 | important document t Bell Atlantic and Verizon, was |
| 5 | it not? |
| 6 | A. All of their documents were important. |
| 7 | Q. Well, but people cared about the code of |
| 8 | conduct; they did provide training at various times |
| 9 | with regard to it, didn't they? |
| 10 | MR. FRAGOMENI: Objection. |
| 11 | THE WITNESS: Again, I can't |
| 12 | remember all the specifics. |
| 13 | Q. (By Mr. Springer) Do you remember others |
| 14 | receiving training on the code of conduct, if you |
| 15 | don't remember your own? |
| 16 | A. Again, as a supervisor I believe that I |
| 17 | probably would have brought people in and read the |
| 18 | code to them. |
| 19 | Q. Okay. And it concerned itself with the |
| 20 | business ethics of the corporation, did it not? |
| 21 | A. Yes. The gist of it, yes. |
| 22 | Q. Now, I want you, if you could, to turn to |
| 23 | the third page here, the one that says Notice at the |
| 24 | top. I'm sorry, I think you've gone to Page 4. It |

Charles Robinson
March 23, 2005

1    says Notice there.  Do you see that on the second

2    page right up there --

3         A.   Okay.  Yeah.

4         Q.   Okay.  And there are a number of

5    paragraphs about what the code of conduct is, and if

6    you'd look at the third paragraph, do you see where

7    it says there -- okay?

8         A.   Yeah.

9         Q.   This code of business conduct is not a

10   code of employment -- is not a contract of

11   employment between you and the Bell Atlantic Company

12   that employs you.

13             Do you see that?

14        A.   Yes, I do.

15        Q.   And no it doesn't -- and does not give

16   you rights of any kind; do you see that?

17        A.   Yes, I do.

18        Q.   Okay.  Do you remember reading that?

19        A.   I never remember reading that.

20        Q.   Okay.  But you do remember -- maybe not

21   verbatim -- reading the code of conduct when it was

22   given to you?

23             MR. FRAGOMENI:  Objection to form.

24   Go ahead.

Charles Robinson
March 23, 2005

```
1              THE WITNESS:  Again, I -- I remember
2   the code of conduct.
3              MR. SPRINGER:  Okay.
4        Q.   (By Mr. Springer)  Do you remember
5   reading it?
6        A.   I remember reading it, but again, not to
7   this degree.
8        Q.   Okay.  Well, as a supervisor, was -- was
9   it not important that you be familiar with the code
10  of conduct?
11       A.   If that was in my job description, yes.
12       Q.   Okay.  And if it wasn't in your job
13  description then you would think it wasn't
14  important?
15       A.   I don't know specifically what you mean
16  by that.
17       Q.   Well, I'm asking what I thought was a
18  straightforward question --
19             Was it important as a supervisor for you
20  to familiar with the code of conduct?
21       A.   I would say so, yes.
22       Q.   Did your subordinates ask you questions
23  with regard to the code?
24       A.   I don't recall ever being asked any
```

54

Charles Robinson
March 23, 2005

1   questions.

2         Q.    Okay.  Did you ever have to look up

3   anything in the code that you remember?

4         A.    No, I don't remember.

5         Q.    Okay.  Did any of your supervisors speak

6   to you about the code of conduct -- that you

7   remember?

8         A.    Not that I remember, no.

9         Q.    Okay.  I am not going to read every part

10  of this notice, but I am going to read some things

11  in the next paragraph here where it says United

12  States employees and US international assignees of

13  Bell Atlantic Corporation and its subsidiaries must

14  understand that there is no there fixed duration and

15  there are no fixed terms or conditions to the

16  employment relationship.

17              Do you see that?

18        A.    Yes.

19        Q.    Okay.  Then the next sentence says:

20              Employees can terminate their employment

21  whenever they wish and for whatever reason they

22  might have with or without notice.

23              And you understood that as an employee of

24  Bell Atlantic, you could do that, that you could

Charles Robinson
March 23, 2005

```
 1   terminate your employment whenever you wished and
 2   for whatever reason you might have without notice?
 3        A.   Yes, I did.
 4        Q.   Okay.  And then it says:
 5             Just as Bell Atlantic Corporation or its
 6   subsidiaries can terminate their employment or
 7   change the terms and conditions of their employment
 8   at any time or for any reason with or without notice
 9   unless the employment is covered by a collective
10   bargaining agreement, you were not covered by a
11   collective bargaining agreement, were you,
12   Mr. Robinson?
13        A.   No, I was not.
14        Q.   And did you understand then that Bell
15   Atlantic Corporation or its subsidiaries could
16   terminate your employment or change the terms and
17   conditions at any time or for any reason with or
18   without notice?
19        A.   I would say so, yes.
20        Q.   Okay.  And then it goes on to say:
21             This is known as employment at will.
22             Prior to my using that phrase a few
23   minutes ago, have you ever heard the phrase
24   employment at will?
```

Charles Robinson
March 23, 2005

1      A.    No, I don't recall it.  I'm sure, you

2  know, over the course of my, you know, years as a

3  person.

4      Q.    And then it says this will -- at-will

5  employment relationship may not be modified except

6  in a written agreement signed by the employee and an

7  authorized representative of Bell Atlantic Company.

8          You didn't have any written employment

9  agreement, did you with --

10     A.    No, but over the years, I've also been

11  told that that was my job from cradle to grave.

12     Q.    And when were you told that, when you

13  were hired?

14     A.    Over the course -- basically, again, I

15  can't recall, but I heard that phrase many, many

16  times over the course of my career.

17     Q.    That it was your job from cradle to

18  grave?

19     A.    Basically yes.

20     Q.    And do you -- you just don't remember

21  when it was said to you?

22     A.    No.

23     Q.    Okay.  Do you remember who said it to

24  you?

Charles Robinson
March 23, 2005

```
1         A.    I would say that supervisors had said
2    that to me over the years.
3         Q.    Do you remember any specific supervisor
4    and when?
5         A.    No.
6         Q.    Okay.  Now, my question to you though is.
7              Did you have any written agreement that
8    modified your at-will relationship -- to your
9    knowledge?
10        A.    No to my knowledge, no.
11        Q.    Okay.  I want to show you --
12              MR. SPRINGER:  (Handing.)
13              (C. Robinson Exhibit No. 2, Code
14              Acknowledgement Form, marked for
15              identification.)
16              (C. Robinson Exhibit No. 3, Code of
17              Conduct, marked for identification.)
18        Q.    (By Mr. Springer)  Mr. Robinson, why
19    don't we look at Exhibit 2 for the moment, and
20    that's an acknowledgment form; do you see that?
21        A.    Yes.
22        Q.    Okay.  And is that your signature?
23        A.    Yes, it is.
24        Q.    And Do you remember signing it?
```

Charles Robinson
March 23, 2005

1      A.    It's my signature, so I'm sure I signed

2   it.

3      Q.    Okay.  And I note that you acknowledged

4   that you received a copy of Verizon's Connecting

5   Through Integrity, our Code of Business Conduct.

6            And when you signed it, were all of those

7   statements true in the bullets; in other words, I

8   have received a copy of Verizon's Connecting Through

9   Integrity, Our Code of Business Conduct; I fully

10  understand my responsibilities and know and abide by

11  the standards of business conduct contained in

12  Verizon's Connecting Through Integrity; I understand

13  any violations of these standards can lead to

14  disciplinary action; I am responsible for obtaining

15  a copy of this code for reference.

16           Were all of those true?

17     A.    I would say they're true, yes.

18     Q.    Okay.  So when you signed this

19  acknowledgment, you were being truthful when you

20  acknowledged each of these things; is that correct?

21     A.    And again, you know, I knew to the -- you

22  know, have integrity, and again, as far as every

23  single thing that's in that document, I don't know.

24     Q.    Okay.

Charles Robinson
March 23, 2005

```
1          A.    Even though I signed this.

2          Q.    Had you signed any such form previously

3    with regard -- withdraw that.

4                Do you remember signing any such form

5    previously with regard to the code of conduct?

6          A.    I am sure that I've signed this, these

7    forms over the years.

8                     MR. FRAGOMENI:  He asked you if you

9    remember.

10                    THE WITNESS:  I don't remember.

11                    MR. SPRINGER:  Okay.

12         Q.    (By Mr. Springer)  But you're sure that

13   you have?

14         A.    I would -- I don't remember specifically

15   that I signed these forms.

16         Q.    Okay.  But you said that you were sure

17   that you had; was that not so?

18                    MR. FRAGOMENI:  Objection.

19                    THE WITNESS:  Again, I would have

20   to say that I don't recall at this particular

21   time.

22         Q.    (By Mr. Springer)  And you said that --

23   I'm sorry.

24                And you said you may not have read every
```

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

```
 1   word; is that correct?
 2        A.   That's correct.
 3        Q.   Did you retain a copy for reference?
 4        A.   I can't remember that.
 5        Q.   If you would look the page Bates No. 456
 6   and it says:
 7             This code of business conduct is not an
 8   employment contract in any form, although adherence
 9   to these standards is a condition of employment.
10             You recognize that the code was not an
11   employment contract?
12                  MR. FRAGOMENI:  Objection.
13        Q.   (By Mr. Springer)  Is that correct?
14        A.   I don't really know what you mean by
15   that.
16        Q.   When you say you don't know what I mean
17   by that, you don't know -- it says here it's not an
18   employment contract, did you think it was an
19   employment contract, Mr. Robinson?
20        A.   I don't know if I read this specific --
21        Q.   That's not question.  My question is:
22             Do you know whether it's an employment
23   contract?
24        A.   I don't know if it's an employment
```

Charles Robinson
March 23, 2005

1    contract.

2        Q.    And it says here, again, about four lines

3    down:

4            Employees can terminate their employment

5    whenever they wish and for whatever they might have,

6    with or without notice.

7            That's language that you'd -- we'd seen

8    previous at Bell Atlantic, isn't that so?

9        A.    I just read it over here.

10        Q.    Yeah.  And you're pointing to Exhibit 1,

11    the Bell Atlantic Code of Conduct?

12        A.    That's correct.

13        Q.    And that's the same language, isn't it,

14    basically?

15        A.    I would say so, yes.

16        Q.    Okay.  And so you continued to

17    understand, did you not, that you were an employee

18    at-will who could terminate his employment whenever

19    you wished for whatever reason you might have, with

20    or without notice?

21            MR. FRAGOMENI:  Objection to form.

22            THE WITNESS:  Again, you know, I

23    knew that I was free to leave.

24            MR. SPRINGER:  Okay.

Charles Robinson
March 23, 2005

1      Q.    (By Mr. Springer)  And similarly Verizon

2  was free as an employee (sic) at will to terminate

3  your employment or change its terms and conditions

4  at any time?

5      A.    I never viewed it as that.

6      Q.    Okay.  Why not?

7      A.    Because, again, the previous statement

8  that I had made about cradle to grave and again the

9  loyalty that I exhibited towards the company, that's

10  what I really felt.

11      Q.    Okay.  And that's what you relied on?

12      A.    Yes.

13      Q.    Okay.  Anything else that you're relying

14  to not view it as employment at will?

15      A.    Again, there were times over my career

16  because of the importance of my jobs that I -- my

17  difference assignments that people wanted to make

18  sure that I was going to stay, you know at that

19  particular assignment.

20      Q.    Okay.

21      A.    Because of the unique knowledge that I

22  possessed.

23      Q.    Okay.  That wasn't true in NMC, was it?

24      A.    When you say --

Charles Robinson
March 23, 2005

```
 1        Q.    Nobody made a statement that they wanted
 2   you to stay in NMC, did they?
 3        A.    I can't recall at the job interview
 4   specifically what was told to me or what I said.
 5        Q.    Okay.
 6        A.    At this time.
 7        Q.    Or anytime subsequent to that, did
 8   Mr. Pilat say that he wanted you to stay?
 9        A.    I don't recall anything like that.
10        Q.    Okay.  So other than the statements at
11   various times that people told you they wanted it --
12   you to stay in various jobs previous to the NMC and
13   some supervisors who you can't remember at times you
14   can't remember saying that Verizon or its
15   predecessor was a as cradle-to-grave place and the
16   loyalty you exhibited, that's your only reasons for
17   saying that your employment was not at will; is that
18   correct.
19              MR. FRAGOMENI:  Objection.
20              THE WITNESS:  That's all that I can
21   name at this particular moment.
22        Q.    (By Mr. Springer)  Nothing else you can
23   think of; is that correct?
24        A.    I can't think of anything at this moment.
```

64

Charles Robinson
March 23, 2005

1      Q.    Okay.  And are those the only reasons for

2  your saying that you can only be terminated for

3  cause.

4          Do you have any other reasons for saying

5  you could be terminated for cause -- other than for

6  cause, I'm sorry.

7      A.    I cannot think of anything right now.

8      Q.    Okay.  Any other reasons -- one of your

9  allegations in your -- you've read your complaint,

10 haven't you, that you filed in this lawsuit,

11 Mr. Robinson?

12     A.    I don't recall reading it.

13     Q.    Okay.  Just so I am clear with regard to

14 the contract that you have, what did Verizon do to

15 violate that contract, terminate you?

16     A.    I would say so, yes.

17     Q.    Anything else it did to violate that

18 contract?

19     A.    Not that I can think of right now, no.

20     Q.    Okay.  Now, in -- one of your allegations

21 is that you were wrongfully terminated in violation

22 of a contractual obligation Verizon had; is that

23 correct?

24     A.    That's correct.

Charles Robinson
March 23, 2005

1        Q.    Okay.  And was that again solely with

2    regard to your termination as you understood it?

3        A.    Yes.

4        Q.    Okay.  And had -- by the way, when you

5    left Verizon, did it provide you everything it

6    should have in terms of vacation pay and earnings;

7    you don't have any claim that it didn't give you

8    what you were entitled to, do you?

9        A.    To the best of my knowledge, they

10    provided me with everything that I should have been

11    provided with.

12        Q.    Okay.  That you had earned up to that

13    point; is that correct?

14        A.    That's correct.

15        Q.    Okay.  So you're not owed any additional

16    compensation for work you had done there; is that

17    correct?

18        A.    I don't believe so.

19        Q.    Okay.  Do you believe that you were

20    terminated in violation of any public policy?

21        A.    I believe that what happened, one of the

22    reasons was the fact that Mr. Pilat and Ms. D'Amato

23    basically wanted to provide preferential treatment

24    to the wholesale arm of Verizon, the CLEC arm of

Charles Robinson
March 23, 2005

1   Verizon and I voiced an objection to that.

2       Q.   Okay.  Tell me what you said and the

3   circumstances in which you said it.

4       A.   To the best of my recollection, it wasn't

5   just myself; it was a meeting with other team

6   leaders and Ms. Amato and Mr. Pilat, and again, I

7   can remember -- again, not word for word or anything

8   -- but they basically wanted us to go above and

9   beyond the call of our duty to -- as far as

10  correcting Verizon orders so that they would flow as

11  opposed to what we would do for other CLEC's.

12          And again, I wasn't the only one that

13  brought up an objection to this.  There were other

14  team leaders that brought up objections and again,

15  statements by Mr. Pilat and Ms. D'Amato stated that

16  they were a part of us and we shouldn't forget that

17  they were a part of us.

18      Q.   When did this meeting occur?

19      A.   I would say -- I don't know

20  specifically.  I don't know specifically, but I

21  would say in 2001.

22      Q.   2001, early in 2001?

23      A.   I don't know specifically.

24      Q.   Could it have occurred in the year 2000?

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

1        A.    I don't know.

2        Q.    Okay.  Did you think this had anything to

3    do with your layoff?

4        A.    I -- I don't know but -- I don't know.

5        Q.    And you say other team leaders also

6    voiced objection?

7        A.    That's correct.

8        Q.    Okay.  And they weren't laid off, were

9    they?

10        A.    To the best of my knowledge, no.

11        Q.    Okay.  Do you remember which other team

12    leaders voiced objection?

13        A.    It's pretty -- I know Patrick Padulski

14    was on.

15        Q.    Okay.  Anyone else that you remember?

16        A.    I can't remember.

17        Q.    Okay.  And do you remember what you said

18    at the meeting?

19        A.    Basically that we shouldn't -- not be

20    doing what they proposed to do.

21        Q.    And you viewed what they proposed to do

22    was over and beyond what was called for?

23        A.    Absolutely.

24        Q.    And in what way?

Charles Robinson
March 23, 2005

1      A.    The NMC was basically a factory providing

2    a service to the various CLEC's.  It -- when that

3    service order came in, all the information was

4    either on that service order, you know, the request

5    from the CLEC for service properly or it was

6    returned.  That was not the process that was

7    involved with Verizon and so again, we were factory,

8    we were not supposed to correct orders, you know,

9    unless --

10          Again, we were supposed to correct

11    orders.  Our function at the NMC was basically to

12    type the order.  If it flowed through, it flowed

13    through,  and if it didn't flow through, if it was a

14    typing error on our part, then he would straighten

15    that typing error out, okay, within the bounds of

16    the job responsibility.  Other than that, we were

17    not supposed to go into various systems and correct

18    information.

19      Q.    And that is what you thought Claudia

20    D'Amato and Hank Pilat were asking you to do?

21      A.    Yes.

22      Q.    Is there anything else that you claim --

23    withdraw that.

24          Let me get back to my question:

Charles Robinson
March 23, 2005

```
 1              Can you identify any violation of public
 2   policy that caused your termination?
 3        A.   I do not recall anything else, other than
 4   what I've just provided you.
 5        Q.   Okay.  So there's no other public policy
 6   that you believe was involved with your termination;
 7   is that correct?
 8        A.   To the best of my knowledge, no.
 9        Q.   Okay.  And as you've said, you don't know
10   whether what occurred in that meeting had anything
11   to do with your termination; is that correct?
12              MR. FRAGOMENI:  Objection.
13              THE WITNESS:  Again, I don't know
14   one way or the other.
15              MR. SPRINGER:  Okay.
16        Q.   (By Mr. Springer)  One of your claims
17   here is that, as I understand it, that you were
18   negligently terminated; is that correct?
19        A.   What does that specifically mean?
20        Q.   Well, I'm am trying to find out.  Let me
21   ask you it this way:
22              Did you believe that Verizon failed to do
23   something that it ought to have done that resulted
24   in your termination?
```

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

```
 1         A.    Yes, I do.

 2         Q.    And what did it fail to do?

 3         A.    It failed to provide me training.

 4         Q.    Okay.  And what training did it fail to

 5   provide you?

 6         A.    Service order processing.

 7         Q.    Okay.  Other than -- and let me ask this

 8   question:

 9              What did the failure to provide you

10   service order processing -- or SOPS -- have to do

11   with your termination?

12         A.    I would say that I was not, again, even

13   though I was not able to write a service order as

14   proficient as the other team leaders.

15         Q.    Anything else the failure to provide you

16   training with regard to service order processing had

17   to do with your termination -- other than your lack

18   of proficiency as compared to other team leaders?

19         A.    I can't recall anything right now.

20         Q.    Okay.  And what duty did -- what duty was

21   owed to you by Verizon to provide you training?

22         A.    All of the other team leaders had the

23   training.

24         Q.    Okay.  What training are you referring
```

Charles Robinson
March 23, 2005

1        Q.    Okay.

2        A.    But the training that I'm referring to

3   was specifically a three week, I believe a three

4   week course.  I don't remember the exact duration.

5        Q.    Okay.  Did you go to anyone else with

6   this request other than Mr. Pilat?

7        A.    Mr. Pilat was my immediate supervisor.

8        Q.    So my -- your answer to my question is

9   no; is that correct?

10       A.    That's correct.

11       Q.    Did you put in writing this request?

12       A.    I may have.

13       Q.    Do you have a copy of that?

14       A.    No, I don't.

15       Q.    Did Mr. Pilat ever tell you that you did

16  need to get training with SOPS?

17       A.    He told me that I should familiarize

18  myself with it.

19       Q.    And that it was important to familiarize

20  yourself with SOPS?

21       A.    No.

22       Q.    Was it important that you familiarize

23  yourself with SOPS?

24       A.    No, I was all -- constantly told that it

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

1    -- I felt that it was important.  Mr. Pilat did not

2    feel it was important.  Mr. Pilat told me that the

3    most important thing that I could do on my job was

4    to meet FOC.

5         Q.    That's Form Order Commitment?

6         A.    Yes.

7                   MR. SPRINGER:   F-O-C.

8         Q.    (By Mr. Springer)  Did Mr. Pilat suggest

9    how you might familiarize yourself with SOPS?

10        A.    I made every effort to familiarize myself

11   with it.

12        Q.    Did he tell you ways that you could?

13        A.    Yes, he did.

14        Q.    And what did he suggest?

15        A.    He suggests that I, again, sit down with

16   other team leaders.

17        Q.    And did you?

18        A.    Yes, I did.

19        Q.    Which ones?

20        A.    I sat down with Patrick Padulski and

21   Susan Rober.

22        Q.    Okay.  And for what purpose did you sit

23   down with them?

24        A.    For a general understanding of the SOP

**KACZYNSKI REPORTING**
617.426.6060

Charles Robinson
March 23, 2005

1    process -- typing of service order itself.

2        Q.    Okay.   In other words, the work that your

3    techs did?

4        A.    That's correct.

5        Q.    Okay.   And how much did you sit with

6    Patrick Padulski?

7        A.    I sat with him probably about three or

8    four days to familiarize myself, and -- but I also

9    went to Mr. Pilat and I told him that Patrick was

10   basically holding back information from me and I

11   made that complaint to Mr. Pilat.

12       Q.    Okay.   What information was he holding

13   back?

14       A.    Just various -- again, nobody was really

15   that proficient as far as the service orders up

16   there.   I had gone and I sat with --

17               MR. FRAGOMENI:  Answer his question.

18               THE WITNESS:  Would you repeat the

19    question, please.

20               MR. SPRINGER:  Why don't we just --

21       Q.    (By Mr. Springer)  You said nobody was

22   that proficient with service orders and you sat with

23   -- and you were about to describe something?

24       A.    I forget now.

Charles Robinson
March 23, 2005

1       Q.   Okay.  Well, Mr. Robinson, you sat with

2   Patrick Padulski three or four days.  Do you

3   remember when that was, early in your time at the

4   NMC?

5       A.   I would say so, yes.

6       Q.   Somewhere in the first few months?

7       A.   I would say so, yes.

8       Q.   Okay.  And that was to get a general

9   understanding of forms and how to fill them out; is

10  that correct?

11      A.   Basically to see what the input was, yes.

12      Q.   Okay.  And you thought he was holding

13  back some information; is that correct?

14      A.   Actually yes.

15      Q.   And what information did you think he was

16  holding back?

17      A.   I don't recall specifically right now.

18      Q.   Okay.  Did you go to Mr. Pilat about

19  that?

20      A.   Yes, I did.

21      Q.   Do you remember the conversation with

22  Mr. Pilat?

23      A.   I said Do you want me to go and talk to

24  him -- you know, Mr. Padulski or do you want to go?

Charles Robinson
March 23, 2005

1    And he said he would.

2        Q.    Okay.  Do you know if they had a

3    conversation?

4        A.    I don't know.

5        Q.    Okay.  Did you go back to Mr. Padulski

6    and get -- and sit with him further to get further

7    understanding --

8        A.    No, I never did.

9        Q.    -- of SOPS?  Why not?

10       A.    Because what did was -- and I would sit

11   down and basically under the guise of quality, sit

12   with my direct subordinates who were doing the work

13   and I learned from them.

14       Q.    Okay.  You said you also sat from --

15       A.    To have an understanding of it.

16       Q.    You also sat with Susan Rober; is that

17   correct?

18       A.    That's correct.

19       Q.    And how many days did you sit who her?

20       A.    I can't recall.

21       Q.    Also around the same time you sat with

22   Patrick Padulski?

23       A.    No, over the course of my time there.

24       Q.    Okay.  And then you said you sat with

Charles Robinson
March 23, 2005

```
 1   your subordinates --

 2       A.   That's correct.

 3       Q.   -- under the guise of quality so that you

 4   would learn how to deal with SOPS; is that correct?

 5       A.   To have a better understanding of it,

 6   yes.

 7       Q.   Okay.  And how much -- was -- would it be

 8   proper to call this shadowing?

 9               MR. FRAGOMENI:  Objection.

10               THE WITNESS:  I don't use that term.

11               MR. SPRINGER:  Okay.

12       Q.   (By Mr. Springer)  And did Mr. Pilat

13   suggest that you shadow the techs?

14       A.   I never heard that from him.

15       Q.   Okay.  Did he suggest that you sit with

16   the techs and learn from them because they knew --

17   because they had received training?

18       A.   I don't believe that he ever said for me

19   to sit with a tech.

20       Q.   Okay.  So other than having you -- what

21   did he suggest that you do to familiarize yourself

22   with SOPS other than sit with other team leaders?

23       A.   Mr. Pilat said that I specifically did

24   not have to know how to write a service order.
```

Charles Robinson
March 23, 2005

1      Q.    When id he say that?

2      A.    He said that numerous times over the

3  course of my tenure there.

4      Q.    And who was present when he said that?

5      A.    It was in the middle of the floor,

6  whether somebody overheard it or not, I don't know.

7      Q.    Okay.  There were three week courses that

8  you say were being given on a regular basis?

9      A.    That's correct.

10      Q.    Okay.  And I take it you made only one

11  request to Mr. Pilat to attend; is that correct?

12                   MR. FRAGOMENI:  Objection.

13                   THE WITNESS:  I don't recall that.

14      Q.    (By Mr. Springer)  Do you recall anything

15  other than one request?

16      A.    I would say no.

17      Q.    Okay.  What was taught, to your

18  knowledge, in these courses?

19      A.    Specifically how to -- from the ground up

20  as far as the service order went.

21      Q.    Okay.  And did you think by sitting with

22  Padulski and Rober and your subordinate you had

23  gained a fair general knowledge of SOPS?

24      A.    I had an understanding of SOP, yes.

79

Charles Robinson
March 23, 2005

1        Q.    Okay.  Did you think it was a good

2    understanding?

3        A.    Let me just clarify as far as, you know,

4    sitting down with Padulski and Rober --

5              This was not in a situation where I just

6    went into a room with them.  This was people lined

7    outside the cubicles, you know, asking them

8    questions, okay?  So just to clarify what this

9    training was, okay.

10       Q.    And you heard them answer the questions?

11       A.    That's correct.

12       Q.    Okay.  And they would -- they would use a

13   variety of techniques to answer those questions,

14   wouldn't they?

15       A.    If they could answer them, yes.

16       Q.    Okay.  And you got to observe all of

17   that?

18       A.    Yes.

19       Q.    Did they ever use a stare and compare

20   technique?

21       A.    I never heard that saying.

22       Q.    Do you know what stare and compare is?

23       A.    No.

24             MR. FRAGOMENI:  Are you saying

Charles Robinson
March 23, 2005

1    S-T-A-I-R or S-T-A-R-E?

2                    MR. SPRINGER:  S-T-A-R-E.

3        Q.    (By Mr. Springer)  Never heard that?

4        A.    No.

5        Q.    Is that -- I'm correct you've never heard

6    it?

7        A.    Absolutely I've never heard that.

8        Q.    Any other way in which you sought to

9    train yourself with regard to SOPS?

10       A.    Not really, no.

11       Q.    Okay.  At any time other than your

12   request to Mr. Pilat that you receive training, did

13   you complain to him about your lack of knowledge of

14   SOPS?

15       A.    He knew that I did -- could not write the

16   service orders like the other -- yes, I did complain

17   and I complained to this degree:

18            Other team leaders were typing orders all

19   the time, okay, as opposed to letting their

20   subordinates do the work, so I had people typing,

21   you know, up and down aisles, you know, as far as

22   typing the service orders, the team leaders, so I

23   felt that I had to be able to type an order in order

24   to, you know, been on an equal standing with them.

Charles Robinson
March 23, 2005

```
 1            MR. FRAGOMENI:  Listen to his
 2   question and answer it.
 3            THE WITNESS:  Okay.
 4       Q.   (By Mr. Springer)  You were about to say
 5   Mr. Padulski -- I'm sorry -- Mr. Pilat knew that you
 6   were not as proficient as other team leaders; is
 7   that correct?
 8       A.   He knew that I did not have the
 9   background that the other team --
10       Q.   Okay.  How did he know that?
11       A.   Because of the resume that I provided
12   him.
13       Q.   Okay.  Any other training that you
14   acquired at any point with regard to SOPS?
15       A.   I can't recall any.
16       Q.   Okay.  Did you only deal with
17   Massachusetts SOPS?
18       A.   I can't recall that.  I can't recall.
19       Q.   Okay.  Do you remember New Jersey and
20   Pennsylvania coming on line at some point during
21   your employment?
22       A.   Yes, I do.
23       Q.   Okay.  Did you receive any training with
24   regard to New Jersey and Pennsylvania SOPS?
```

Charles Robinson
March 23, 2005

1        A.    I cannot recall that.

2        Q.    Did you ask for any?

3        A.    I cannot recall that.

4        Q.    Did your techs receive any?

5        A.    What I recall -- I don't know.

6             MR. SPRINGER:  We've gone for a

7    little more than an hour and a half.  Why don't

8    we take a short break, come back.

9  We'll try to go to one or so and

10    then we'll take a forty-five minute lunch

11    break.

12             Off the record.

13        (Short break taken.)

14             MR. SPRINGER:  Back on the record.

15        Q.   (By Mr. Springer)  Mr. Robinson, you had

16    described a meeting held where you and other team

17    leaders objected to how Claudia D'Amato and Hank

18    Pilat said that internal Verizon CLEC'S should be

19    treated; is that correct?

20        A.    That's correct.

21        Q.    Okay.  This was a difference of opinion;

22    is that correct?

23        A.    Absolutely not.

24        Q.    What --

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

1          MR. FRAGOMENI:  Sorry for the noise.

2          THE WITNESS:  No, it wasn't.

3          Basically, they were telling -- I

4     don't recall the specifics, but they were telling

5     us to do something that was out of the norm to

6     provide, give Verizon preferential treatment --

7     and that was the phrase that was used.

8

9          MR. SPRINGER:  Okay.

10     Q.    (By Mr. Springer)  And but there was

11     nothing illegal to that, as far as you knew?

12          MR. FRAGOMENI:  Objection.

13          THE WITNESS:  I don't know the

14     legalities of this.

15          MR. SPRINGER:  Okay.

16     Q.    (By Mr. Springer)  So you don't -- okay.

17     You simply don't know whether there was

18     legalities involved here?

19     A.    That's correct.

20     Q.    Okay.  And you fully described what you

21     thought the preference was that they were seeking

22     for internal Verizon CLEC's, mainly to make sure

23     that their -- if their orders were not sufficient in

24     some regard that corrections would be made that was

Charles Robinson
March 23, 2005

```
 1    a greater service than was provided to outside

 2    CLEC's like COVAD; is that correct?

 3         A.    That was one of them, yes.

 4         Q.    Any other way that --

 5         A.    I can't recall at this particular time.

 6         Q.    If you could, sir, tell me as

 7    specifically as you can your duties and

 8    responsibilities as a team leader?

 9         A.    My -- as a Team Leader where?

10         Q.    At -- for NMC.

11         A.    Okay, at the NMC.

12         Q.    In April -- April 2000.

13         A.    It was to ensure that -- naturally

14    supervise my employees, okay, answer any questions

15    that they might have and interface with the CLEC's

16    that were assigned to me and meet the firm order

17    commitment, FOC.

18         Q.    Typically, what were the kinds of

19    questions your subordinates would have?

20         A.    What should I do in this particular

21    instance', why doesn't this order flow properly --

22    that type of a question.

23         Q.    Okay.  Let me ask with regard to SOPS

24    particularly:
```

Charles Robinson
March 23, 2005

```
1               Do you remember any of the particular
2   questions that would be asked about a SOP?
3        A.    Basically, I can give you one example
4   that -- Russell Loomy:  Why didn't -- isn't this
5   assigning to the proper central office?
6        Q.    Okay.
7        A.    Okay?  And that's basically all I
8   remember at this particular time.
9        Q.    Okay.  Would it be fair to say that --
10  how frequently did that happen that there would be
11  questions with regard to SOPS?
12       A.    Frequently.
13       Q.    Several times a day at least?
14       A.    Absolutely.
15       Q.    Okay.  By a number of different techs?
16       A.    Yes.
17       Q.    And tell me, if you could in our own
18  words, what the SOP process involved, or what the
19  SOP system involved?
20       A.    The SOP system involved receiving an
21  order from a CLEC -- again, SOP is Service Order
22  Provisioning that's company-wide.
23       Q.    Right.
24       A.    I'm just referring specifically to the
```

Charles Robinson
March 23, 2005

1    process of the NMC.

2            Basically a request for facilities would

3    be requested by the CLEC; in turn, an order would be

4    written if all of the information was correct.

5        Q.    And who would the order be written by?

6        A.    The order would be written by the -- my

7    techs, by the service reps, okay?

8            And that's basically -- and they would

9    type in the order, depending on what was requested

10   and it would just flow through and assign or not

11   assign.

12       Q.    And when you say assign or not assign, if

13   the order was done correctly it would assign but if

14   there was some mistake, it would assign; is that

15   correct?

16       A.    Not necessarily.  The order could be --

17   the NMC could be completely clean, have the order

18   typed properly, but because off another department

19   that did not have the inventory built correctly for

20   the facilities, it would not assign.

21       Q.    So there may be an error elsewhere that

22   would affect that?

23       A.    That's correct.

24       Q.    So one had to keep on top of what was

Charles Robinson
March 23, 2005

1    happening elsewhere, for instance, if there was a

2    new central office --

3        A.    No.

4        Q.    -- created?

5        A.    No.

6        Q.    Tell me.

7        A.    That was not the -- that was not the

8    responsibility of the NMC, as far as I recall.

9        Q.    Okay.  And if something would not assign,

10   I am assuming the tech would try to solve it himself

11   or herself; is that correct?

12       A.    Yes.

13       Q.    Okay.  And then if they could not figure

14   out why it would not assign, they would then come to

15   you; is that correct?

16       A.    I was one of the people they would come

17   to, yes.

18       Q.    Okay.  And they would ask you:  Look,

19   this isn't assigning, could you tell me why?

20       A.    In some instances, yes.

21       Q.    What other questions would they ask with

22   regard to SOPS?

23       A.    I can't recall at this time.

24       Q.    That was the basic question?

Charles Robinson
March 23, 2005

1        A.    Basically -- it's not assigning.

2        Q.    Yeah.  And what -- did you have a

3   protocol that you went through to determine to try

4   to help them?

5        A.    I would say so, yes.

6        Q.    What was your protocol?

7        A.    It was basically to look at the order and

8   to see what our facilities -- what was missing on

9   that particular order, if there was something

10  missing.

11       Q.    Okay.  And if there was nothing missing,

12  what did you do next?

13       A.    Again, it depends on what the situation

14  was.  There were many scenarios.

15       Q.    Well, tell me, what was your protocol;

16  that is, what was the normal procedure you used?

17       A.    I can't recall every single thing that I

18  did, you know.

19       Q.    I'm not asking for every single thing.

20  I'm asking for your normal procedure.

21       A.    I would look at the order.

22       Q.    Yeah.

23       A.    And basically I would turn around and

24  look to see if the order was written properly.  If

Charles Robinson
March 23, 2005

1   the order was written properly and it wasn't

2   assigning, I would then turn around and let them

3   know if there was an error on their order or I would

4   turn around and if it wasn't assigning a facility, I

5   would call up LFACS, you know, and explain to them

6   that facilities were not there, plus I had the

7   ability to look in LFACS and I would know whether

8   the inventory was built or not.

9       Q.    Any other protocol that you used to

10  determine why things were not -- why SOPS were not

11  assigning?

12      A.    I can't recall anything else.

13      Q.    Okay.  And said just so I understand the

14  process -- and correct me if I'm wrong, Mr. Robinson

15  -- the order comes in from the CLEC, okay?  It's

16  then, in essence, translated into language that

17  Engineering will understand, is it not, by the tech?

18      A.    Not -- again not into engineering, no.

19      Q.    Okay.  Well, tell me what the service rep

20  or tech does on the SOP, the form --

21      A.    They would.

22      Q.    -- so that it assigns?

23      A.    They would validate all the information

24  that was on the request from the CLEC.  If all of

Charles Robinson
March 23, 2005

1    the information on that form was correct, they would

2    then write a service order.

3              If the information was not correct, they

4    would send that back to the CLEC and explain to them

5    what they had to provide back to us in order for the

6    order to flow.

7         Q.   To be correct?

8         A.   That's correct.

9         Q.   In other words, the CLEC may have been

10   making a demand that you technically couldn't

11   fulfill; is that correct?

12        A.   In some instances, correct.

13        Q.   What other things would a CLEC be doing

14   that you couldn't fulfill in an order?

15        A.   They would omit the type of service that w

16   required.

17        Q.   So there would be some missing

18   information?

19        A.   That's correct.

20        Q.   Okay.  So then after the service rep

21   fills out the SOP, okay, to whom does it go, other

22   than Engineering -- it goes to Engineering, doesn't

23   it?

24        A.   It goes downstream.

94

Charles Robinson
March 23, 2005

1          A.    I don't remember at this point.

2          Q.    Do you remember there being a seventy-two

3    hour time requirement, as well, with regard to the

4    process?

5          A.    I do remember that number.

6          Q.    And do you remember what that requirement

7    involved; in other words, what needed to get done

8    within seventy-two hours?

9          A.    I forget.  I don't recall at this

10    particular time.

11          Q.    Okay.  When you basically looked over the

12    shoulders of your techs under the guise of quality

13    to learn more about SOPS, nobody told you you were

14    spending too much time with your techs, did they?

15          A.    Not that I recall, no.

16          Q.    All right.  You could spend as much time

17    as you wanted at learning from them, couldn't you?

18          A.    Not really because I had other

19    assignments.

20          Q.    Okay.  Well, it was a matter of

21    priorities, wasn't it?

22          A.    Well, again, I sat with them; that was

23    it.

24          Q.    How much did you sit with them though?

95

Charles Robinson
March 23, 2005

```
 1          A.   I sat with them long enough basically to

 2    understand what was going on.

 3          Q.   So you felt you had sufficient

 4    knowledge --

 5                    MR. FRAGOMENI:  Objection.

 6          Q.   (By Mr. Springer)  -- to be able --

 7          A.   To understand the process.

 8          Q.   And to provide them guidance, isn't that

 9    so?

10          A.   In most instances yes.

11          Q.   I am -- we had talked about Ruth Linda

12    Rober before, Do you remember that?

13          A.   Yes.

14          Q.   And when did you begin your friendship

15    with her?

16          A.   I don't recall.

17          Q.   Do you recall the year?

18          A.   No, I don't.

19          Q.   Do you recall how it started?

20          A.   No, I don't.

21          Q.   Did you have an e-mail correspondence

22    with her?

23          A.   Yes, I did.

24          Q.   And when did that start?
```

Charles Robinson
March 23, 2005

1    form.

2                    THE WITNESS:  I believe that I was

3    discriminated against by Verizon by the

4    questioning of Mr. Pilat about my age.

5                    MR. SPRINGER:  Okay.

6         Q.   (By Mr. Springer)  And that was before

7    your termination?

8         A.   That's correct.

9         Q.   Okay.  And all I want to know now -- and

10   we're back to those questions, all I want to know

11   now is:

12                    Is there any action that Verizon took

13   other than laying you off?

14        A.   Nothing that I can recall at this minute.

15        Q.   Okay.

16                    MR. SPRINGER:  (Handing.)

17                    (C. Robinson Exhibit No. 5, Single Page

18                    Cartoon, marked for identification.)

19        Q.   (By Mr. Springer)  Can you identify this?

20        A.   Yes.

21        Q.   What is it?

22        A.   This is a cartoon that was handed to me

23   by Mr. Pilat and Ms. D'Amato while I was sitting in

24   my cubicle.

Charles Robinson
March 23, 2005

1     Q.    And were the names written in when it was

2   handed to you?

3     A.    Absolutely.

4     Q.    Okay.  And it was handed by both of them

5   to you?

6     A.    That was handed to me by Mr. Pilat and

7   Claudia D'Amato was standing right there with him.

8     Q.    Was there anyone else there?

9     A.    I believe -- I don't recall anybody

10  else.  I remember those two specifically.

11    Q.    Okay.  And do you remember when this

12  occurred?

13    A.    I don't recall that specifically.

14    Q.    I notice a fax line on the top that is

15  August 13th, 2000.  Is that approximately when this

16  occurred?

17    A.    It -- probably.

18    Q.    Okay.  Now, did you think that you're

19  being handed this had anything whatsoever to do with

20  your age?

21    A.    Yes.

22    Q.    Why?

23    A.    Because if you notice, Charlie is marked

24  as the unicorn.

109

Charles Robinson
March 23, 2005

1      Q.    Yes.

2      A.    Okay.  And one way to view this is a --

3   an animal that's extinct or animal that's basically

4   a fantasy figure, but again, where the other animals

5   are real, this one here is -- no longer exists.

6      Q.    And other than what you've just said, is

7   there any other reason to believe this was handed to

8   you because of your age?

9      A.    Again, because of statements that had

10  been made to me by Mr. Pilat, you know, previous,

11  you know, about how I was old enough and I'd retire

12  and, you know, and things like that.

13     Q.    We will get to those statements in a

14  minute.

15            Was anything said to you by Mr. Pilat or

16  Ms. D'Amato when this was handed to you?

17     A.    Not that I recall, no.

18     Q.    Okay.  And what did you do with this

19  cartoon afterwards?

20     A.    I had this in my cubicle.

21     Q.    Did you put it up on your wall?

22     A.    I has it -- yes.

23     Q.    Why did you put it up on your wall?

24     A.    So I wouldn't lose it.

Charles Robinson
March 23, 2005

1       Q.   Okay.  Did you make copies for others?

2       A.   No.

3       Q.   Did you show this to others?

4       A.   No.

5       Q.   Did you make an enlargement of it?

6       A.   No.

7       Q.   Did you talk to it -- I'm sorry.

8           Did you talk with others about it?

9       A.   Again, just one brief conversation.

10      Q.   With whom?

11      A.   Susan Rober.

12      Q.   And when was that conversation?

13      A.   Again, I don't know who I was talking to

14 but she overheard me talk about the cartoon and I

15 just basically remember the gist of it saying:

16 Well, what would you think?  How would you feel if

17 this was given to you?  And that ended the

18 conversation.

19      Q.   She said that or you said that?

20      A.   What part?

21      Q.   How would you feel if this was given to

22 you?

23      A.   I said that.

24      Q.   And did she have a response?

Charles Robinson
March 23, 2005

1         A.    She just walked away.

2         Q.    Okay.  Were you having troubles with the

3    other team leaders at this point?

4         A.    I would say no.

5         Q.    Why would you voted off the island, to

6    your knowledge?

7         A.    Mister -- I have no clue.

8         Q.    This was around the time, I take it, that

9    the Survivor show was popular on TV?

10                    MR. FRAGOMENI:  Objection.

11                    If you know.

12                    THE WITNESS:  I can't recall.

13                    MR. SPRINGER:  Okay.

14        Q.    (By Mr. Springer)  Describe to me each of

15   these people in this exhibit -- which is Exhibit 5,

16   I believe -- are named and it is Patrick -- Patrick

17   who -- who is that?

18        A.    That would be Patrick Padulski.

19        Q.    He was a Team Leader?

20        A.    That's correct.

21        Q.    Lou -- who is that?

22        A.    He was another Team Leader.

23        Q.    Okay.  Sue -- who is that?

24        A.    Another Team Leader.

Charles Robinson
March 23, 2005

1       Q.    Is that Sue Rober?

2       A.    Yes.

3       Q.    And Lou Leone, is that him?

4       A.    I guess, I mean --

5       Q.    Was there another --

6       A.    No, he was a Team Leader there, Lou

7    Leone, yes.

8       Q.    Okay.  And Hank is the lion?

9       A.    That's correct.

10      Q.    And I take it the only Hank was Hank

11   Pilat?

12      A.    Correct.

13      Q.    Who was Brenda?

14      A.    She was another Team Lead.

15      Q.    Claudia?

16      A.    Another Team Lead.

17      Q.    Well, wasn't it --

18      A.    No, Claudia was an AOM, sorry, an AOM.

19      Q.    Lisa?

20      A.    She was a Team Lead.

21      Q.    And Jean?

22      A.    She was a Team Lead.

23      Q.    And is that Lisa Smith?

24      A.    That's correct.

Case 1:04-cv-11964-NG    Document 21-2    Filed 10/21/2005    Page 71 of 139

Charles Robinson
March 23, 2005

```
1        Q.    And Jean, what was Jean's last name?

2        A.    Freeman.

3        Q.    Okay.  So these were all team leads

4   except Claudia and Hank who were supervisors or Team

5   Leads?

6        A.    That's correct.

7        Q.    Is Brenda older than you?

8        A.    I don't know.

9        Q.    Okay.  And just again, other than posting

10  it on your cubicle wall, did you color it in?

11       A.    Never.

12       Q.    Did you do anything with it other than

13  posting it on your cubicle wall?

14       A.    I never did anything with this other than

15  post it on the cubicle wall.

16       Q.    How long did you keep it up there?

17       A.    I never took it down.

18       Q.    Okay.  Did you think it was funny?

19       A.    No.

20       Q.    Do you know whose handwriting this is?

21       A.    I believe this is Mr. Pilat's

22  handwriting.

23       Q.    That's your speculation isn't it?

24                 MR. FRAGOMENI:  Objection.
```

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

```
 1              THE WITNESS:  I have a -- I have
 2    documents that he has signed that I believe this
 3    is his, and by --
 4         Q.   (By Mr. Springer)  And you -- sorry, go
 5    ahead?
 6         A.   I believe this is his handwriting.
 7         Q.   Because you've done a comparison of
 8    printing --
 9         A.   No -- plus the fact he handed it to me.
10         Q.   But you're not a handwriting expert, are
11    you?
12         A.   No.
13         Q.   Never received any training in that, did
14    you?
15         A.   No.
16         Q.   And he never said that this was his
17    handwriting, did he, when he handed it to you?
18         A.   Again -- no, he didn't.
19         Q.   Okay.  Now, you say that you were
20    discriminated against on the basis of your age with
21    regard to your layoff during the Reduction in Force.
22              Who in particular discriminated against
23    you on the basis of your age?
24         A.   Mr. Pilat.
```

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

1      Q.    Anyone else?

2      A.    I'd have to say Claudia was involved.

3      Q.    Why would you have to say Claudia was

4   involved?

5      A.    She made the decision with him.

6      Q.    Okay.  What information do you have to

7   suggest it was age discrimination?

8      A.    I've provided everything to my attorney.

9      Q.    Well, I am asking --

10           MR. FRAGOMENI:  He is asking you a

11   question --

12           THE WITNESS:  Oh.

13           MR. FRAGOMENI:  -- about your

14   understanding.

15           THE WITNESS:  My understanding?

16           MR. SPRINGER:  Yeah.

17      Q.    (By Mr. Springer)  What information do

18   you have that suggests that you were discriminated

19   against on the basis of your age?

20      A.    Comments that were made to me by

21   Mr. Pilat, an attempt to reduce my responsibilities

22   and this cartoon.

23      Q.    Anything else?

24      A.    Not that I can recall now.

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

1        Q.    Okay.  With regard to comments, can you

2    tell me every comment you believe indicates that

3    your layoff was a result of your age?

4        A.    Again, any time that he asked me,

5    Mr. Pilat -- and again, he didn't ask me, he was

6    basically making a statement, and again, he would

7    say You're old enough, you would retire if an offer

8    was made.

9            This started from the first time that I

10   -- you know, went up to the NMC, and it wasn't just

11   in conversation.

12       Q.    When you say it wasn't just in

13   conversation, what do you mean?

14       A.    I didn't have that feeling because it was

15   said to me numerous times over the first couple

16   months, two or three months that I was there, in

17   fact, so much so that I told him to stop that type

18   of questioning of me because I had seen that type of

19   questioning in the past.

20            I did not want to be identified as a

21   possible retiree.

22       Q.    Where had you seen that kind of

23   questioning before?

24       A.    I had gone through RIF's before.

Charles Robinson
March 23, 2005

1      Q.   And so you're saying that in the past,

2   people asked you whether you wanted to retire?

3      A.   No.  I saw older coworkers being asked

4   that question.

5      Q.   Whether they wanted to voluntarily leave

6   the company?

7      A.   No.

8      Q.   Whether they wanted to retire?

9      A.   Not that question, but basically -- yes

10   on that idea, yes.  They would -- yes.

11      Q.   Well, tell me if you remember any of the

12   specifics of what this prior questioning involved;

13   in other words, can you remember any occasion where

14   that occurred and who was involved?

15      A.   Again, I can just remember back years and

16   with the first RIF and I remember again it wasn't a

17   voluntary thing.  It was basically people that were

18   the oldest workers there that were the ones that

19   were let go.

20      Q.   When you say the first RIF, what time

21   were you talking about?

22      A.   That goes back probably fifteen years.

23      Q.   Okay.  Do you remember any specifics at

24   any time with regard to what was said and by whom

Charles Robinson
March 23, 2005

1      concerning this prior questioning about retirement?

2          A.   I don't really recall anything else.

3          Q.   So you don't recall any -- any names?

4          A.   Oh, who, of people that I just provided.

5          Q.   Yeah, of people who were -- who did the

6      questioning, do you have any memory of any names of

7      the people who did the questioning?

8          A.   I don't recall, no.

9          Q.   Okay.  And do you have any names of any

10     of the persons who were questioned?

11         A.   I would say, again, I know people that

12     were --

13                   MR. FRAGOMENI:  Give him the names.

14                   THE WITNESS:  Thomas Kennedy and Al

15     Spagnoli.

16         Q.   (By Mr. Springer)  And when was that?

17         A.   Years ago, I don't know exactly when.

18         Q.   Okay.  And do you know what specifically

19     was asked of them?

20         A.   No, I don't.

21         Q.   And do you know -- and you don't know who

22     asked it of them?

23         A.   No.

24         Q.   Okay.  And do you know whether this was

Charles Robinson
March 23, 2005

1   an involuntary or voluntary layoff they were

2   involved in -- or both?

3       A.   It was an involuntary layoff.

4       Q.   Okay.  And when you say fifteen years ago

5   that -- that's the first layoff that you remember,

6   about fifteen years ago?

7       A.   Again, I don't know specifically the time

8   frame; it could have been ten years ago.

9       Q.   Okay.  And do you know everyone who was

10  laid off in that layoff?

11      A.   In my particular area that I was involved

12  with, you know, my general circle of people, no --

13  the -- those are two names that I've provided you.

14      Q.   Okay.  And I'm asking -- so you don't

15  know everybody?

16      A.   I don't know every single person, no.

17      Q.   Do you know how many people were laid off

18  in that layoff?

19      A.   No, I don't.

20      Q.   Okay.  And just so I'm clear:

21          What do you remember being said to

22  Mr. Kennedy and Mr. Spagnoli that you over --

23          Did you overhear this or did they tell

24  you?

Charles Robinson
March 23, 2005

```
 1          A.   They basically told me that, you know,

 2    and again, I just -- it's again --

 3                    MR. FRAGOMENI:  Answer his question,

 4    please.

 5                    THE WITNESS:  I over -- I didn't

 6    overhear it.  I was told this.

 7          Q.   (By Mr. Springer)  What did they tell

 8    you?

 9          A.   That they were basically being asked to

10    retire.

11          Q.   Do you remember -- know if a question was

12    asked of them?

13          A.   I don't know specifically, no.

14          Q.   Do you know if they were asked whether

15    they wanted to retire?

16          A.   I don't know specifically, no.

17          Q.   Okay.  So you don't know what was said to

18    them at all --

19          A.   That's correct.

20          Q.   -- at all; is that correct?

21                    MR. FRAGOMENI:  Objection.

22                    THE WITNESS:  I don't recall the

23    specifics of the conversation, no.

24          Q.   (By Mr. Springer)  Now, you say Mr. Pilat
```

Charles Robinson
March 23, 2005

1    asked you questions just about as soon as you got

2    there; is that correct?

3         A.    That's correct.

4         Q.    And what were the questions that he asked

5    you?

6         A.    He would say to me, you know, you're old

7    enough, if an offer was made, you would take it,

8    wouldn't you -- and basically identifying me as that

9    type of a person.

10        Q.    And was -- did this just come out of the

11   blue?

12        A.    I believe so, yes.

13        Q.    Do you remember any context for it?

14        A.    I remember this context that he wasn't

15   happy with his job, okay, so he would ask me that,

16   like I'd be crazy not to take something.

17        Q.    So -- just so I'm clear, you think it may

18   have been in the context of a discussion of job

19   dissatisfaction and him saying if I had an

20   opportunity, I'd take it and --

21        A.    It wasn't that benign.

22        Q.    Well, I'm trying to find out what the

23   context was, Mr. Robinson?

24        A.    I don't know a lot of specific context,

Charles Robinson
March 23, 2005

1    but all I know is that what said to me.  I did not

2    have a good feeling about it because it was said

3    more than once on numerous occasions.

4        Q.    Well, let's try to remember the first

5    occasion.  Do you remember the first occasion that

6    it occurred; how soon after you got to NMC in April

7    of 2000?

8        A.    I would say within the first month or so.

9        Q.    Okay.  And was it in his cubicle or

10   office?

11       A.    Yes.

12       Q.    Okay.  And were you the only two there?

13       A.    Yes.

14       Q.    And Do you remember what he said to you

15   that you didn't think was benign?

16       A.    Again You're old enough, you would retire

17   if an offer was made.

18       Q.    Okay.  And was this in the context of any

19   discussion?  Was it about job dissatisfaction?

20       A.    I know he was dissatisfied with his job.

21       Q.    Okay.  Now, I'm trying to see if there's

22   any context in which it was made.

23             Did you raise the issue of retirement

24   with him?

Charles Robinson
March 23, 2005

1      A.    Never.

2      Q.    Did you ever discuss that -- did you ever

3   say to anyone at NMC, you know, I just want to be

4   here three more years?

5      A.    I don't remember that, absolutely not.

6      Q.    Okay.  Did you ever say to anyone how

7   much longer you wanted to stay at NMC?

8      A.    I don't recall that at all.

9      Q.    Did you say that to Mr. Pilat?

10     A.    I don't recall that at all.

11     Q.    Did you ever have a discussion with him

12   when you came on board in that -- in your interview

13   when he made you an offer or shortly thereafter made

14   you an offer about how long you would stay there?

15     A.    I told him I was there for the duration.

16     Q.    Duration of what?

17     A.    Whatever my working career was going to

18   be.

19     Q.    Okay.  Did you ever have a discussion at

20   that point that you wanted to be there about three

21   more years anyway?

22     A.    I never remember saying that, no.

23     Q.    Do you remember discussing with anyone

24   that you were dissatisfied with your job?

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

1      A.    I never said that.

2      Q.    Okay.  Did you discuss -- okay.

3            Other than your remembering Mr. Pilat

4    within a month of you getting there saying that you,

5    you know, you would retire if an offer were made,

6    wouldn't you -- and did he say anything about your

7    age at that point that you're old enough to retire?

8      A.    Basically, yes.

9      Q.    What did he say?

10     A.    You're old enough, you would retire.

11     Q.    Was it true that if you got a good enough

12   package you would retire?

13     A.    I was very happy with my job.

14     Q.    Okay.  Were there discussions of packages

15   at the time?

16     A.    I don't recall that at all.

17     Q.    Were there packages around at that time?

18     A.    I don't know.

19     Q.    There were always packages at Verizon,

20   weren't there, around then?

21     A.    I don't recall it at all.

22     Q.    Okay.  Do you remember any discussion of

23   any upcoming package with anyone or whether a

24   package would be coming up with anyone?

125

Charles Robinson
March 23, 2005

1        A.    Absolutely not.

2        Q.    Okay.  Do you have any understanding of

3    why Mr. Pilat would say this to you in his office a

4    month after you had come on board?

5        A.    I have no idea.

6        Q.    Do you remember any context in which it

7    was said, other than perhaps a discussion of job

8    dissatisfaction?

9        A.    I don't recall right now.

10        Q.    Okay.  Mr. Pilat said he wasn't that

11    happy in his job to you at some point?

12        A.    I believe so yes.

13        Q.    Yeah.  Pretty early on?

14        A.    Yes.

15        Q.    It might have been this same

16    conversation?

17        A.    I don't know that.

18        Q.    Okay.  You just don't remember?

19        A.    That's correct.

20        Q.    Now, you said he said it again at some

21    point -- or something similar?

22        A.    Again --

23        Q.    Did he use the exact same words?

24        A.    Yes.

Charles Robinson
March 23, 2005

1       Q.    Okay.  And what were those words?

2       A.    Basically you're old enough to retire you

3   know -- you know, that was it.

4       Q.    Okay.  And when's the next time he said

5   that?

6       A.    I don't know.

7       Q.    Six months later?

8       A.    I have no idea.

9       Q.    A year later?

10      A.    I have no idea.

11      Q.    How often -- so your statement is that he

12  said it at least twice that you remember?

13      A.    I would say more than twice.

14      Q.    Well, when did --

15            MR. FRAGOMENI:  You've got to tell

16  him when.

17            THE WITNESS:  Okay.  I don't know

18  specifically.  I would say it happened from the

19  time I got up there until the strike began, that's

20  what I would say.

21            It happened numerous times.  I

22  don't know the specific dates, but it happened

23  numerous times from the time that I got there

24  until the strike began.

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

1              MR. SPRINGER:  Okay.

2         Q.   (By Mr. Springer)  And the strike began

3    in August of 2000; is that correct?

4         A.   I believe so, yes.

5         Q.   Okay.  So you're saying within a month,

6    so from May through August, it happened numerous

7    times.  How often?

8         A.   It was often enough that I said to him I

9    wanted him to knock it off.

10        Q.   Okay.  Well, how often did it occur, how

11   many times?

12        A.   I'd say at least three times.

13        Q.   Okay.  Did it happen after August of

14   2000?

15        A.   It didn't happen after I told him to

16   knock it off.

17        Q.   Okay.  So do you have any -- now that

18   you've said it happened three times, do you have any

19   memory of when it occurred the second time?

20        A.   No, I don't.

21        Q.   And do you have any memory of the context

22   in which it occurred, what you guys were discussing?

23        A.   No, I don't.

24        Q.   Was there anybody present?

Charles Robinson
March 23, 2005

1        A.    Not to my knowledge.

2        Q.    Where did it occur -- where he made this

3    remark about you'd retire?

4        A.    I don't recall every -- you know --

5    instance where it occurred.

6        Q.    Okay.  I'm not asking every, I'm asking

7    where it occurred the second time if you remember?

8        A.    I don't know.

9        Q.    Was it in his office?

10       A.    I don't know.

11       Q.    Okay.  And do you remember any other

12   conversations surrounding it?

13       A.    No, I don't.

14       Q.    Did you take any notes?

15       A.    No, I didn't.

16       Q.    Okay.  So then it occurred a third time,

17   is that correct, before August?

18       A.    I would say so, yes.

19       Q.    Okay.  Do you have any memory of anything

20   other than the words he used?

21       A.    No.

22       Q.    Do you have any memory of the

23   conversation whatsoever beyond that remark that you

24   claim is age-related?

Charles Robinson
March 23, 2005

1       A.    No, I don't.

2       Q.    Okay.  Now, what did -- at that point you

3    said you -- you told him to knock it off; is that

4    correct?

5       A.    That's correct.

6       Q.    What did you say to him?

7       A.    I said to him I've seen this type of

8    action, line of questioning before in the past and I

9    didn't like it.

10       Q.    Okay.  So these were questions he was

11    asking you?

12       A.    Well, you know, again, it wasn't

13    questions me, it wasn't a sit-down with me to find

14    out what my goals were.  It was a statement.

15       Q.    Well, wasn't it a question of whether

16    you'd accept the package if it were offered to you?

17       A.    But again, I don't believe that it was

18    said in that way, that manner, you know.

19       Q.    Well, weren't the words you'd accept an

20    offer if it were made to you?

21       A.    You're old enough, you would accept an

22    offer if it was made to you.  Again, it wasn't -- it

23    was a -- it wasn't a question, to me it was more of

24    a declarative statement even though it may seem that

Charles Robinson
March 23, 2005

```
 1    believe that your being given the cartoon was age-
 2    related?
 3          A.    Could you repeat that again?
 4          Q.    Sure.  Can you -- do you have -- other
 5    than what you've testified a few minutes ago, have
 6    you given me -- let me rephrase that.  I'll withdraw
 7    it.
 8                Have you given me every reason that you
 9    believe the cartoon was age-related.
10                You told me everything?
11          A.    Yes.
12          Q.    Okay.  Now, you said one of the reasons
13    you believe the decision to lay you off in the RIF
14    was age-related was that prior to that time, there
15    was an attempt to reduce your responsibilities; is
16    that correct?
17          A.    That's correct.
18          Q.    And can you tell me what happened?
19          A.    Yes.
20          Q.    Mr. Pilat requested that I go into his
21    office and he informed me that a contract dispatcher
22    was going to be released from the payroll and that
23    if I would mind taking over her responsibilities and
24    I said absolutely not, but the caveat was that he
```

132

Charles Robinson
March 23, 2005

1    was going to take away my reporting people, so I

2    agreed with him at that meeting, you know, okay,

3    fine.

4                 Then when I went home that night --

5                 MR. FRAGOMENI:  Did you say

6    absolutely not that you would -- would not

7    accept it or accept it.

8                 THE WITNESS:  No, I thought -- no.

9                 MR. SPRINGER:  I'm sorry.

10                MR. FRAGOMENI:  I'm sorry, but I'm

11        confused.

12                THE WITNESS:  No, that I absolutely

13    would accept it; you know, I would do anything

14    anything that they wanted there.  I would

15    absolutely accept it, you know, that job.

16                And then what happened was the

17    caveat was that he was going to take away my

18    reporting people, this is what he told me, so I

19    went home that night and again, I realized that

20    reporting people are power and if they were

21    getting rid of this person --

22  You know, dispatching -- I

23    believe that this was an attempt by him to reduce

24    my responsibilities so that I would be the

Charles Robinson
March 23, 2005

1   logical person to get rid of if anybody

2   was going to be released.

3          Q.    (By Mr. Springer)  And then did you

4   object to --

5          A.    I did.

6          Q.    When you came back in the morning?

7          A.    That -- absolutely.

8          Q.    And what happened as a result of your

9   objection?

10         A.    He said we'll discuss it, you know -- you

11  know, in a few weeks, but his intent was to take

12  away my reporting people.

13         Q.    Why do you say that?

14         A.    Because he told me.

15         Q.    Okay.  And when did this occur?

16         A.    I don't have the specifics, but -- I

17  don't have the specific time frame, but it was

18  probably -- I don't know.  I don't know the

19  specifics.  Mr. Pilat would know that.

20         Q.    Okay.  Mr. Robinson, is it possible you

21  misunderstood Mr. Pilat?

22         A.    Absolutely not.

23         Q.    Wasn't he basically saying this would be

24  in addition to your other duties?

Charles Robinson
March 23, 2005

1        A.    No.

2        Q.    Well, wasn't it at the time that the

3    staff at NMC was being severely reduced?

4        A.    The staff at NMC -- I don't recall that,

5    I don't know.

6        Q.    Well, these -- the duties of assigning

7    people tasks that this contractor had, that wasn't

8    very difficult, was it?

9        A.    It was -- you needed to turn around and

10   be able to juggle the work to dispatch the work to

11   all the techs properly, yes.

12       Q.    Well, if you were -- yeah, you needed to

13   juggle if you were also taking care of your Team

14   Leader responsibilities; is that correct?

15       A.    No, even a dispatcher you had to know

16   what orders were out and what people needed orders.

17       Q.    Well, ultimately you did both jobs,

18   didn't you?

19       A.    That's correct.

20       Q.    And you were able to do both of them?

21       A.    That's correct.

22       Q.    And you did them well?

23       A.    That's correct.

24       Q.    And you thought it was a no-brainer,

Charles Robinson
March 23, 2005

1    didn't you, to do the dispatching job?

2                    MR. FRAGOMENI:  Objection.

3                    THE WITNESS:  I don't remember ever

4    saying that.

5        Q.   (By Mr. Springer)  Well, you thought it

6    was going to be pretty easy, didn't you?

7                    MR. FRAGOMENI:  Objection.

8                    THE WITNESS:  I don't remember that

9    it was going to be pretty easy.

10                   MR. SPRINGER:  Okay.

11       Q.   (By Mr. Springer)  No-brainer means

12   pretty easy, doesn't it?

13                   MR. FRAGOMENI:  Objection.

14       Q.   (By Mr. Springer)  -- to you?

15       A.   Yes.

16                   MR. SPRINGER:  Now, it's just about

17   one.  Why don't we try to get back at 1:30 and

18   I'll try to proceed as --

19                   MR. FRAGOMENI:  Okay.

20                   MR. SPRINGER:  -- rapidly as I can.

21                   MR. FRAGOMENI:  Thank you.

22                   (Lunch break taken.)

23                   MR. SPRINGER:  Back on the record.

24                   (C. Robinson Exhibit No. 6, 2-Page

136

Charles Robinson
March 23, 2005

1           Document, marked for identification.)

2      Q.   (By Mr. Springer)  Mr. Robinson, I'm

3  showing you a series of e-mails that have been

4  produced to you previously and these appear to be a

5  series of e-mails between you and Hank Pilat; is

6  that correct?

7      A.   Yes.

8      Q.   Okay.  Why don't we look at the first one

9  in time, and this relates to the work assignment

10 that was being offered to you ultimately in addition

11 to your duties as a Team Leader, and this is sent by

12 you to Mr. Pilat, is it not, on 6/7/2001 at

13 9:01 a.m.; is that correct?

14     A.   Yes.

15     Q.   Okay.  Now, this occurred after -- this

16 e-mail that you sent occurred after the conversation

17 where you were offered the position of assignment --

18 well, the duties of assignment of work; is that

19 correct?

20     A.   That's correct.

21     Q.   And at this point when you are writing

22 this e-mail, is it your understanding that the

23 assignment of work duties are separate from your

24 Team Leader responsibilities?

**KACZYNSKI REPORTING**
617.426.6060

Charles Robinson
March 23, 2005

1          A.    Absolutely not.

2          Q.    Okay.  Just so I'm clear:  So when you're

3    writing that, you're thinking of taking this on as

4    an additional?

5          A.    What happened -- we're starting right

6    here, right at 6/7 9:01 when I sent him this

7    note?  --

8          Q.    Yeah.

9          A.    -- we had a conversation in his office

10   the day prior.

11         Q.    Yeah.

12         A.    Okay?  And again I wrote this:

13              I had been thinking I have no problem

14   taking the position of assignment of work; however,

15   I do not like the feeling that I may be being pushed

16   aside, and that is in direct reference to the fact

17   that he had told me that he was going to take away

18   my reporting people.

19              There's no doubt in my mind that's what

20   occurred.

21         Q.    Then it says here:

22              To me, the job of assigning is a

23   no-brainer.

24              That's your words, right?

138

Charles Robinson
March 23, 2005

1      A.   Fine, that's my -- yes, my e-mail, fine.

2      Q.   And by that, you meant not a particularly

3  difficult thing to do; is that correct?

4      A.   That is correct.

5      Q.   Okay.  Then it says:

6           If I need to be trained in service orders

7  to become of value to this organization, then that

8  is what I want.

9           Had you had a discussion with Mr. Pilat

10  about being -- well, about difficulties that you had

11  with service orders?

12      A.   That, absolutely not.  What -- it wasn't

13  difficulties with service orders, it was that I was

14  not trained in the service orders because the other

15  Team Leaders were typing service orders.

16      Q.   Well, just so I'm clear:

17           Why did the issue of service orders come

18  up in this e-mail?  Was there a conversation you had

19  with Mr. Pilat about service orders the previous

20  day?

21      A.   Again, I had conversations numerous times

22  with Mr. Pilat about service orders, being trained

23  and numerous times he told me that it didn't make

24  any difference.

Charles Robinson
March 23, 2005

1      The context of this is for the fact that

2  I had Team Leaders all around me that were not just

3  typing one order, they were doing blocks of orders

4  and that's what the context of this e-mail is.

5      Q.   I am wondering why it appears in this

6  e-mail about assignment of work.  Was there a

7  comment made to you by Mr. Pilat the previous day

8  with regard to service orders?

9      A.   He -- no.  He never told me that I had to

10  be trained in service orders, never.

11      Q.   Okay.

12      A.   That was my -- my note to him.

13      Q.   Mr. Robinson, a couple of moments ago you

14  said that you had had numerous conversations with

15  Mr. Pilat about wanting to be trained in service

16  orders.  I thought there was only one conversation

17  early on in your employment in NMC where you had

18  such a conversations.  Are you now telling me you

19  had numerous conversations with him about being

20  trained?

21      A.   I would say that I had more than one,

22  yes.

23      Q.   Well, tell me -- you've described one.

24  What was the other conversation that you had with --

Charles Robinson
March 23, 2005

```
1          A.    Preferential treatment is preferential
2     treatment.
3          Q.    But I'm asking:  Do you have any
4     specifics whatsoever?
5          A.    No, I do not.  I never saw the complaint;
6     he never showed it to me.
7          Q.    Okay.  Now, your view was that Mr. Pilat
8     gave some of the younger males the opportunity to
9     travel to open new NMC's; is that correct?
10         A.    That's correct.
11         Q.    Where?
12         A.    I believe in New York.
13         Q.    Okay.  Anywhere else?
14         A.    To the best of my knowledge, that's it.
15         Q.    Who were these?
16         A.    It was Adam Alberti that was given it.
17         Q.    Okay.  Anyone else?
18         A.    No.
19         Q.    Okay.
20         A.    To open up an NMC, no.
21         Q.    Okay.  And what about the testing of new
22    types service orders, who was given that assignment?
23         A.    Matt Blais was gives that type of work.
24         Q.    Anyone else?
```

Charles Robinson
March 23, 2005

1          A.    Brian Bird was also -- yes, Brian Bird.

2          Q.    Anyone else?

3          A.    Those are the only names that I recollect

4    right now.

5          Q.    Okay.  And do you know who gave them

6    these assignments?

7          A.    My understanding?  Well, Brian Bird

8    worked for me.

9          Q.    I understand.  Do you know who gave

10   him --

11         A.    Yeah, Henry Pilat.

12         Q.    Are you sure of that?

13         A.    I'm ninety-nine percent sure.

14         Q.    Okay.  Why do you have some doubt?

15         A.    Because it's a while ago.

16         Q.    Okay.  And any other assignments other

17   than those two that you thought showed?

18         A.    That's all I can recall right now.

19         Q.    Okay.  And other than the preferential

20   treatment that you claim that Hank Pilat was showing

21   by these assignments, was there any other basis for

22   your believing that he didn't want you there as of

23   when you said I am not ready to retire?

24         A.    Yes, because the general feeling I always

KACZYNSKI REPORTING
617.426.6060

158

Charles Robinson
March 23, 2005

1    had from him, and I stated that before.

2        Q.    But I'm asking what the basis was before

3    you said prior to the?

4        A.    Again, because of the fact he would ask

5    me:  You're old enough, you would retire.

6            And again, I use the ask, but I couldn't

7    think of it before, but it was a rhetorical

8    question; it was not a declarative statement.  I sat

9    downstairs by myself.

10       Q.    What do you mean you sat downstairs?

11       A.    Well, in the lobby is what I'm saying; I

12   was in the lobby and I was just looking out the

13   window.

14           MR. FRAGOMENI:  He's talking about

15   today.

16           THE WITNESS:  Today.  Today.  Sorry,

17   today I was just -- you know, sorry.

18       Q.    (By Mr. Springer)  Is that to tell me

19   your attorney didn't influence you with regard to

20   the?

21       A.    No.

22           MR. FRAGOMENI:  Objection.

23           THE WITNESS:  No, not at all.

24           MR. FRAGOMENI:  I don't know what he

Charles Robinson
March 23, 2005

1   said.

2                   THE WITNESS:  No, not at all.

3                   MR. FRAGOMENI:  I'm just trying to

4   make sure you understand.

5                   THE WITNESS:  No.  No.  No, I was

6   just sitting there.  No.  No.

7                   MR. FRAGOMENI:  Are you talking

8   about sitting in the lobby today?

9                   THE WITNESS:  I was sit -- in fact,

10  I saw you walk by, you know.

11                  MR. FRAGOMENI:  Who are you saying

12  you to?

13                  THE WITNESS:  The court reporter.

14      Q.    (By Mr. Springer)  Anyway, Mr. Robinson,

15  those comments that you attribute to Mr. Pilat you

16  also claim occurred before the August strike, August

17  2000, so they're a year old and I'm asking you:

18              Is there anything else that is more

19  recent that you can claim led you to the feeling

20  that he wanted to get rid of you?

21      A.    He was going to take away my reporting

22  people.

23      Q.    Okay.  Other than that?

24      A.    And again, just the overall feeling that

Charles Robinson
March 23, 2005

1    I had.

2         Q.    Okay.  And is there any other basis you

3    want to tell me for the overall feeling that you

4    had, any -- any other actions or words by Mr. Pilat

5    that contributed to that?

6         A.    He would basically take my people, when I

7    had them, without conferring with me and give them

8    assignments, so I didn't know what was going on.

9         Q.    Okay.  Didn't he do that with other Team

10   Leaders as well?

11        A.    I don't know.  I can only speak for

12   myself.

13        Q.    Okay.  Anything else?

14        A.    Nope.

15        Q.    Okay.  Let's go up to the next e-mail

16   here.

17             I thought you were interested in taking

18   over the assigning function.  Did I miss something

19   -- and that's -- and then he goes, then you write

20   to him:

21             I didn't approach you on the assigning

22   function.  I will perform any task in here, I am a

23   good soldier, but again, I'm stating my concerns.

24   The assigning function, again, to me is a

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

1    no-brainer.  Why don't you read my note again and

2    try to understand my concerns.

3             What are you referring to there?

4        A.    What I'm referring to is again, we had a

5    conversation a prior day, so again, I'm just

6    reiterating the fact on this again that he was

7    taking away my reporting people, and I just wanted

8    him to understand that I didn't like the feeling of

9    being pushed aside.

10       Q.    Okay.  At no point in either of these

11   e-mails does it indicate that he is taking away your

12   reporting people.

13            I mean you don't say that?

14       A.    But let's go up to the next e-mail.

15       Q.    Okay.  The task of assigning work will be

16   in addition to your current responsibilities, not in

17   place of.

18            Isn't --

19       A.    Well --

20       Q.    Isn't that a clarification for you?

21            Why was it different at any point?

22       A.    Absolutely not, because just as you said

23   that I did not mention reporting people, now what

24   he's doing is he's saying in addition to, not in

Charles Robinson
March 23, 2005

1    place of -- that's not true, okay?

2         He was going to take away my reporting

3    people and this is the conversation that we had and

4    this is why that's in context there.

5         Q.   Did you have a conversation with him

6    between 6:30 a.m. and 10:14 a.m.?

7         A.   No.  This was the day prior.

8         Q.   Okay.  I'm --

9         A.   No, I would have been -- I'm sorry.

10        Prior to 6/7 when I wrote that note is

11   when I had my conversation with Mr. Pilat.

12        Q.   Yeah.  You're saying there was no

13   conversation between 6:30 and 10:14?

14        A.   I couldn't swear to that.

15        Q.   Well, it does appear, does it not, that

16   what he's writing to you as a result of a

17   conversation with you where he's clarifying things

18   is the second sentence:  I'd be -- I by no means

19   meant to imply that you are to be relieved of any

20   other duties assigned to you.

21        There is nothing in either of your

22   e-mails talking about being relieved of any

23   assignment -- duties assigned you, is there?

24        A.   Because our conversation took place prior

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

1    to June 7th.

2         Q.    And I'm saying isn't there -- wasn't

3    there a conversation between 6:30 and 10:14 on that

4    day?

5              MR. FRAGOMENI:  He answered

6    that already.  You just asked him the same

7    question.

8         Q.    (By Mr. Springer)  Do you remember one?

9         A.    I would say absolutely not.  This is in

10   reference to the conversation that I had on June 6th

11   with him.

12        Q.    Okay.  But does the e-mail make -- chain

13   sense then because why would he be responding in

14   this e-mail to a conversation previously when the

15   e-mails themselves go in a different direction?

16        A.    Because I had stated my concerns to him

17   in the first e-mail and he finally got a gist of

18   exactly what I was referring to.

19              Why this big thing here is right.  Why

20   would he even write a thing?

21        Q.    Well, that's why I'm saying wasn't the --

22        A.    Right.

23        Q.    -- isn't your memory faulty here in the

24   conversations --

Charles Robinson
March 23, 2005

1      A.   Absolutely not.

2      Q.   -- and the conversation occurred

3    between --

4      A.   Absolutely not.

5      Q.   You're so sure of this.

6      A.   I'm positive of this.

7      Q.   But you're not sure of lots of other

8    events that occurred at the same time, isn't that

9    so?

10     A.   This -- but I have documentation that I'm

11   looking at right here.

12     Q.   I understand, but there's no

13   documentation of when that conversation occurred?

14     A.   And there's no documentation that says I

15   talked to him between these two.

16          I'm letting you know right now that the

17   conversation occurred the day before that I sent

18   this e-mail.

19     Q.   Okay.  He says here in the third sentence

20   in the first paragraph:

21          I only stated that I was not going to

22   assign you any additional accounts because I was

23   going to give you the function of assigning work as

24   well as your other duties?

Charles Robinson
March 23, 2005

1          A.    That's a false statement.

2          Q.    Now, did you respond to this and say it

3     was a false statement?

4          A.    If you notice what has happened, now he

5     -- as you say, is not mentioning it because I took

6     exception with what we had in the conversation on

7     the 6th.

8          Q.    Did you anywhere say that that sentence

9     was a false statement?  Is there an e-mail response

10    that says that's false?

11         A.    There was no need.

12         Q.    Why not?

13         A.    Because of the fact -- again, like I

14    said, I had a conversation with him the 6th.  Now

15    all of a sudden -- he was still my boss.

16         Q.    Well, you could have said it in a nice

17    way that's not true, couldn't you have -- even if he

18    is your boss?

19         A.    I didn't believe there was any reason to

20    say it once this came up.

21         Q.    You had no difficulty disagreeing with

22    him at other times, did you, Mr. Robinson?

23         A.    Again when -- disagreement, no.

24         Q.    In fact, you frequently disagreed with

Charles Robinson
March 23, 2005

```
1    him during meetings?

2         A.    As -- what are the specifics?

3         Q.    I'm asking you:  Didn't you frequently

4    disagree with him.

5                   MR. FRAGOMENI:  Objection.

6                   THE WITNESS:  When you say disagree,

7    did I voice my concerns or -- yes.

8                   MR. SPRINGER:  Okay.

9         Q.    (By Mr. Springer)  And disagreed with him

10   or Claudia, isn't that so?

11                  MR. FRAGOMENI:  Objection.

12                  THE WITNESS:  Well, no.

13        Q.    (By Mr. Springer)  Often when they wanted

14   to change things, you said you didn't go along with

15   them?

16        A.    To change things --

17        Q.    Weren't you resistent to change,

18   Mr. Robinson?

19        A.    Absolutely not.

20        Q.    Well, didn't you object to their desire

21   to change things?

22                  MR. FRAGOMENI:  Objection.

23                  THE WITNESS:  What is the specific?

24        Q.    (By Mr. Springer)  Do you remember any
```

175

Charles Robinson
March 23, 2005

1      Q.    Okay.  After sending that e-mail in June

2  of 2001, did you do anything to increase your

3  knowledge of the SOP system?

4      A.    Again, I had a working knowledge of SOP.

5      Q.    That's not my question.

6           Did you do anything to increase your

7  knowledge and abilities with SOP?

8      A.    In addition to the assignment function

9  and taking care of my peers, no, I did not.

10     Q.    Okay.

11     A.    -- I mean taking care of my direct

12 reports.

13     Q.    When people came to ask you for help with

14 regard to SOPS, did you tell them Pretend I'm not

15 here?

16     A.    Absolutely.

17     Q.    Do you do that with some frequency?

18     A.    What context do you mean now.

19     Q.    How often did you tell them that?

20     A.    If I thought they should know the answer,

21 I said Pretend I'm not here; tell me what you would

22 do in the situation.  They would use -- that's me --

23 as a learning tool for them because they had all the

24 training.

Charles Robinson
March 23, 2005

1        Q.    Well, weren't they coming to you because

2    they don't didn't know what the answer was?

3        A.    Absolutely not.  I tried to jog their

4    memory and let them see that they could resolve the

5    problem themselves -- because of the fact we had

6    lines waiting to ask foolish questions.

7             When I say foolish questions, questions

8    that they had been trained in, you know, that they

9    should have known the answer to.

10            Pretend I'm not here -- but I never

11    turned anybody away.  What would you do?  That was

12    the question that I would ask them, and I would have

13    a dialogue with them.

14        Q.    Were you aware that a number of reps were

15    going to other Team Leader because you were not

16    answering their questions?

17        A.    That -- let me explain it this way:  That

18    a lot of other reps were coming to me also and

19    asking me questions that other than Team Leads did

20    not know the answers to.

21        Q.    Well, my question is:

22            Were you aware that there were a number

23    of reps going to other Team Leaders because you

24    didn't answer their questions?

1      A.   No, I was not.

2      Q.   Do you know -- were you aware that when

3  you said I -- I'm pretend I am not here that people

4  took that as your not knowing the answer?

5      A.   Absolutely not -- because of the fact, if

6  anything, every service rep or the majority of

7  service reps in there thought that I was the only

8  one that ever answered their question or got back to

9  them with an answer.

10          Their complaints always were that Jeez, I

11  gave so and so this, Sue this, I gave Patrick this,

12  they haven't got back to me yet, and they say

13  Charlie, you always get back to us with an answer.

14      Q.   Who were those reps who said you always

15  get back with an answer?

16      A.   I would say that Kathy Sherber again.  I

17  would say that Cassandra Osorio; I would say that

18  anybody that was on my team and anybody that asked

19  me a question.

20      Q.   Were there any people who were

21  dissatisfied on your team and, you know, complained

22  about you not giving answers to questions or not --

23      A.   To be --

24      Q.   -- being familiar enough with SOPS?



Charles Robinson
March 23, 2005

```
 1          A.   To the best of my knowledge, absolutely

 2    not.

 3          Q.   Were you aware that some of your reps

 4    were also going to Hank Pilat and Claudia D'Amato

 5    for answers because you were not answering

 6    questions?

 7          A.   It was set up so that basically any rep

 8    could go anywhere.

 9          Q.   Okay.  But do you know they were going

10    because you weren't answering questions?

11          A.   I would not know that because what

12    happened was Hank Pilat and Claudia D'Amato never

13    came to me and told me that -- and in some

14    instances, they were the only ones that were privy

15    to the answers.

16          Q.   Okay.  Did Lisa -- I'm sorry, did Patrick

17    Padulski tell you that other reps were coming to him

18    because you didn't know answers?

19          A.   He may have, yes.

20          Q.   Okay.  And what -- tell me that

21    conversation, if you remember -- the conversations,

22    if you remember them.

23          A.   I don't remember the specific of the

24    conversations, but the way that the NMC worked was
```

Charles Robinson
March 23, 2005

1   that a rep could go to anybody.

2        Q.    Did Lisa Smith come to you and tell you

3   that others were coming to her because you didn't

4   know answers to questions?

5        A.    I can't -- again, I'm sure that's -- that

6   conversation may have occurred, but I also know that

7   I answered a lot of questions of Lisa Smith's people

8   that they were not familiar with.

9        Q.    Mr. Robinson, when did you first learn

10  that the Reduction in Force was a possibility?

11       A.    I would say prior to July -- July 30th

12  when I was informed.

13       Q.    Okay.  You were actually informed on

14  July 28th, weren't you?

15       A.    I don't know the specific date.  It could

16  be the 28th or the 30th.  I thought it was

17  July 30th.

18       Q.    Okay.  Prior to that, you were in -- you

19  were aware that a RIF was a possibility, were you

20  not?

21       A.    We were told that our location was not

22  going to be affected.

23       Q.    Who told you that?

24       A.    Hank Pilat told us that and Claudia

Charles Robinson
March 23, 2005

1   D'Amato told us that.

2          Q.    And when did she -- did when he or she

3   tell you that?

4          A.    They had numerous team meetings prior to

5   the RIF and we were told that it would be AOM that

6   would released down south, our location was safe.

7          Q.    Well, at some point you knew that

8   forty-two of the people in NMC were going, the

9   techs, the reps were going; you knew that, didn't

10  you?

11         A.    Yes, I did.

12         Q.    And when did you know that?

13         A.    I would say prior to them being

14  released --

15         Q.    Okay.

16         A.    -- you know, whatever the time frame is.

17         Q.    And if all those reps were being

18  released, then management would need to be released

19  because management was supervising them; isn't that

20  so?

21         A.    That's correct.

22         Q.    Okay.  And was -- so the first time

23  you're saying that you knew that there was going to

24  be a RIF was when you were informed by Hank Pilat

Charles Robinson
March 23, 2005

1    that it was going to occur?

2         A.    No, I would say probably about two weeks

3    prior to that.

4         Q.    Okay.  And tell me what you learned two

5    weeks prior to that?

6         A.    That our location was going to be --

7    first of all, they always said that somebody could

8    retreat back to the -- as a service rep, okay?  And

9    then, for some reason, that was rescinded, but

10   that's what people were told.

11        Q.    There was an open meeting of the Team

12   Leaders?

13        A.    That's correct.

14        Q.    Were Hank and Claudia there --

15        A.    That's correct.

16        Q.    -- two weeks?

17        A.    That's correct.

18        Q.    And they said there would be a RIF at

19   that point?

20        A.    There was always going to be RIF

21   within --

22              MR. FRAGOMENI:  Answer his question,

23   what did they say.

24              THE WITNESS:  Yes.

Charles Robinson
March 23, 2005

1          MR. SPRINGER:  Please don't

2    interrupt him, let him finish.

3          MR. FRAGOMENI:  Listen, sir:  Please

4    don't tell me what to say.  Okay?

5          MR. SPRINGER:  Don't interrupt him.

6          MR. FRAGOMENI:  Please don't tell me

7    what to say.

8          MR. SPRINGER:  You've done it a

9    lot.  Don't do it --

10          MR. FRAGOMENI:  Please don't tell me

11    what to say.

12     Q.   (By Mr. Springer)  Mr. Robinson, tell me

13    what you heard at that meeting?

14     A.   That there would be a RIF and that we

15    would not be affected.

16     Q.   And who was the we that would not be

17    affected?

18     A.   Myself and all the other Team Leaders

19    that were present.

20     Q.   Okay.  Were you also informed that --

21    that the forty-two reps would be laid off at that

22    point?

23     A.   I don't recall when we were informed of

24    that.

Charles Robinson
March 23, 2005

1      Q.    Okay.  When did you know that the RIF

2    would affect the Team Leader?

3      A.    Again, prior to July 30th.

4      Q.    Okay.

5      A.    The exact meeting that we were told that

6    we would be affected I do not know.

7      Q.    Okay.  So you're saying two weeks before

8    July 28th or 30th you were told that you wouldn't be

9    affected and then there was a later meeting where

10   you were told that you would be affected?

11             MR. FRAGOMENI:  No wonder this is

12   taking so long, sir, you are repeating his

13   answers --

14             MR. SPRINGER:  I was --

15             MR. FRAGOMENI:  Wait a minute, you

16   keep repeating his answers and then asking a

17   question again.

18             No wonder it's taking so long.

19             MR. SPRINGER:  Go ahead.

20             THE WITNESS:  I would say that,

21   to the best of my recollection, it was two weeks

22   prior that we were informed that the RIF was

23   going to take place, just to clarify.

24             I believe that prior to that --

Charles Robinson
March 23, 2005

1    and again, whatever time frame was, you know,

2    say from this -- right around this time frame

3    of this note, I believe things were percolating

4    but nothing was said, okay?

5  And it was from, say, the middle

6    of June or the end of June to -- I'd say the end

7    of June until the end of July, I don't know the

8    exact time frame, that we were told that we

9    would be affected at our location.

10                  MR. FRAGOMENI:  Continue.

11  THE WITNESS:  All I remember

12    is them constantly telling us we would not

13    have anybody eliminated, even with the

14    temporary employees being released from

15    the payroll.

16

17    Q.    (By Mr. Springer)  And Claudia and Hank

18  told you that in team meetings?

19    A.    Absolutely.

20    Q.    And then at some point prior to your

21  meeting with Hank Pilat and being told you were laid

22  off, you learned that you were at risk and other

23  Team Leaders were at risk; is that correct?

24    A.    Yes, because Pat Stevens had a meeting.

Charles Robinson
March 23, 2005



1    Q.    And it was at that meeting that you were

2    told you were at risk?

3    A.    I believe it was probably the Friday or

4    whatever the week before, couple days before.

5    Q.    Okay.  So whenever Mr. Stevens met with

6    you and others, Team Leaders, and said you were at

7    risk; is that correct?

8    A.    I believe so, yes.

9    Q.    Okay.  Was it at that point that you were

10   asked to fill out a resume or earlier?

11   A.    We -- I don't know specifically when I

12   was asked to fill out the resume, but again, it was

13   in the June-July time frame.

14   Q.    And then after the meeting with

15   Mr. Stevens and the other Team Leaders, you met with

16   Mr. Pilat where he informed you you were laid off;

17   is that correct?

18   A.    Yes.

19   Q.    Was that --

20   A.    He told I was -- he didn't say laid off.

21   Q.    Can -- just so I'm clear --

22         Did you meet with him alone?

23   A.    Yes.

24   Q.    Was it in his office?

Charles Robinson
March 23, 2005

1       A.    No.

2       Q.    Where was it?

3       A.    It was in a -- the conference room.

4       Q.    Okay.  And tell me as nearly as you can

5    remember what he said to you and you said to him?

6       A.    I went in there and he was actually

7    standing up in a corner and he said to me Sit down,

8    and I sat down at the table similar to this and he

9    told me that, you know, he gave me the package,

10   whatever, and I said You've got to be kidding me,

11   you know.

12            And I said you think that I'm going to be

13   angry with this, I said I'm not.  I said I don't

14   believe this should happen and, you know, we'll

15   discuss this at a later time.

16       Q.    Did you believe you were being

17   discriminated on the basis of age at that time?

18       A.    Absolutely.

19       Q.    Why?

20       A.    Because I was the oldest white male that

21   was there and I was the only one that was

22   retirement-eligible.

23       Q.    Any other reason you believe that that

24   decision was made?

Charles Robinson
March 23, 2005

1          A.    All of the other incidents that I've

2     cited in the previous questioning.

3          Q.    So you felt at that point, no question it

4     was age discrimination; is that correct?

5          A.    That's correct.

6          Q.    And had you made up your mind that you

7     were going to sue at that point?

8          A.    No, absolutely not.

9          Q.    Okay.  Had you consulted a lawyer yet?

10         A.    No, I didn't.

11         Q.    But you knew that when he said he was

12    going to hear from you, what did you mean?

13                   MR. FRAGOMENI:  That's not what he

14    said.

15                   Don't put words in his mouth, that's

16    not what the said.

17         Q.    (By Mr. Springer)  Tell me what you

18    remember testifying?

19         A.    Testifying to?

20         Q.    Just a few minutes ago I thought you said

21    that Mister -- you told Mr. Pilat --

22                   MR. FRAGOMENI:  He said they would

23    discuss it later -- that's what they said, or

24    what he said.

Charles Robinson
March 23, 2005

1           MR. SPRINGER:  Well -- please.

2           MR. FRAGOMENI:  If you have an

3   opportunity to put words in his mouth, that is

4   not appropriate in this deposition, sir.

5           MR. SPRINGER:  Well --

6           MR. FRAGOMENI:  That's not

7   appropriate.

8           MR. SPRINGER:  Well, if you read the

9   federal rules, you'd learn what was appropriate at

10  a deposition.

11          MR. FRAGOMENI:  I have read the

12              federal rules and if you want --

13  MR. SPRINGER: Why don't we --

14          MR. FRAGOMENI:  We can read them

15  right now, if you want.  You can cite what rule I'm

16  violating.

17          MR. SPRINGER:  Rule 30.

18          MR. FRAGOMENI:  What rule am I

19  violating?

20          MR. SPRINGER:  Rule 30.

21          MR. FRAGOMENI:  And what is the

22  violation?

23          MR. SPRINGER:  You're interfering,

24  you're objection, you're coaching.

Charles Robinson
March 23, 2005

1              MR. FRAGOMENI:  I'm not coaching

2       anybody.

3              You can say any opportunities, right?

4              MR. SPRINGER:  Look at this record.

5       Look at this record and you'll find out, and I'd

6       like to continue.

7              MR. FRAGOMENI:  Right.  Please,

8       don't put words in his mouth, okay?  He did not say

9       you will hear from me.

10             That's not what he said.

11             MR. SPRINGER:  What did he say?

12             THE WITNESS:  We'd be discussing it.

13      Q.    (By Mr. Springer)  And what did you mean

14      by saying we'd be discussing it?

15      A.    I didn't know what I meant at that

16      particular time.

17             It was quite a shock to me.

18      Q.    Was it -- did you feel you'd be

19      discussing the fact that you thought it was age

20      discrimination?

21      A.    Yes, because of the things that had

22      transpired over the course of my time there.

23      Q.    And just so we are clear about the things

24      that had transpired, tell me if I'm omitting

Charles Robinson
March 23, 2005

1   anything;

2           There was the unicorn cartoon; there were

3   the remarks he had made three times he had, you

4   know, raised the issue of your retirement to -- for

5   a package prior to the reduction, I mean prior to

6   the strike, and there was, as I just said, the fact

7   that you were the oldest white male that was in the

8   department?

9           A.   Yeah.

10          Q.   Anything else?

11          A.   Also the preferential treatment that was

12  given to younger males.

13          Q.   And you've described that here?

14          A.   That's correct.

15          Q.   Yeah -- in this deposition I mean?

16          A.   Also the fact that I had never been

17  spoken to about performance when I was up to the

18  NMC, never once.

19          Q.   Anything else?

20          A.   That's all I can recall right now.

21          Q.   Okay.

22               MR. SPRINGER:   (Handing.)

23               (C. Robinson Exhibit No. 7, 1-Page Charge

24               of Discrimination, marked for

Charles Robinson
March 23, 2005

1              identification.)

2         Q.    (By Mr. Springer)   That's your signature

3    there as well, Mr. Robinson?

4         A.    That's correct.

5         Q.    And this is what you filed with the MCAD,

6    is it not?

7         A.    Yes.

8         Q.    Okay.  And had you consulted a lawyer at

9    this point?

10             I see -- I see, I'm sorry, actually Mr.

11   Fragomeni's name is listed.  So you had consulted a

12   lawyer by this point; is that correct?

13        A.    That's correct.

14        Q.    Okay.  And you also say that the date of

15   most recent -- date of most recent or continuing

16   discrimination was 8/7/01 and what occurred on that

17   date, if you would, sir?

18        A.    I don't know specifically.  Again, I

19   don't know -- August 7th, '01 I was laid off on

20   July 28th, so I would have to say, again,

21   August 7th, I don't know why that date is there.  I

22   would have to say it was because of my termination

23   from the payroll.

24        Q.    Okay.  And you were laid off when, in

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

1    your view, when Mr. Pilat told you that you were

2    getting a package in his office; is that correct?

3         A.   I know it didn't look good.

4         Q.   Pardon?

5         A.   I know it didn't look good.

6         Q.   What do you mean?

7         A.   Well, of course I thought I was, but --

8    yes.

9         Q.   Yeah, you knew you were laid off?

10        A.   Yes.

11        Q.   Okay.  And that's why you were so upset?

12        A.   Yes.

13        Q.   And you -- that's why you told them that

14   this is not right; didn't you say that to him?

15        A.   I don't recall saying that.

16        Q.   Okay.  Do you remember thinking it?

17        A.   I thought I was an excellent employee and

18   I had no reason to believe other than the things

19   that transpired with Mr. Pilat, I had another been

20   talked to about my performance -- never.

21        Q.   Okay.  And you were -- when you walked

22   out of Mr. Pilat's office, you were concern your

23   career at Verizon was over, weren't you?

24             MR. FRAGOMENI:  Objection.

Charles Robinson
March 23, 2005

```
 1                    THE WITNESS:  No.

 2         Q.    (By Mr. Springer)  Why not?

 3         A.    Because what I did was I tried to network

 4    and get a job and I thought I was an excellent

 5    employee.

 6         Q.    I understand, but those didn't succeed,

 7    did they?

 8         A.    No, obviously not -- I'm here.

 9         Q.    Okay.  And there were -- there was no --

10    there was no certainty you were going to be able to

11    network and get a job, was there?

12         A.    There's nothing certain in life.

13         Q.    Sure.  Do you remember any more of the

14    conversation with Mr. Pilat on that day when you

15    were told you were being laid off?

16         A.    No.  I was pretty traumatized.

17               I do remember this -- that he asked me

18    before he wanted me just to take all of -- not all

19    of my belongings, just to leave the premise (sic),

20    but before I did, to please go and make sure the

21    service rep had their work assigned before I left

22    the premise and being the good soldier, that's what

23    I did.

24         Q.    Okay.  And so you were asked to leave the
```

Charles Robinson
March 23, 2005

1   premise that day?

2       A.   That's correct.

3       Q.   So you knew your employment was over?

4       A.   I wasn't escorted out, but I more or less

5   thought that, yes.

6       Q.   Mr. Robinson, when did you first believe

7   you were discriminated against on the basis of age;

8   was it at the time that you were laid off or was it

9   before?

10      A.   I believe that it occurred -- again, as I

11  have stated when I was being asked those questions

12  -- the refusal to provide me training in the

13  service order process, again the assignment to the

14  work, etcetera.

15      Q.   Did you complain to anyone about that?

16      A.   No, I didn't.

17      Q.   Why not?

18      A.   Because I always -- I complained to

19  Mr. Pilat.

20      Q.   Well, you only complained to him about

21  the fact that you didn't want him to make a

22  reference to your accepting a package any more and

23  then he stopped?

24      A.   Again, he was my boss.

Charles Robinson
March 23, 2005

1       Q.    I understand but I'm asking:

2             Did you complain to him about anything

3    other than that?

4       A.    I don't know what you mean.

5       Q.    Well, I'm asking did you complain to

6    anyone about what you felt, you claim now was age

7    discrimination or that you felt was age

8    discrimination.  You said that you complained to

9    Mr. Pilat about the comments that he made and then

10   he stopped them.  I'm asking you did you -- did you

11   complain to anyone about anything else?

12      A.    No, I didn't.

13      Q.    Why not if you thought it was age

14   discrimination?

15      A.    That just wasn't in me.

16             MR. SPRINGER:  (Handing.)

17             (C. Robinson Exhibit No. 8, 4-Page

18             Resume, marked for identification.)

19      Q.    (By Mr. Springer)  This was a resume that

20   you filled out, was it not?

21      A.    That's correct.

22      Q.    Okay.  Do you remember when you filled it

23   out?

24      A.    No.

Charles Robinson
March 23, 2005

1    Q.    There is a date down at the bottom,

2    7/10/01 -- 2001 early in the morning.  Does that

3    refresh your recollection?

4    A.    If that's the date stamp, that would be

5    the date stamp.

6    Q.    Okay.  So it was about that time, to the

7    best of your memory?

8    A.    Yes.

9    Q.    And what were you told about the purpose

10   for which you were to provide this resume?

11   A.    Again, we were always supposed to have a

12   resume on file.

13   Q.    Okay.  Were you told that there was any

14   special purpose for this resume?

15   A.    Again, I know that a RIF was occurring.

16   Q.    So by 7/10/01, you knew -- withdraw that.

17        At the time you were filling out this

18   resume, you knew a RIF was occurring?

19   A.    I'm not positive on that because, again,

20   we had our meetings and we were told basically just

21   to have our resume, that's all.  I do not know when

22   we were officially notified.

23   Q.    Okay.  Do you have any memory of this

24   resume being filled out for any special purpose?

Charles Robinson
March 23, 2005

1        A.    Again, to have on it file.

2        Q.    Okay.  But it also could have been filled

3   out because you were told a RIF was occurring?

4        A.    Yes.

5        Q.    Okay.  It says here accomplishments.  As

6   a member of the NMC, I helped Verizon enter the long

7   distant market in Mass. by meeting key objectives?

8        A.    Correct.

9        Q.    What did you do to help Verizon enter the

10  long distant market in Massachusetts?

11       A.    I ensured that the service reps were

12  writing the orders and that we were processing the

13  orders to the best of our ability to meet any of the

14  points that were required in order to enter the long

15  distance market.

16       Q.    Any other way you helped Verizon enter

17  the long distance market in Massachusetts?

18       A.    No.

19       Q.    Are there any other accomplishments that

20  you had during your tenure there from April of 2000

21  to 7/10/2001?

22       A.    Yes.

23       Q.    What other accomplishments?

24       A.    My accomplishments were that I helped

KACZYNSKI REPORTING
617.426.6060

Charles Robinson
March 23, 2005

1    institute -- known to my bosses, as a matter of

2    fact, my boss Hank Pilat -- that I streamlined the

3    process as far as identified a process to make sure

4    that Central Office data was up-to-date with the

5    correct nomenclature so that service orders would

6    flow through.

7            I also was -- I was involved with COVAD

8    and again, I straightened out a lot of their more

9    serious issues, such as -- you know, losing our

10   service at particular buildings.  I also was

11   involved with the attendance, identifying that; I

12   also --

13       Q.    Attendance?

14       A.    Attendance -- make that more streamlines,

15   you know, I suggested that to Lou Leone who set it

16   up.

17       Q.    Attendance?

18       A.    Attendance so that it could be on-line,

19   you know, a tracking system so that we could see how

20   many orders were written by our service reps so that

21   we could be compared with our other -- other peers,

22   you know, so that each Team Leader could be looked

23   at.

24            But also, I just want to let you know

Charles Robinson
March 23, 2005

1    that I'm saying that's accomplishments now, but the

2    way that I was brought up in this business was that

3    unless you save the company money or were really

4    involved in some great things such as, you know,

5    helping Verizon into the long distance market, they

6    were not considered accomplishments because this

7    accomplishment in reality is significant

8    accomplishments, you know, something that saved the

9    company money, something you stood out doing, you

10   know, something other -- because I believe even the

11   description on the resume, you know, how to fill

12   this out was you don't throw every stupid little

13   thing in.

14        Q.   Okay.

15        A.   Okay?  I believe that anything that I did

16   was I was performing my job.

17        Q.   And, in fact, with regard to COVAD work

18   and the attendance, that was part of your job,

19   wasn't it?

20        A.   No, because in COVAD, it was my special

21   expertise that was able to resolve issues, you know,

22   get inventory built quicker and, you know, I knew

23   where to go to have this done.

24        Q.   Well, describe that a little more

Charles Robinson
March 23, 2005

1    specifically, what special expertise did you bring

2    to the job?

3        A.    My engineering expertise.

4        Q.    And that allowed inventory to be built

5    more quickly?

6        A.    That's correct.

7        Q.    And so what you were doing was

8    essentially servicing the customer, weren't you?

9        A.    Exactly.

10       Q.    And that's part of your job?

11       A.    Exactly.

12       Q.    All right.  And that's why you didn't

13   list that here; is that correct?

14       A.    Exactly.

15       Q.    How many other people were involved in

16   helping Verizon enter the long distance market?

17       A.    I would say a lot of people.

18       Q.    Hundreds?

19       A.    I don't know the numbers.

20       Q.    At least dozens, wouldn't you say?

21       A.    Are we talking -- again, I would say so,

22   yeah.

23       Q.    After your conversation with Mr. Pilat

24   where he indicated to you that you would no longer

Charles Robinson
March 23, 2005

1   have a job, did you have any further conversations

2   after you walked out of the -- I'm sorry, you were

3   walk -- were you escorted out?

4           You weren't escorted out, that's correct,

5   but you were told to leave the premises --

6       A.    That's correct.

7       Q.    -- on that day.

8           Did you have any subsequent conversations

9   with Mr. Pilat?

10      A.    What do you mean by conversation?

11      Q.    Did you have any talks with Mr. Pilat

12  after that day?

13      A.    No.

14      Q.    Okay.  Did you have any talks with

15  Claudia D'Amato after that day?

16      A.    No.

17      Q.    Do you know what Claudia D'Amato's

18  involvement was in the decision to select you for

19  layoff among the Team Leaders?

20      A.    No, I do not.

21      Q.    And only Mr. Pilat met with you, not

22  Ms. D'Amato?

23      A.    That's correct, Mr. Pilat was my direct

24  supervisor.

Charles Robinson
March 23, 2005

1      Q.   Did he tell you the reasons that you were

2   selected at that time?

3      A.   No.

4      Q.   Did you ask him?

5      A.   No.

6      Q.   Why not?

7      A.   I don't remember asking because the way

8   that -- again I don't remember the conversation, but

9   I remember that he was basically reading from a

10  script, you know, telling me -- bang, bang, bang.

11     Q.   Okay.  And now that you have said he was

12  reading from a script, do you remember any more of

13  the conversation --

14     A.   No.

15     Q.   -- that you had with him in the

16  conference room?

17     A.   No.  I just remember again, just bang,

18  bang, you know, I don't remember a lot of the

19  specifics of it, but I do remember him saying you've

20  been selected, that's all.

21     Q.   And as soon as he said that, you felt it

22  was age discrimination?

23     A.   Absolute not.  I felt age discrimination

24  prior to that.

203

Charles Robinson
March 23, 2005

1          Q.    Well, you certainly felt it at that

2    time --

3          A.    Oh, absolutely.

4          Q.    -- as well?

5                And we've gone over the prior

6    occasions --

7          A.    Yes.

8          Q.    -- haven't we?

9          A.    Yes.

10         Q.    Your claim is that you suffered emotional

11   distress here as a result of Verizon's actions; is

12   that correct?

13         A.    That's correct.

14         Q.    What conduct exactly was the cause of

15   that distress?

16         A.    My being released from the -- terminated.

17         Q.    Your being released from the company?

18         A.    Yes.

19         Q.    Okay.  Describe, if you would, how you

20   have suffered emotionally.

21         A.    I'll tell you I lost a lot of self esteem

22   and, you know, the inability to sleep.  I've also

23   lost confidence in myself -- and I'm getting that

24   back now.

214

Charles Robinson
March 23, 2005

```
 1                MR. SPRINGER:  Off the record.
 2                     (Discussion off the record.)
 3                MR. SPRINGER:  Back on the record.
 4        Q.   (By Mr. Springer)  Mr. Robinson, how soon
 5   after Mr. Pilat told you you would no longer be
 6   employed and you'd need to vacate the premises and
 7   gave you the package did you start looking for a job
 8   on the outside?
 9        A.   I didn't look for a job on the outside.
10             When you say the outside --
11        Q.   I mean other than Verizon internally;
12   you said you looked for jobs externally.
13        A.   As soon as I -- you know, my time frame
14   was over.
15             August 28th was the actual date that I
16   was released from the Verizon payroll.
17        Q.   Right.  And so when did -- as -- on
18   August 28th did you start looking for jobs on the
19   outside?
20        A.   I would say the following week
21   absolutely.
22        Q.   Okay.  Was it before then?
23        A.   No, I didn't look before then.
24        Q.   No need to because you were on the
```

216

Charles Robinson
March 23, 2005

1    (phonetic spelling) and he's at Revolution Group,

2    and I sent my resume to him. He did consultant work

3    for various telecommunications companies --

4    everybody basically I spoke to.

5         Q.    Mr. Robinson, you don't believe you

6    should have been laid off, is that correct -- chosen

7    for layoff; is that correct?

8         A.    That's absolutely correct.

9         Q.    Who you think should have been, your

10   staff?

11        A.    That wasn't my decision to make, but I

12   believe that there were people that performed below

13   me.

14        Q.    And who were those?

15        A.    I would say Lisa Smith was one.

16        Q.    Anyone else?

17        A.    I believe that Adam Alberti was another.

18        Q.    Anyone else?

19        A.    I also believe that Matt Blais was

20   another.

21        Q.    Okay. And you do believe it should have

22   been based on performance?

23        A.    Yes.

24        Q.    Okay. Why was Matt -- why was Matt

217

Charles Robinson
March 23, 2005

1    Blais's performance below yours in your view?

2        A.   I believe that I was just superior to the

3    people there.  Do you see that I said as far as a

4    performer goes, knowing the overall job, knowing how

5    to deal with people and that's what I believe.

6        Q.   Okay.  And the basis for that, if you

7    could be more --

8        A.   The basis is my experience and my proven

9    track record.

10       Q.   Okay.  Did you make any complaints about

11   any other Team Leaders that you thought were not as

12   knowledgeable as you to Mr. Pilat or Claudia

13   D'Amato?

14       A.   I never made any complaints about that,

15   no.

16       Q.   Okay.  What about Mr. Padulski, did you

17   ever complain about him?

18       A.   I complained that he did not provide me

19   information.

20       Q.   Okay.  Other than that, did you make any

21   other complaint about him?

22       A.   No.

23       Q.   Did you make any complaint about Lisa

24   Smith?