# EXHIBIT 2

Pursuant to Local Rule 5.3(A), exhibits attached hereto have been redacted to protect the personal privacy of individuals, including dates of birth and social security numbers.

### DISTRICT OF MASSACHUSETTS

**U.S. DISTRICT COURT**                    **C.A. NO.: 04-11964-NG**

```
* * * * * * * * * * * * * * * * *
                                *
CHARLES ROBINSON,               *
                Plaintiff       *
                                *
vs.                             *
                                *
TELESECTOR RESOURCES GROUP, INC. *
d/b/a VERIZON SERVICES GROUP,   *
                Defendant       *
                                *
* * * * * * * * * * * * * * * * *
```

       **DEPOSITION OF HENRY PILAT,** a witness called on behalf of the Plaintiff, before Marissa L. Malley, Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Fragomeni & Carey, 15 Broad Street, Boston, Massachusetts, on Tuesday, May 17, 2005, commencing at 2:50 p.m.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**
One State Street
Boston, Massachusetts  02109
Telephone (617) 742-6900

1    Q.   And by whom are you employed?

2    A.   Verizon.

3    Q.   How long have you been with Verizon?

4    A.   Since 1979, August.

5    Q.   What is your position there?

6    A.   I am a manager.

7    Q.   Okay.  How long have you been a manager?

8    A.   Probably since '86.

9    Q.   And where is your location?

10    A.   125 High Street.

11    Q.   And how long have you been at 125 High Street?

12    A.   Two years.

13    Q.   Okay.  Where were you before?

14    A.   125 High Street, Oliver Tower.

15    Q.   Okay.  What is your date of birth?

16    A.     56.

17    Q.   Can I ask you who made the decision to terminate Mr.

18        Robinson?

19    A.   It wasn't a termination.  We were going through a

20        reduction in force.

21    Q.   Was Mr. Robinson hired in that process or fired?

22    A.   There were 11 positions, we had 12 candidates.  Mr.

23        Robinson was not selected for one of the positions.

24    Q.   So, your termination -- your terminology is that he

8

1   was not hired?

2     MR. MCLAFFERTY:  Objection to the form.

3  A. No.

4  Q. You tell me.  Tell me; was he terminated or failed to

5   be hired?

6     MR. MCLAFFERTY:  Objection to the form.

7  A. Neither.  It was -- he was not selected to have one of

8   the positions that we had available.

9  Q. Okay.  So, for the purposes of the rest of this

10   deposition, which would you prefer?  That he was

11   terminated or not hired?

12     MR. MCLAFFERTY:  Objection to the form.  You can

13   answer.

14  A. Either one.  It's not --

15  Q. All right.  I'll use terminated, okay?  Who made the

16   decision to terminate Mr. Robinson?

17  A. It was a decision that both Claudia D'Amato and myself

18   made.

19  Q. Where was that decision made?

20  A. At Bowdoin Square.

21  Q. And when was it made?

22  A. I don't recall the exact date.

23  Q. Give me a time frame.

24  A. I believe it was July 2001.

DUNN & GOUDREAU

1    Q.    Beginning of July or the end of July?

2    A.    The beginning.

3    Q.    So, the first week of July, you made the decision with

4          Claudia D'Amato?

5              MR. MCLAFFERTY:    Objection.

6    A.    To the best of my knowledge.

7    Q.    Why did you make that decision?

8    A.    Comparatively, to the other candidates that we had on

9          the list, Mr. Robinson did not meet the criteria.

10   Q.    How did you compare Mr. Robinson to the other 11

11         people?

12   A.    What we did is, we -- according to the RIF guidelines,

13         we utilized a process of personal knowledge, as well

14         as resumes.

15   Q.    What documents support your decision to terminate Mr.

16         Robinson?

17             MR. MCLAFFERTY:    Objection to the form.    You can

18         answer.

19   A.    Again, we didn't terminate him, but -- can you repeat

20         the question?    I'm sorry.

21   Q.    What documents support your decision to terminate Mr.

22         Robinson?

23   A.    The resume and the personal knowledge.

24   Q.    Okay.    Are there any other documents that you used?

1    A.    No.

2    Q.    Okay.  Which resume are you referring to?  The resume

3          that's on file at Verizon, or the resume that Mr.

4          Robinson submitted during the process?

5    A.    It was the resume that Mr. Robinson submitted.

6    Q.    Okay.  Did you, at any time, review Mr. Robinson's

7          personnel file, which is produced by your counsel?

8          And I've measured it and I'll tell you, it's an inch

9          and a quarter thick.

10             MR. MCLAFFERTY:  I'll just object to the

11         characterization that you can --

12             MR. FRAGOMENI:  Measure it.  Measure it, if you

13         want.

14   A.    I don't have a measurer.

15   Q.    Have you -- did you review anything in Mr. Robinson's

16         personnel file, while making the decision to

17         terminate?

18   A.    I would have to look at it, but I did not review his

19         personnel file, no.

20   Q.    Okay.  So, the documents that your counsel has

21         produced to us that's an inch and a quarter thick, had

22         no bearing on whether or not you hired or fired Mr.

23         Robinson?

24   A.    That is correct.

1        a team leader?

2   A.   I was never asked.

3   Q.   Would you have?

4   A.   I think it would depend upon the position.

5   Q.   What position did you think Mr. Robinson would be

6        qualified for?

7   A.   Certainly in engineering, in a staff function.

8   Q.   Anything else?

9   A.   No.

10   Q.   Did you hire Mr. Robinson for the position of team

11        leader?

12   A.   Yes, I did.

13   Q.   When did you do that?

14   A.   April or May of 2000.

15   Q.   And did you -- what documents did you use to rely upon

16        to hire Mr. Robinson, at that time?

17   A.   At that time, he produced a resume and I believe that

18        was the only document that was used.

19   Q.   What else did you rely upon to hire Mr. Robinson?

20   A.   The interview.

21   Q.   Okay.  What about the interview that caused you to

22        believe that he was qualified for the position of team

23        leader?

24   A.   Well, during the course of the interview, Mr. Robinson

1      convinced me that he had the skills necessary to

2      perform the job of the team lead.  When I reviewed his

3      resume, I saw that he had a lot of staff experience

4      and didn't really have any team lead experience.  I

5      expressed a concern, but he advised me that he had had

6      a crew at one point, early in his career, and that he

7      could handle the position.

8    Q.  Again, did you review the inch and a quarter file of

9      Mr. Robinson when you hired him --

10         MR. MCLAFFERTY:  Objection to the form.

11   Q.  -- which has been marked as Exhibit 1?

12   A.  No, I did not.  That wasn't available to me.

13   Q.  Okay.  Had you asked for it?

14   A.  No, I did not.

15   Q.  Now, you knew Mr. Robinson had had, at that time,

16      about 28 years with Verizon; 29 years?

17   A.  I knew he had the length of service.  I wasn't sure of

18      how much.

19   Q.  And you knew that he had -- his background was in

20      engineering?

21   A.  Yes, I did.

22   Q.  And you hired him and you reviewed him six months

23      later?

24   A.  Yes, I did.

1          people?

2                  MR. MCLAFFERTY:  Objection to the form.

3      A.   No, we did not.

4      Q.   Well, you used them in your mind, rather than taking

5           them and looking at them.  But you knew that you gave

6           them good appraisals?

7      A.   We used personal knowledge, yes.

8      Q.   And the personal knowledge is referenced and

9           documented by your appraisals?

10     A.   They would have to be.

11     Q.   Correct.  Now, what changed between March 2001 and

12          July of 2001, that caused you not to hire Mr. Robinson

13          or fire Mr. Robinson?

14                 MR. MCLAFFERTY:  Objection to the form.

15     A.   And again, comparatively speaking, when Mr. Robinson

16          was placed against all the other candidates, he just

17          did not match up.

18     Q.   Was this appraisal in March of 2001, the poorest

19          appraisal of the 12?

20     A.   I can't say that.

21     Q.   Do you know, one way or another, whether this falls

22          somewhere in the middle?

23     A.   I can't say that.

24     Q.   How would you know?

```
 1    A.    I only had certain members of the team reporting to

 2          me.

 3    Q.    Who were they?

 4    A.    I had Jean Freeman, Patrick Podolske, Susan Rober,

 5          Brenda Joy, Lisa Smith, Luigi Leone.

 6    Q.    And who had the others?

 7    A.    The others were Claudia's.

 8    Q.    How many --

 9    A.    D'Amato.

10    Q.    -- did Claudia have?

11    A.    Claudia had five.

12    Q.    So, Mr. Robinson was not reporting to Claudia?

13    A.    That's correct.

14    Q.    So, he was reporting to you?

15    A.    That is correct.

16    Q.    And yet, she made a decision to terminate him?

17              MR. MCLAFFERTY:  Objection.

18    A.    She did not make a decision to terminate him.  We

19          jointly came to the decision.

20    Q.    Okay.  Now, of the people that you supervised; Jean

21          Freeman, Patrick Podolske, Susan Rober, Brenda Joy,

22          Lisa -- I'm sorry, what is Lisa's last name?

23    A.    Smith.

24    Q.    Smith, and Luigi Leone, --
```

1        jump in with your answer.

2   Q.  Can you compare Mr. Robinson to Jean Freeman for me?

3        MR. MCLAFFERTY:  Objection.

4   A.  In what respect?

5   Q.  In terms of the job.  In terms of, you know, why you

6        didn't fire Jean Freeman as opposed to Mr. Robinson.

7   A.  Jean Freeman had excellent system skills.  She had

8        good product knowledge; she had a knowledge of the

9        retail market as well as wholesale.  She had a

10      wonderful attitude.  She managed her people well; she

11      would show, coach, develop them.

12  Q.  And you're saying Mr. Robinson did none of those

13      things?

14  A.  I'm saying that compared to Jean, he did not.

15  Q.  Okay.  How old was Jean Freeman in 2001?

16  A.  I don't recall.  Thirty-something.

17  Q.  Well, did you provide the MCAD with a list of the ages

18      of these people; dates of birth?

19  A.  At one point, yes, I did.

20  Q.  Okay.  And so, you know how old she was at the time?

21      MR. MCLAFFERTY:  Objection.

22  A.  Not at the time --

23  Q.  Well, you know now, don't you?

24      MR. MCLAFFERTY:  Objection.

1    A.    Again, the reason I know now is because there was --

2    Q.    And what is her -- how old was she?

3    A.    I don't know.  I don't have the ages in front of me.

4    Q.    All right.  So, what you provided to the MCAD is

5          accurate?

6    A.    I could -- if I could see it, I could go back --

7    Q.    Sure.

8    A.    -- against HR records and verify it.

9    Q.    Okay.  How about Patrick Podolske?  Can you compare

10         Mr. Robinson with Patrick Podolske?

11    A.   Again, Patrick had excellent system knowledge.  He had

12         skills required, he could work in multi-disciplines,

13         he developed his people, he was a good team lead.

14    Q.   Contrast with Mr. Robinson?

15    A.   Again, comparatively speaking, Patrick did a better

16         job as a team leader.

17    Q.   Okay.  How about Susan Rober?  Same question.

18    A.   Susan had, again, product knowledge, a wonderful

19         attitude.  She took on additional responsibility, she

20         guided her folks, she developed them.

21    Q.   As opposed to Mr. Robinson?

22    A.   Compared to Mr. Robinson, she did a better job.

23    Q.   Same question for Brenda Joy.

24    A.   Again, Brenda had system knowledge.  She came to us

1      with skills, she more or less ran the absence group,

2      she had product knowledge, good attitude.

3   Q.  Are you saying Mr. Robinson had a bad attitude?

4   A.  I'm not saying he had a bad attitude.  I'm saying that

5      he, at times, could be negative.

6   Q.  In what way?

7   A.  There had been instances where, at team meetings, he

8      was more or less -- would kind of -- and I don't

9      remember specific instances.  But what would happen

10      is, he would -- any time someone had a suggestion, he

11      was just very negative; it won't work, can't be done.

12      There was one particular instance when I was having a

13      feature in front of the office, and I believe it had

14      to do with the impending strike, and the team leads

15      were behind me.  Mr. Robinson was making comments to

16      one of the other team leads, kind of downplaying the

17      importance of the message that I was trying to

18      deliver.

19   Q.  Did you find that you were competing with Mr. Robinson

20      in some form?

21   A.  Not that I'm aware of.

22   Q.  You didn't feel threatened by him?

23   A.  No, not at all.

24   Q.  Now, the same question.  I'm sorry that we got

```
 1              diverted.  Lisa Smith; compare Mr. Robinson to Lisa

 2              Smith.

 3     A.       Lisa, again, had worked in wholesale prior to, had

 4              good product knowledge, had also worked as a

 5              specialist in retail, was very familiar with the

 6              products.  Again, developed her team, was concerned

 7              about getting the job done and doing it correctly.

 8     Q.       Same question for Luigi Leone.

 9     A.       Luigi, again, exhibited system strength, knowledge of

10              the business, developed his people.

11     Q.       Now, on each of the -- now, have I exhausted the

12              people that had reported to you?

13     A.       How many do you have?  Do you mind -- I'm sorry.

14     Q.       Jean Freeman, Patrick Podolske, Susan Rober, Brenda

15              Joy, Lisa Smith, and Luigi Leone.

16     A.       Yes.

17     Q.       Okay.  It seems that at each time that I asked you

18              that question, the first thing that you mentioned is

19              system knowledge.

20     A.       Yes.

21     Q.       That the system knowledge of these people was superior

22              to Mr. Robinson?

23     A.       Yes.

24     Q.       And what did you do to train these people to get that
```

1          system knowledge?

2     A.   I didn't.

3     Q.   Who trained them to get the system knowledge?

4     A.   I don't know who it was that trained them, but they

5          acquired it and they had it.

6     Q.   Do you have any idea how they got it?

7     A.   It would be conjecture.  The only thing I could

8          suppose is some of them had been service reps in the

9          past, they were taught it.  If they weren't a service

10         rep recently, there was also the opportunity for them

11         to have training because we constantly had new people

12         coming into the group.  They could sit in on the

13         training.

14    Q.   Did you ever offer Mr. Robinson that training?

15    A.   Yes.

16    Q.   When?

17    A.   I expressed that there were new classes going on; at

18         any point, he could go in and sit in with them.

19    Q.   And what did he say?

20    A.   He said that he would.

21    Q.   Okay.  Do you know when those classes were being held

22         and where?

23    A.   The classes were -- I can't -- I don't recall actual

24         dates.  The classes were held at 6 Bowdoin Square,

1          right in our office.

2     Q.   During the day or at night?

3     A.   During the day.

4     Q.   Okay.  And they were part of your -- you'd get paid

5          during the day to go to these classes?

6     A.   That is correct.

7     Q.   Okay.  And you're saying he refused to go?

8     A.   I'm not saying he refused to go.  He did not take the

9          opportunity.

10    Q.   Okay.  When you hired Mr. Robinson, did you know that

11         he didn't have the training for the -- is it the SOP?

12         Is that correct?

13    A.   That's one of the systems, yes.

14    Q.   Okay.  Did you know that he didn't have the training

15         to do that?

16    A.   He had knowledge of SOP.

17    Q.   Okay.  And you knew that?

18    A.   Yes.

19    Q.   You knew that compared to the other 11, Mr. Robinson

20         had an engineering background and may needed more

21         training in the SOP?

22              MR. MCLAFFERTY:  Objection.

23    A.   I'm not saying that.  What I'm saying is that Mr.

24         Robinson had an engineering background.  He dealt or

1          interfaced -- that interfaced with the SOP system, so

2          he certainly had knowledge of it.

3     Q.   But you knew it was not as extensive as the other 11 -

4          -

5               MR. MCLAFFERTY:  Objection.

6     Q.   -- people that were in the department?

7               MR. MCLAFFERTY:  I'm sorry.  Objection.

8     A.   I couldn't tell whether or not it was extensive or not

9          extensive.  Part of the job of the team lead was to be

10         able to maneuver within the SOP system.

11    Q.   Did you do anything to ensure that he had that

12         training, in order to succeed in the department?

13    A.   Again, I advised Mr. Robinson that the opportunities

14         were there for the new classes, as they were coming

15         out.  I encouraged him to participate in that.  I also

16         encouraged him to either sit with his own team

17         members, the other managers at the location, and/or

18         sit with his own associates.

19    Q.   Okay.  So, getting back to my original question; what

20         changed between March of 2001 and July of 2001, that

21         caused you to fire or terminate Mr. Robinson?

22              MR. MCLAFFERTY:  Objection.

23    A.   Again, I did not fire Mr. Robinson.  It was a

24         reduction in force.

1          How many times have you been involved in a reduction

2          in force?

3    A.    One.

4    Q.    How many times have you been responsible for choosing

5          someone, as a result of a directive for reduction in

6          force?

7    A.    One.

8    Q.    And is -- we're talking about this instance here,

9          where Mr. Robinson was let go?

10   A.    Yes.

11   Q.    Okay.  Now, did you refer to what will be marked as

12         exhibit 6, when you formulated your opinion in July to

13         let go, fire, terminate, not hire, or reduce Mr.

14         Robinson in force?

15         MR. MCLAFFERTY:  Objection to the question -- to

16         the form.  You can answer.

17   A.    I used this as a guideline, yes.

18   Q.    Okay.  And you're sufficiently familiar with it today,

19         to discuss it?

20         MR. MCLAFFERTY:  Objection.

21   A.    I have to say no.  I have not seen it since --

22   Q.    Okay.  Did you review it -- I'm sorry.  Did you review

23         it while you were actually doing the reduction in

24         force?

1           court reporter can hear you.

2                THE WITNESS:  Oh, I'm sorry.

3      A.   I believe we had some impact, or I had some impact, in

4           Step 7.

5      Q.   Can you tell us what that step is?

6      A.   Oh, I'm sorry.  I wouldn't have had anything to do

7           with that.  That would've been the business partner,

8           unless my director did.  "Review business case with

9           legal -- administration team -- "  I believe I came in

10          in Step 9.

11     Q.   What is Step 9?

12     A.   Task number 9, I should say.  "Develop and implement

13          the appropriate communication strategy, mandatory for

14          the staffing exercises."

15     Q.   Did you -- I'm sorry, did you finish?

16     A.   Yes.  I had a piece of that.

17     Q.   Okay.  Was there anything in writing, reflecting what

18          you did?

19     A.   I believe we sent out a communication; a Lotus Note.

20     Q.   Where is that?

21     A.   I don't have it.  I think it was sent out by Claudia.

22     Q.   Do you know where it is?

23     A.   I don't.

24     Q.   Do you know if it was produced in documents to us?

48

1    A.    I don't.

2    Q.    How many pages was it?

3    A.    It was just a one page document that said that we were

4          going through a RIF process.  That we needed to, you

5          know, get your resumes together.

6    Q.    This was --

7    A.    And I believe there were some timelines associated

8          with that, as well.

9    Q.    This was a communicate (sic) to the 12 people?

10   A.    Yes.

11   Q.    Okay.  And it was done by e-mail, or was it done by

12         fax?

13   A.    It was done by e-mail.

14   Q.    By e-mail.  Okay.  And you're saying, you have no

15         record of that e-mail?

16   A.    I do not.

17   Q.    Okay.  Anybody in your department that would have that

18         e-mail?

19   A.    Unless HR has it, I'm not sure.

20   Q.    But you authored it?

21   A.    Claudia authored it, I believe.  Claudia and I.

22   Q.    How much money, by the way, was Claudia making at that

23         time?

24   A.    I have no idea.

1    Q.    Okay.

2    A.    I don't know.

3    Q.    Okay.  Why don't we just -- that's 7, right?

4          THE COURT REPORTER:  That's number 7.

5              (Exhibit No. 7, Verizon RIF Form B, marked

6              for identification.)

7    Q.    Why don't we go through the document that I think

8          you'll recognize.  If you can tell us what that is?

9    A.    This is a document that lists; the date of birth, the

10         last name, first name of -- one, two, three, four,

11         five, six, seven, eight, nine, ten, eleven, twelve --

12         all twelve team leads.

13   Q.    Okay.  When was that document prepared?

14   A.    I don't really remember.  I think this was in response

15         to the EEO complaint.

16   Q.    Did you draft that?

17   A.    I believe I did.

18         MR. FRAGOMENI:  Okay.  Did you -- why don't we

19         mark that as exhibit 8.

20              (Exhibit No. 8, Document Containing Team

21              Leads Information, marked for identification.)

22   Q.    Mr. Pilat, where did you get the information used to

23         compile Exhibit 8?

24   A.    The HR records.

1    Q.   Okay.  And HR records are found in your office or in
2         the HR department?
3    A.   No, I'm sorry.  It wasn't HR records.  I believe it
4         was a 1477, which is like an attendance document.  And
5         on that it carries, like, last name -- preliminary
6         information.  Just basic information with regard to
7         the name, social security number, date of birth.
8    Q.   Where is that found?
9    A.   Ellie Hawkins, who used to be our E.A. or executive
10        assistant, would keep those on hand.
11   Q.   Okay.  And why would she keep those on hand?
12   A.   They were for attendance purposes.
13   Q.   And on the -- those are attendance records that you
14        keep?
15   A.   Yes.
16   Q.   Are they check-off sheets?
17   A.   No.  They were used as tracking for vacations,
18        holidays.  She used them for payroll purposes.
19   Q.   Okay.  And specifically, on those attendance records,
20        are dates of birth?
21   A.   I believe so.
22   Q.   Okay.  Did you know, by the way, Mr. Robinson's 27
23        years, or 30 years, of attendance at Verizon?
24   A.   No, I did not.

1           age.

2    Q.    Okay.  Who asked Mr. Robinson to retire; did you?

3           MR. MCLAFFERTY:  Objection.

4    A.    I never asked Mr. Robinson to retire.

5    Q.    Did anyone, as far as you know, ask Mr. Robinson to

6           retire?

7    A.    Not that I'm aware of.

8    Q.    Did anyone say to Mr. Robinson, you are retirement

9           eligible?  It's time for you to retire?  Something to

10          that effect?

11   A.    No.

12   Q.    Did you know that Mr. Robinson, at the time that you

13          terminated him, laid him off, fired him, not hired

14          him; that he was eligible to retire?

15   A.    Yes, I did.

16   Q.    Okay.  And you didn't mention that?  That didn't come

17          up in a conversation with him at any time?

18   A.    No, it did not.

19   Q.    Okay.  Did you hire anyone to perform Mr. Robinson's

20          duties after he left?

21   A.    No, I did not.

22   Q.    Did you hire any contractors since the year 2001, to

23          perform any duties that Mr. Robinson performed before

24          he left?

74

1    A.    No, I did not.

2    Q.    Who performed his duties as a result of his leaving?

3    A.    They were absorbed by the remainder of the team.

4    Q.    Okay.  So, all of his work was parceled out among 12 -

5          - 11 other people?

6    A.    That is correct.

7    Q.    Okay.  And did you give or ask Mr. Robinson to

8          acquire, or to do more work, or to, you know -- give a

9          new assignment to Mr. Robinson some time in June of

10         2001?

11   A.    Can you be more specific on that?

12   Q.    Did you ask him to take on additional responsibilities

13         in 2001?

14   A.    Yes.  There was a Lotus Note that referred to that.

15   Q.    Okay.  And why did you ask him to take on additional

16         responsibilities?

17   A.    We were getting rid of our contractor.

18   Q.    Who was the contractor that you were getting rid of?

19   A.    Janice Miller.

20   Q.    You were going to terminate her contract?  It was a

21         written contract that -- in other words, she was a

22         1099 employee?

23   A.    Yes.

24   Q.    And so, her duties would then be assigned to Mr.

1           Robinson?

2    A.    Not only to Mr. Robinson, but parceled out to

3           everyone.

4    Q.    To all of the rest of the 11 people?

5    A.    Correct.

6    Q.    Okay.  And this was in June of 2001?

7    A.    Yes.

8    Q.    Okay.  And a month later, you decided that you wanted

9           to get rid of Mr. Robinson; correct?

10          MR. MCLAFFERTY:  Objection.

11   A.    That's not correct.

12   Q.    Let me see.  You said in July of 2001, you made the

13          decision to terminate Mr. Robinson.

14   A.    No.  There was a reduction in force --

15   Q.    Okay.

16   A.    -- and Mr. Robinson was not selected to be retained.

17   Q.    Wow.  All right.  Is this a table in front of us, sir?

18          MR. MCLAFFERTY:  Objection.

19   Q.    Is this a conference table?

20          MR. MCLAFFERTY:  Objection.  Don't answer that.

21   Q.    What do you call this at Verizon?

22          MR. MCLAFFERTY:  Frank --

23   Q.    What do you call this table?  What do you call this

24          piece of furniture at Verizon?

1          MR. MCLAFFERTY:  Frank, the witness has answered

2          the question.  Tables aren't relevant to the question.

3          Would you please ask another question?

4          MR. FRAGOMENI:  It's robotic, if you ask me.

5     Q.   Mr. Pilat, in the year 2001, July, someone formulated

6          the opinion -- you, Claudia D'Amato -- that Mr.

7          Robinson would not be selected for a position;

8          correct?

9          MR. MCLAFFERTY:  Objection.

10    A.   That's correct.

11    Q.   All right.  Now we're on the same page.  Now, in June

12         of 2001, you're asking Mr. Robinson to assume more

13         duty; correct?

14    A.   I am asking Mr. Robinson to contribute more, yes.

15    Q.   Okay.  Not contribute more; you're asking him to do

16         more work?

17    A.   To contribute more to the team, yes.

18    Q.   And you've asked everybody else to do that?

19    A.   Everybody else was taking up a piece of it as well.

20    Q.   Okay.  All right.  What changed between June of 2001

21         and July of 2001, to cause you not to hire Mr.

22         Robinson?

23         MR. MCLAFFERTY:  Objection.

24    A.   We had 11 positions, there were 12 candidates.  Mr.

77

1        Robinson did not -- was not selected.  He did not

2        measure up to the other 11.

3   Q.   Okay.  And yet you, in June, were giving him the same

4        responsibilities that you were giving the other 11?

5        Additional responsibilities?

6   A.   Correct.

7   Q.   And he was competent to do those then in June, but not

8        in July?

9        MR. MCLAFFERTY:  Objection.

10  A.   Again, in July, we were going through a reduction in

11       force.

12  Q.   When did you first know there was going to be a

13       reduction in force?

14  A.   I believe it was in July, when everybody else was made

15       aware of it.

16  Q.   Did you know prior to July of 2001?

17  A.   There had been rumors that the other business

18       organizations were going through it.

19  Q.   You had an idea that your department was going to be

20       affected; correct?

21  A.   No.  I did --

22  Q.   Did you ask anybody?

23  A.   We were constantly asking.

24  Q.   When did you first ask about a reduction in force in

1    Q.   Okay.  That were surrounding a conference table,

2         seated in chairs?

3         MR. MCLAFFERTY:  Don't answer it.  Frank, if you

4         have a question to ask, ask the question.

5    Q.   And you're asking whether or not there's a RIF that's

6         going to be assigned to your department?

7    A.   Yes.

8    Q.   Okay.  And what was the answer given?

9    A.   Not at that time.

10   Q.   Okay.  So, you're asking this question during the

11        first quarter.  How about the second quarter?  The

12        second quarter comes along sometime between March and,

13        I assume, June?  May?

14   A.   Yes.  June was the second quarter.

15   Q.   June.  And what was the answer?

16   A.   To the best of my knowledge, what I recall, no.

17   Q.   Okay.  So, you thought up until June that your

18        department was not going to be affected by a RIF?

19   A.   That is correct.

20   Q.   And some point between June and July -- middle of

21        July, beginning of July -- you discovered that there

22        was going to be a RIF?

23   A.   We were notified that we were going through a

24        reduction, yes.

1    Q.    And that notification came in what form?

2    A.    That came in a call to Claudia and I, from Pat

3          Stevens.

4    Q.    And Pat called you sometime between June of 2001 and

5          July of 2001?

6    A.    Correct.

7    Q.    Okay.  Have you ever been charged with an ethics

8          violation at Verizon?

9    A.    No.

10   Q.    Have you ever had any investigation of your activities

11         at Verizon, by anyone internally at Verizon?

12   A.    Yes.

13   Q.    And when did that occur?

14   A.    I believe that was recently.

15   Q.    And what date?

16   A.    2003, perhaps.

17   Q.    What was the subject matter?

18   A.    It was Charles Robinson's case; the EEO, I believe.

19   Q.    EEO is what?

20   A.    Equal Employment Opportunity.

21   Q.    Okay.  And what was the result of that investigation -

22         - internal investigation at Verizon?

23   A.    I don't know.

24   Q.    Were you involved in any other ethics violation by any

1        documents, sir, and those are produced by your

2        counsel.  I'll represent to you that they're resumes

3        that they presented to the MCAD, and also in response

4        to our request for documents, I believe.  Do you

5        recognize those documents?

6   A.   Yes.

7   Q.   Can you tell us what they are?  Identify what they

8        are?

9   A.   I believe they are resumes.

10   Q.   Are those the resumes of each of the 11, plus Charles

11        Robinson, that you reviewed in your determination as

12        to whether or not any of those people would be

13        retained, fired, terminated, laid off, etcetera,

14        etcetera?

15           MR. MCLAFFERTY:  Objection to the form.  But you

16        can answer.

17   A.   I believe they are the same documents.

18   Q.   Okay.  And you said, maybe an hour or two ago -- about

19        an hour ago I guess, that those documents, in addition

20        to -- (Strike that.)  Those documents and nothing else

21        -- and your personal knowledge --

22   A.   That is --

23   Q.   -- were used in the determination as to who was going

24        to be retained, fired, hired, laid off?

1    A.    That is correct.

2          MR. FRAGOMENI:  Okay.  Why don't we mark that

3          packet as --

4                (Exhibit No. 11, Packet of Resumes, marked

5                for identification.)

6    Q.    There's one piece that's not -- I'm going to ask you

7          to look at that while that's being marked.  Do you

8          recognize that e-mail?

9    A.    It is from Luigi Leone.

10   Q.    Okay.  And what's the subject matter of that?

11   A.    Resumes.

12   Q.    And does he ask you, specifically, whether he wants a

13         -- whether you want a formal resume or whether you

14         want an in-house resume?  Is that something -- maybe

15         I'm paraphrasing it incorrectly, but what does it say?

16   A.    It says, "When do you need the hard copy?  If it

17         doesn't need to be in a formal resume format, see the

18         copy below.  If you need formal resume, let me know.

19         I have a Word file at work.  Below is my on-line

20         resume."

21   Q.    Okay.  What did you do in response to that?

22   A.    I believe I told him the on-line resume would be fine.

23   Q.    Okay.  And did you tell him orally or did you tell him

24         by another e-mail?

1    A.    I don't remember.

2    Q.    Okay.  But you have a memory of at least telling him

3          that the on-line is fine?

4    A.    Yes.

5                MR. FRAGOMENI:  Okay.  Let's mark that.

6                    (Exhibit No. 12, E-mail from Luigi Leone to

7                Henry Pilat, July 9, 2001, marked for

8                identification.)

9                MR. MCLAFFERTY:  Just note for the record; that

10         doesn't appear to be the complete Leone document.

11   Q.    Correct.  There seems to be more -- something missing,

12         but for purposes of this document, sir, what's the

13         date on the top of it?

14   A.    July 9th.

15   Q.    Okay.  So, as of July 9th, you're still compiling

16         resumes?

17   A.    I believe so.

18   Q.    Okay.  Did Mr. Robinson's ethic violation play any

19         role in you not hiring, or your firing, terminating,

20         laying off, letting go, of Mr. Robinson?

21   A.    I'm sorry, his --

22   Q.    Well, he had an ethics case; correct?  Opened by Ms.

23         Rober?

24   A.    Yes, he did.

1    Q.   And did that play any role in your decision regarding

2          Mr. Robinson, in the year 2001?

3    A.   Not directly, no.

4    Q.   Indirectly?

5    A.   It may have been in the back of my mind, yes.

6    Q.   How far back?

7    A.   Enough back that it was there, but I did not verbalize

8          it with anyone.

9    Q.   You didn't repeat it to anyone and it wasn't the

10        subject matter of your conversation with Ms. D'Amato?

11    A.   That's correct.

12    Q.   Did she know about it?

13    A.   Not to my knowledge.

14    Q.   Okay.  So, it was never brought up and it was never

15        part of your decision making?

16        MR. MCLAFFERTY:  Objection.

17    A.   That's correct.

18    Q.   All right.  Let me just mark -- have you seen that

19        three page document?

20    A.   No, I didn't.

21        MR. MCLAFFERTY:  Is that number 12, Frank?

22        MR. FRAGOMENI:  Thirteen.

23    Q.   Have you seen this before?

24    A.   No.

90

1    Q.    You've never seen this?

2    A.    No.

3          MR. FRAGOMENI:  For the record, it's a document

4          that was produced by your counsel, entitled General

5          Case, and it's three pages.  Just mark that as exhibit

6          13.

7               (Exhibit No. 13, Document - General Case,

8               marked for identification.)

9    Q.    What was the thing that was the foremost in your mind,

10         that was -- besides the resume; that was a document --

11         but you said, your personal knowledge of Mr. Robinson.

12         What was the thing that was foremost in your mind, the

13         furthest in the front of your mind, as to what you

14         would use for your decision making of Mr. Robinson or

15         not?

16   A.    Can you clarify that?

17   Q.    I'll try to rephrase that.  You said in the back of

18         your mind was the ethics investigation; way, way back.

19         And what was the thing that was the most forward in

20         your mind, using your personal knowledge about Mr.

21         Robinson, that played a role in your decision making

22         as to whether you wanted to hire him, fire him,

23         terminate him, lay him off, let him go?

24   A.    The requirements of the job, which were the system

1          skills, the attitude.

2     Q.   System skills, attitude.  So, are we -- I want to go

3          from the front of your mind to the back of your mind.

4          System skills is in the front?

5     A.   System skills.

6     Q.   What's going on behind that?

7     A.   Product knowledge.

8     Q.   Product knowledge.

9     A.   Development of the work force.

10    Q.   The third is development of the work force.  What's

11         the fourth?

12    A.   I tried to use those three as the main guiding

13         principles throughout all.

14    Q.   Okay.  Take the first one.  Now, the system --

15    A.   System knowledge.

16    Q.   Is that a computer speak?

17    A.   It's several different things, yes.

18    Q.   Is it a computer program?

19              MR. MCLAFFERTY:  Objection.  You can answer the

20         question.

21    A.   System knowledge refers to -- it's not really a

22         computer -- it is a computer program I would assume,

23         yeah.  It's a computer program that we would interact

24         with on various levels.  We had DICAS, we had LSRM, we

93

1    A.    When I first came to wholesale?  I would say in '89.

2    Q.    So, from 1989 to the year 2001, you had a constant

3          knowledge gaining objective of the system that we now

4          refer to as "the system," I guess.

5               MR. MCLAFFERTY:  Objection.

6    A.    There are several.

7    Q.    Okay.  Clarify it for me.

8    A.    There are several systems within that.  Depending upon

9          the job function that I had, depended upon the system

10         that I needed to know.

11    Q.    Now, what was the system that you believe Mr. Robinson

12         was deficient in?

13    A.    He had deficiencies in the SOP ordering systems, which

14         included --

15    Q.    How long did it take you -- I'm sorry.

16    A.    Okay.  Which included New York, New England SOPs, the

17         MISOS systems, SOAC.

18    Q.    Okay.  How long did it take you to acquire that

19         knowledge; that you believe you had a sufficient

20         knowledge of the SOPs?

21    A.    I had worked in the SOPs in various other

22         organizations.  The SOPs are the same.

23    Q.    Okay.  Mr. Robinson had not, and you knew that when

24         you hired him?

94

1    A.    But, Mr. Robinson also had SOP knowledge because he

2          was in engineering, which that department interfaced

3          with the SOPs.

4    Q.    All right.  Give me a time frame that you learned --

5          to be able to say that you had sufficient knowledge of

6          SOPs.  A year, two years, months, weeks, days?

7    A.    It's really hard to say.  The SOPs are -- when I went

8          through initial training as a service rep; maybe two

9          weeks, three weeks.

10    Q.    And so, after two weeks you felt -- or three weeks,

11          you felt that you had sufficient knowledge of the SOPs

12          to be able to say that you had good working knowledge

13          of it?

14    A.    For the job title that I had at the time, yes.

15    Q.    Okay.  Could you teach it?  Could you tell somebody

16          else how to use it?

17    A.    I probably could.

18    Q.    Why didn't you teach Robinson how to do it?

19              MR. MCLAFFERTY:  Objection.

20    A.    Why didn't I teach Charlie how to --

21    Q.    Yes.

22    A.    -- do SOP?

23    Q.    Yes.

24    A.    Because I was running an office.

95

1    Q.    Well, why didn't you take him aside and teach him how

2          to do it, if it took you three weeks to do it?  Why

3          didn't you teach him how to do it?

4              MR. MCLAFFERTY:  Objection.

5    A.    Again --

6    Q.    If you felt he was deficient, why didn't you teach

7          him?

8    A.    I gave him opportunities to learn the SOPs.

9    Q.    Why didn't you teach him?

10             MR. MCLAFFERTY:  Objection.

11   A.    I did not teach him because I had an office to run.

12   Q.    How many hours a week did you work?

13   A.    Off and on, I'd probably say 60.

14   Q.    And do you share an office or do you have your own

15         office?

16   A.    I had my own office.

17   Q.    And did you take an hour for lunch each day?

18   A.    Usually, no.

19   Q.    What was your hours of operation?  What time did you

20         get in, what time did you leave?

21   A.    I was probably in by 7:30, 8 o'clock.  And I was there

22         until 6 or 7 at night.

23   Q.    And all of those hours were consumed in running your

24         office?

1    Q.    Was it between March of 2001 and July of 2001?

2    A.    I don't recall.

3    Q.    You just don't know?

4    A.    I don't recall.

5    Q.    Do you know where it was when you told him?

6    A.    I don't recall.

7    Q.    Do you know whether you were in a room, whether you

8          were outside, whether you were in a bar?

9    A.    I don't recall.

10   Q.    Okay.  Do you know who else was present?

11   A.    I don't recall.

12   Q.    Do you know how many times you told him?

13   A.    No, I do not.

14   Q.    And then the next item that's next in your mind was --

15         if you could refresh my memory, what was that?

16   A.    Attitude.

17   Q.    Attitude.  What about his attitude, that you found put

18         him at risk for termination, firing, failure to be

19         rehired, laid off, let go?

20   A.    I found Mr. Robinson to have, at times, a very

21         negative attitude.

22   Q.    Did anybody else in the department have a negative

23         attitude?  Everybody came in cheery and happy every

24         day?

DUNN & GOUDREAU

1     MR. MCLAFFERTY:  Objection.

2 A. Compared to the other 12 -- to the other 11, Mr.

3   Robinson had a questionable attitude.

4 Q. Was Mr. Robinson grumpy every day?

5 A. No, I'm not saying that.

6 Q. Okay.  So, compared to the other 11, Mr. Robinson was

7   the most negative?

8 A. That is correct.

9 Q. And how did he express that negativity?

10 A. Comments, actions.

11 Q. Well, tell me specifically what the comments were.

12 A. Again, it was more procedural.  He was always

13   negative, stating that, you know, this process would

14   not work, this is broken, no one would agree to it.

15 Q. He said that every day?

16     MR. MCLAFFERTY:  Objection.

17 A. I'm not saying he said that every day.

18 Q. When did he say those things?

19 A. They were verbalized in the team meetings.

20 Q. How often were you have -- did you have team meetings?

21 A. We had team meetings once a week.

22 Q. And every week, Mr. Robinson would show up and be

23   negative about everything that you mentioned --

24     MR. MCLAFFERTY:  Objection.

1    Q.    -- or anyone else mentioned?

2    A.    Again, it was not all the time.  More often than not.

3    Q.    Okay.  And so, did you ever tell Mr. Robinson, jeez,

4          you have a negative attitude?

5    A.    I think the entire team would tell Mr. Robinson that

6          he had a negative attitude.

7    Q.    They actually told him, you have a negative attitude?

8    A.    I can't recall specifically.

9    Q.    Did you hear anybody say that to him?

10   A.    I can't recall specifics.

11   Q.    I'm not asking for specifics.  Just generally, did you

12         hear anybody say it to him?

13   A.    (Witness nodding).

14   Q.    Is that a no?

15   A.    That's a no.

16   Q.    Did you ever say that to him?

17   A.    I did remember saying, Charlie, your attitude.

18   Q.    Your attitude?  You've got a great attitude or you

19         have a bad attitude?  What did you say?

20   A.    Your attitude.

21   Q.    Your attitude.  And what does that mean to you?

22   A.    That he had a negative attitude.

23   Q.    You didn't say negative attitude.  You said, your

24         attitude; correct?

DUNN & GOUDREAU

1    A.    To the best of my recollection, yes.

2    Q.    And he knew, or you think he knew, what you meant by

3          that?

4    A.    To the best of my recollection --

5    Q.    And what was his response?

6    A.    He really wouldn't have one.

7    Q.    Say that again.

8    A.    He wouldn't have one.

9    Q.    What do you mean, he wouldn't have one?  What was his

10         response?

11   A.    I don't recall.  He would grunt, perhaps.

12   Q.    Can you make the sound for me?

13         MR. MCLAFFERTY:  Objection.

14   A.    Hmm.

15   Q.    Okay.  And did you take that to be a yes, or a no, or

16         I'm agreeing with you, not agreeing with you?

17   A.    Well, neither.

18   Q.    Okay.

19   A.    I believe he just dismissed it.

20   Q.    And what did you say in response to that?

21   A.    Nothing.

22   Q.    How often would you say, attitude, to him?

23   A.    I recall saying it once.

24   Q.    And where was it that you said that?

1    Robinson, attitude?  Why would you say that to him?

2  A.  Again, I don't remember specifically.

3  Q.  Okay.  So, now we're got -- that's the second reason

4    that's foremost in your mind.  And the third one --

5    refresh my memory as to what's behind that in your

6    mind.

7  A.  It's people development and management.

8  Q.  All right.  And that, I guess in layman's terms, is

9    relationship to your employees?

10  A.  Development of your employees.

11  Q.  Okay.  And what about that was a problem with Mr.

12    Robinson?

13  A.  Well, Mr. Robinson -- because of his lack of system

14    knowledge and because of the fact that, you know, he

15    did not put forth the effort to learn, could not

16    respond to questions from his -- from the field.

17  Q.  Okay.  So, it's somehow related to -- number one and

18    number three are somehow related?  The systems versus

19    his ability to translate that knowledge into effective

20    communication with his employees?

21  A.  That is correct.

22  Q.  Okay.  Now, agree with me or disagree with me, but

23    older employees, or employees who have had more time

24    at Verizon, have less knowledge of computers; is that

```
 1            correct?
 2                 MR. MCLAFFERTY:  Objection.
 3       A.   I don't understand that question at all.
 4       Q.   Well, in general, you'd agree with me or disagree with
 5            me.  Is it true that older employees, or employees who
 6            have had greater service at Verizon, are less familiar
 7            with either the computer itself, or the systems, or
 8            the software, related to Verizon programs?
 9                 MR. MCLAFFERTY:  Objection.
10       A.   I would have to disagree with you.
11       Q.   All right.  And why?
12       A.   Because I consider myself to be an older person with a
13            serious length of time at the company --
14       Q.   Okay.
15       A.   -- and if anything, the corporation demands that you
16            keep up with the systems.
17       Q.   How old are you now?
18       A.   Forty-eight.
19       Q.   And how old were you in -- let's do the math -- how
20            old were you in 2001?
21       A.   Forty-six (sic).
22       Q.   Okay.  And at that time, how long had you been
23            employed by Verizon?
24       A.   Twenty-one years.
```

1    Q.    And Mr. Robinson had, at that time, 30 years?

2    A.    Maybe.  I don't know.

3    Q.    You don't know that?

4    A.    I don't know what his actual service date was.

5    Q.    Did it matter to you?

6    A.    No, not really.

7    Q.    Okay.  And at the time that you let him go, didn't

8          hire him, you terminated him, he was how old?

9    A.    I'm not sure.  Maybe 48?

10   Q.    If he's in his 50's, would I -- would that be

11         something that surprised you?

12   A.    Not really.

13   Q.    Okay.  Who's still present in your department?

14   A.    I think I need you to clarify that because I kind of

15         moved on jobs, so can you --

16   Q.    You're not in the same department that you were in

17         2001?

18   A.    Different work function.

19   Q.    All right.  Who of the 11 people that were retained,

20         hired, not fired, in 2001, are still at Verizon?

21   A.    Patrick Podolske, Brenda Joy, Roy Peterson, Lisa

22         Smith, Susan Rober, Luigi Leone, Matt Blais, Adam

23         Aliberti.

24   Q.    All in the same positions?

DUNN & GOUDREAU

1    A.    No.

2    Q.    Demoted, promoted, retreated?

3    A.    Neither.  They found -- some found other positions

4          within the organization.

5    Q.    Did you assist them in the finding of positions within

6          the organization?

7    A.    No.

8    Q.    Did anybody ask you for a reference?

9    A.    Yes.

10   Q.    Who?

11   A.    I'm sorry.  Not a reference, but a -- if they could

12         use me as a reference.

13   Q.    I see.  And who was that?

14   A.    Patrick did.

15   Q.    And did you give him a reference?

16   A.    Yes, I did.

17   Q.    Okay.  And what was the reference?  Was it a good one,

18         a bad one, a --

19   A.    It was a good one.

20   Q.    Good one.  Was it in writing?

21   A.    No.  It was a telephone conversation.

22   Q.    To someone within Verizon, that he should hire this

23         guy?

24   A.    What had happened was, Patrick had applied for a

1    Q.   Mr. Pilat, you made a mention of the fact that you

2         told Mr. Robinson about the training program.  Did Mr.

3         Robinson ever ask for training?

4    A.   Yes.

5    Q.   And what was your response?

6    A.   That -- attend one of the initial training sessions,

7         and/or shadow one of your peers, or sit with one of

8         your associates.

9    Q.   Did he take the time to job shadow?

10   A.   I believe he did.  He told me he did.

11   Q.   And did you see him do it?

12   A.   No.

13   Q.   But you have some knowledge that he did job shadow?

14   A.   Only from what he told me.

15   Q.   Okay.  Yet, your documents and your affidavit say that

16        he didn't.

17            MR. MCLAFFERTY:  Objection to the form.

18   Q.   He did not job shadow.  Now, today you think that he

19        did?

20   A.   I -- again, I don't know whether he did or did not.  I

21        believe he told me he did.

22   Q.   And do you have any information that says he didn't?

23   A.   Other than the fact that his skills did not reflect

24        it.

1                    marked for identification.)

2    Q.    When did you transfer all of his work to the other

3          employees; transfer Mr. Robinson's work to the other

4          employees?

5    A.    Once he was notified that he was not selected as a

6          team --

7    Q.    When was that?  Dates?

8    A.    August of 2001.

9    Q.    You're saying he was notified in August that he wasn't

10         going to be retained?

11                   MR. MCLAFFERTY:  Objection.

12   A.    That's when I transferred his responsibilities.

13   Q.    When was he officially notified?  When was Mr.

14         Robinson officially notified?

15   A.    I believe it was the end of July, beginning of August.

16   Q.    Do you say, anywhere in your affidavit, that the

17         additional duties that had been performed by another

18         contractor that you were letting go, was going to be

19         parceled out to the rest of the 11?

20   A.    I don't know.  Wait a second.  No, it is not mentioned

21         anywhere in here.

22   Q.    When did you know, or when did this idea that you

23         parceled it out to the rest of the 11, come into your

24         -- into the -- into your thought process?

1    A.   Parceled what out?  Mr. Robinson's responsibilities?

2    Q.   No.  The contractor's responsibilities.

3    A.   I'm not following you.

4    Q.   Where are the e-mails to the rest of the 11 people,

5         telling them that they're going to assume the

6         contractor's responsibilities, as well as Mr.

7         Robinson's?

8         MR. MCLAFFERTY:  Objection to the form.  You can

9         answer.

10   Q.   Did you e-mail everybody, asking them to do that?

11   A.   No, I did not.

12   Q.   Okay.  You only e-mailed Mr. Robinson?

13        MR. MCLAFFERTY:  Objection to the form.

14   A.   I only e-mailed Mr. Robinson because he e-mailed me

15        initially.

16   Q.   So, the rest of the 11 people; you walked to their

17        cubicles and said, by the way, here's some extra work?

18        MR. MCLAFFERTY:  Objection to that form.

19   A.   Again, no.  What had happened was, I believe we had a

20        team meeting, at which point it was discussed what was

21        going to happen.

22   Q.   Okay.  Isn't it a fact that Mr. Robinson was the only

23        one that you weren't giving additional duties to?

24        MR. MCLAFFERTY:  Objection.

1    A.    No, it's not.

2    Q.    And isn't it a fact that you were going to take away

3          some of his reports?

4          MR. MCLAFFERTY:  Objection.

5    A.    No, that is not true.

6    Q.    What's the purpose of a RIF?

7          MR. MCLAFFERTY:  Objection to the form.

8    Q.    Reduction in force; what is the purpose of it?

9    A.    I couldn't really tell you the business purpose for

10         it.  I don't know.  It's to reduce the force.

11   Q.    Correct.  And does that mean that -- reduce costs?

12         MR. MCLAFFERTY:  Objection.

13   A.    It could possibly be.

14   Q.    Well, is it a purpose of getting rid of someone, or is

15         it the purpose of reducing the force because of the

16         costs?

17         MR. MCLAFFERTY:  Objection to the form.

18   A.    Again, I have no first hand knowledge of what a RIF

19         actually entails.  As far as whether or not it's the

20         business reasoning behind it, I'm not privy to that.

21   Q.    Well, you did a RIF; correct?  You did that RIF that

22         involved Mr. Robinson?

23   A.    Yes, I did.

24   Q.    All right.  And you read the RIF booklet that they

DUNN & GOUDREAU

1           gave you, that said that a reduction in force is

2           necessary because we have to cut costs; correct?

3                   MR. MCLAFFERTY:  Objection.

4       A.  I was notified that we were going through a RIF, and I

5           had to go down from 12 team leads to one.

6       Q.  Twelve teams leads to eleven?

7       A.  To eleven, I'm sorry.  Correct.

8       Q.  And what was the purpose of that?  To get rid of one,

9           just to get rid of someone?  Or was it because you

10          needed to reduce costs?

11                  MR. MCLAFFERTY:  Objection.

12      A.  Again, I was told that these were my directives.  I

13          needed to go down by one body.

14      Q.  Why?

15      A.  Because we were having a reduction in force.

16      Q.  Why?  Why?

17                  MR. MCLAFFERTY:  Objection.

18      A.  Again, it's because -- whether or not it was a

19          business reason.  I'm sure my district could answer

20          that, but --

21      Q.  Are you telling me, Mr. Pilat, that you don't know why

22          your department was reduced from 12 to 11 --

23      A.  I can --

24      Q.  -- in the year 2001?  You have no idea?

1          MR. MCLAFFERTY:  Objection to the form.  You can

2          answer.

3   A.  Again, I was given a directive that I had to eliminate

4      one position.

5   Q.  Why; you didn't ask why?

6   A.  It was a reduction in force.

7   Q.  Why?

8          MR. MCLAFFERTY:  Objection.

9   A.  Again, I was following my orders.

10  Q.  Why would someone tell you that you needed to reduce

11      your department from 12 to 11?  Why?

12         MR. MCLAFFERTY:  Objection.

13  A.  I don't know.

14  Q.  You never asked anybody, why am I losing an employee?

15  A.  Because we were having a reduction in force.

16  Q.  Why?

17         MR. MCLAFFERTY:  Objection.

18  A.  We were having a reduction.

19  Q.  Why?

20         MR. MCLAFFERTY:  Objection.  Mr. Fragomeni has

21      asked the question a number of times.  Answer his

22      question again and let's see where we're at.  But I

23      think the witness has answered the question; I think

24      I'm catching five or six times, now.  But, if you can

1    ask the question again?  Mr. Pilat, answer the

2    question.

3  Q.  It's three letters; why?

4        MR. MCLAFFERTY:  Okay.  Objection to that.

5    Answer his question.

6  A.  We were having a reduction in force.

7  Q.  Yes, you keep saying that to me, and I keep asking

8    you, why would you be reducing your force from 12 to

9    11?  Why?

10        MR. MCLAFFERTY:  I'm going to jump in for a

11    second.  You've asked the question a number of times,

12    Frank.  Mr. Pilat has said he was directed by his

13    management.  You keep asking the --

14  Q.  Could it be, Mr. Pilat, that it was reduction in force

15    because you needed to cut costs, because you were

16    losing work?  Is that a possibility?

17        MR. MCLAFFERTY:  Objection to the form.  You can

18    answer the question.

19  A.  It's possible.

20  Q.  And is it a possibility that you had a reduction in

21    force to get rid of someone?

22        MR. MCLAFFERTY:  Objection to the form of the

23    question.  You can answer.

24  A.  We were having a reduction in force because we were

129

1              Robinson about his termination?

2     A.    At what time?

3     Q.    At any time.

4     A.    When I informed Mr. Robinson -- not of his

5           termination.  When I informed him that he was not

6           selected --

7     Q.    Okay.  You said that?  You said those words, "you

8           haven't been selected"?

9     A.    Yes, I did.

10    Q.    Okay.  And does it somehow mirror the words that are -

11          - paragraph -- Exhibit Number 14?  Is that Verizon

12          speak?

13             MR. MCLAFFERTY:  Objection to the form.

14    Q.    "You have not been selected"?

15    A.    There were 11 positions.  Mr. Robinson was not

16          selected.

17    Q.    Selected?  Okay.  Sounds like the Publisher's Clearing

18          House; you have not been selected or you have been

19          selected.

20             MR. MCLAFFERTY:  Objection to the form.

21    Q.    Mr. Pilat, did you say that to Mr. Robinson; "you have

22          not been selected"?  Did you use those words?

23    A.    To the best of my recollection, yes, I did.

24    Q.    What else did you say to him?

1    A.    I handed him his package.

2    Q.    And then you said, bye?

3    A.    I said, you have 30 days to, you know, to work.  If

4          you wanted to use -- I believe I said, if you wanted

5          to use the facilities here at the office, that was

6          fine.

7    Q.    Facilities meaning bathroom or -- what does that mean?

8    A.    Facilities meaning a PC, phone.

9    Q.    A --

10    A.    PC.

11    Q.    What does that mean?

12    A.    What is a PC?

13    Q.    Yes.

14    A.    It's a personal computer.

15    Q.    Okay.  We speak the same language there.

16          MR. MCLAFFERTY:  Objection.

17    Q.    What did Mr. Robinson say to you?

18    A.    He did not respond.

19    Q.    Did he grunt?

20    A.    No.

21    Q.    Did you say anything about how you felt at that

22          moment?

23    A.    No, I did not.

24    Q.    How did you feel at that moment?

1           MR. MCLAFFERTY:  Let me --

2    Q.    What is your aversion to the use of the word

3          terminated?

4           MR. MCLAFFERTY:  One second.  Let me just make my

5          comment, then you can ask him that question, Frank.

6          You've been laughing at various times during the

7          course of Mr. Pilat's answers.  You may not agree with

8          or like the terminology or the phraseology he's using,

9          but these are his answers.  I'd appreciate it if you

10         wouldn't laugh at the witness.

11          MR. FRAGOMENI:  I'm not laughing at him.  I'm

12         laughing at the terminology that he's using.  I think

13         it's robot and I think it's just programmed.  However,

14         that's my editorializing.

15   Q.    Mr. Pilat --

16          MR. MCLAFFERTY:  And that indeed is what it is.

17   Q.    -- what is your aversion to the use of the word

18         terminated?

19          MR. MCLAFFERTY:  Objection.

20   Q.    Why don't you use that word in the context of Mr.

21         Robinson's condition at this moment?

22          MR. MCLAFFERTY:  Objection to the form of the

23         question.  You can answer it.

24   A.    I object to it because he still had an opportunity for

| | | |
|---|---|---|
| 1 | | a position elsewhere within Verizon. |
| 2 | Q. | Okay.  So, let's see if we can break this down.  The |
| 3 | | first thing that happened is you asked him -- you told |
| 4 | | him that he wasn't selected, and then you said, just a |
| 5 | | little while ago, you were devastated because you knew |
| 6 | | that that could possibly mean he would be terminated. |
| 7 | | Am I using those words correctly? |
| 8 | A. | I said that his employment would be terminated. |
| 9 | Q. | Fine.  All right.  Now, when did Mr. Robinson's |
| 10 | | employment terminate? |
| 11 | A. | I believe the notification, or the off-payroll date, |
| 12 | | was 30 days later. |
| 13 | Q. | Okay.  You were devastated at that moment because you |
| 14 | | knew that Mr. Robinson had a potential to be |
| 15 | | terminated? |
| 16 | A. | No.  It was a very, very strenuous process and I was - |
| 17 | | - I was just -- it's -- I was just devastated by it. |
| 18 | Q. | Why?  Tell me again, why?  Maybe I missed it.  Why |
| 19 | | were you devastated? |
| 20 | A. | I was just emotionally impacted by it. |
| 21 | Q. | Why? |
| 22 | A. | The process itself. |
| 23 | Q. | Were you unsure that you made the right decision? |
| 24 | A. | No. |

139

1               MR. MCLAFFERTY:  Objection.

2   A.   I'm not sure.

3   Q.   Okay.  Did you have any discussions with Mr. Robinson,

4       regarding the -- his consideration for continued

5       employment at Verizon, at any time during the RIF

6       process?

7   A.   Did I have any conversations with Mr. Robinson

8       regarding his continued employment?

9   Q.   Yes.

10  A.   Okay.  So, I think we had discussions with everyone

11      with regard to their continued employment.

12  Q.   Okay.  What are the basis of those discussions with

13      Mr. Robinson?

14  A.   Maybe I'm not understanding the question correctly,

15      but --

16  Q.   What's your understanding of the question?

17  A.   Are you asking -- and again, you need to ask it again.

18      I'm sorry, I apologize.

19  Q.   Did you ever sit down or go to Mr. Robinson?  I know

20      you don't have to sit down -- did you go to him and

21      say anything about the process of the RIF?

22  A.   We had this discussion with everyone.

23  Q.   What was the discussion with Mr. Robinson?

24  A.   Mr. Robinson was part of the group.

1    Q.   So, you had a group meeting?

2    A.   Yes.

3    Q.   And you told them there was going to be a RIF and you

4        said, what?

5    A.   That it was going to be based on the resumes and

6        personal knowledge.

7    Q.   Okay.  Did you ever have a conversation with Mr.

8        Robinson specifically, about the RIF?  Other than

9        telling him he was the one to be separated?

10   A.   Not that I recall, no.

11   Q.   Okay.  Did you have any role, sir, in compiling

12       documents in response to Plaintiff's requests for

13       documents, related in this case?

14   A.   I may have.  What documents are you referring to?

15   Q.   Well, did someone ask you to go through your files and

16       compile documents in order to produce them for us in

17       this case?

18   A.   I believe so.  They asked me for --

19          MR. MCLAFFERTY:  Hold on a second.  I want to --

20          MR. FRAGOMENI:  Yeah, I don't want to get

21       involved in that.

22          MR. MCLAFFERTY:  I don't want the witness to

23       testify about attorney-client privileges.

24          MR. FRAGOMENI:  No, and I'm not asking for that.

1    A.    -- I'm not --

2    Q.    I'm sorry.  You had further --

3    A.    I don't have a detailed knowledge of it.

4    Q.    How were you trained, in any form, regarding age

5          discrimination?

6    A.    Well, corporate wide, Verizon does have a EEO training

7          that people go through, with regard to sex

8          discrimination, age discrimination.

9    Q.    How was it that you were trained in the age

10         discrimination area?

11   A.    I don't recall exactly, but I'm sure at some point, I

12         had some type of corporate communication.

13   Q.    Did you know, in the year 2001, that it was illegal to

14         terminate someone on the basis of their age?

15   A.    Yes.

16   Q.    And were you sensitive to the fact that Mr. Robinson

17         was over 40 when you terminated him?

18              MR. MCLAFFERTY:  Objection to the form.  You can

19         answer.

20   A.    It didn't play a factor in the decision making

21         process.

22   Q.    Okay.  Are you telling me that how old Mr. Robinson

23         was, was never anywhere between systems and the

24         ethical complaint that's way back in your mind?

1                MR. MCLAFFERTY:  Objection to the form.

2       A.   Again, I did not take age as an issue.

3       Q.   Okay.  From the systems that's in the front of your

4            brain, and the back of your brain is the ethics

5            violation; you're telling me beyond the ethics

6            violation, outside of the brain is Mr. Robinson's age?

7                MR. MCLAFFERTY:  Objection to the form.

8       A.   And again, I have to say that the age was not an issue

9            for any of the candidates.

10      Q.   Fine.  But I'm asking you for Mr. Robinson.  From the

11           front of your brain to the back of your brain; from

12           the front where the systems were and from the back

13           where Mr. Robinson's ethical violation was, nothing in

14           between in your brain matter indicated how old Mr.

15           Robinson was?

16               MR. MCLAFFERTY:  Objection.

17      A.   That's correct.

18      Q.   Okay.  Did you know when you interviewed Mr. Robinson,

19           that he was a non-traditional employee?

20               MR. MCLAFFERTY:  Objection to the form.

21      A.   What is a -- I don't know what a non-traditional

22           employee is.

23      Q.   Well, someone from another department.

24      A.   I knew that Mr. Robinson was from engineering, yes.

1    A.   In -- maybe the word's not right.  Resident; it should

2          be resident.

3    Q.   Should be --

4    A.   Resident.

5    Q.   Spell that, please.

6    A.   R-E-S-I-D-E-N-T.

7    Q.   Okay.  Resident.  As a result of being a Verizon

8          employee, you suddenly gain that?

9    A.   No.  That's a result of being in a management

10        position.

11    Q.   Okay.  But if you're transferring from another

12        department, how should you be trained to assimilate

13        into that new department?

14    A.   It depends upon the department you're going into.

15    Q.   Well, now come on, Mr. Pilat.  We're talking about

16        your department, we're talking about the year 2001,

17        we're talking about Mr. Robinson, and we're talking

18        about a team leader position.

19           MR. MCLAFFERTY:  Objection.

20    Q.   Is that clear enough for you?

21           MR. MCLAFFERTY:  Objection.  You can answer the

22        question, if you can.

23    A.   That's clear enough.

24    Q.   Okay.  How would you train Mr. Robinson in that

1           position?

2    A.    Mr. Robinson was given the opportunity, as I say, to

3           job shadow other associates, other managers --

4    Q.    Which you said that he didn't, but now you're saying

5           he probably did.

6                MR. MCLAFFERTY:  Objection.

7    Q.    Correct?

8                MR. MCLAFFERTY:  Objection.

9    A.    I'm not sure if he did or he didn't.

10   Q.    Okay.  And two is what; attend classes?

11   A.    That were made available, yes.

12   Q.    Okay.  And three; how else would you train him?

13   A.    To learn the systems.

14   Q.    How?

15   A.    By either attending the classes --

16   Q.    Okay.

17   A.    -- that were available.

18   Q.    Okay.  Anything else?

19   A.    Well, you've got to also keep in mind that Mr.

20          Robinson was not unfamiliar with wholesale.

21   Q.    Okay.

22   A.    Wholesale had a branch within engineering, as well.

23   Q.    Okay.  So, you're saying that he didn't need to be

24          trained at all, or he needed to be trained somewhat?

1    A.    I'm not saying either.  I'm saying that Mr. Robinson

2           applied for the position of a team lead.

3    Q.    Okay.

4    A.    When he applied --

5    Q.    Did you set him up to fail, Mr. Pilat?

6           MR. MCLAFFERTY:  Objection.

7    A.    No, I did not.

8    Q.    Did you help him in any way?

9    A.    I gave him opportunities.

10    Q.    Okay.  What were those opportunities?

11    A.    Training classes as they started up, new product

12           knowledge as it was made available.

13    Q.    You handed him documents, as related to new

14           technologies?

15    A.    There were methods that were constantly coming out and

16           available.

17    Q.    What does that mean?

18    A.    That means that methods usually produce -- when new

19           products were made available, there was a method that

20           was produced.

21    Q.    And was that method in the form of a document?

22    A.    Yes.

23    Q.    And you handed it to Mr. Robinson?

24    A.    It was e-mailed electronically to all the members of

152

1    Q.   Okay.  Performance pay?

2    A.   It's merit, yes.

3    Q.   What's the Verizon policy if someone's not performing

4        satisfactory (sic)?

5           MR. MCLAFFERTY:  Objection to form.

6    A.   Usually, I believe you were placed on a performance

7        improvement plan.

8    Q.   Was Mr. Robinson ever done -- ever placed on the plan?

9    A.   No, he was not.

10   Q.   Okay.  Help me out with COVAD.  What is COVAD?

11   A.   COVAD is a clec.

12   Q.   What is --

13   A.   It is a -- it basically is a competitor of Verizon.

14       They are also a customer of Verizon.

15   Q.   Was COVAD one of the largest clecs?

16   A.   Yes, COVAD was.

17   Q.   And who was the contact at Verizon?

18   A.   There were several contacts.  Initially, it was

19       Tiffany Blake.  From then, it transitioned to Charlie.

20   Q.   Okay.  When did it transition to Charlie Robinson?

21   A.   When Charlie came on board to replace Tiffany.

22   Q.   Charlie came on board when your department -- to

23       replace Tiffany?

24   A.   Yes.  Tiffany went to another position.

1    Q.    And every team leader went to NMC meetings?

2    A.    We had several meetings.

3    Q.    That every team leader participated --

4    A.    Which meetings are we talking about?

5    Q.    Well, let's see now.  You said you don't remember that

6          Mr. Robinson was going to sit with the GTE to explain

7          the NMC's role in the overall service process.  Do you

8          remember that?

9          MR. MCLAFFERTY:  Objection.

10   A.    I don't remember GTE.  Is there more that you can tell

11         me about the meeting that he was --

12   Q.    You don't remember GTE. at all?  You have no knowledge

13         of GTE?

14   A.    GTE is a former company that incorporated itself into

15         Verizon.

16   Q.    Okay.

17   A.    So, I'm not sure what you're referring to.

18   Q.    Was there a special relationship that Mr. Robinson had

19         with GTE, that in some way related to the NMC?

20   A.    Mr. Robinson was part of an interdepartmental team

21         where he did represent the NMC  It was a combination

22         of the NMC, maintenance, provisioning --

23   Q.    Okay.

24   A.    -- and I believe the meetings took place in Maryland.

164

1    Q.    Okay.  Did you encourage that representation or

2          discourage it?

3    A.    They had asked for representation.

4    Q.    And you appointed Mr. Robinson?

5    A.    Yes, I did.

6    Q.    Okay.  And when did that occur?

7    A.    I'm not really sure of the date.

8    Q.    Between March and July of 2001, or before March of

9          2001?

10   A.    I'm not really sure.  It could've been before.  I'm

11         not sure.

12   Q.    Okay.  You have no idea when?

13   A.    No.  I'm sorry, I don't.

14   Q.    Did you, at any time, alter or revoke that

15         authorization?

16   A.    For?

17   Q.    His representing to the NMC meetings?

18   A.    No, I did not.

19   Q.    Okay.  Does the strike at -- or did the strike at

20         Verizon have any role in your evaluation of Mr.

21         Robinson?

22   A.    Only to the fact that it disrupted everybody during

23         that period of time.

24   Q.    Did it have any role in your ability or inability to

1              properly evaluate Mr. Robinson?

2     A.      And again, to the certain degree that during that

3              time, we were all doing duties outside the norm.  So -

4              -

5     Q.      Is that a yes or a no?

6     A.      I don't know.

7     Q.      Okay.  You don't know.  Did you ever tell Mr. Robinson

8              that his people liked him and cared for him and

9              respected him?

10    A.      Not that I -- I can't recall.  I can't say I didn't.

11             I'm sure I did.

12    Q.      Okay.  And did you ever retract that statement or say

13             something otherwise?  That they didn't like you and

14             they think that you're a bad person?

15    A.      I do have no knowledge of saying that.

16    Q.      All right.  Did you ever tell Mr. Robinson that you

17             thought he was brilliant?

18    A.      Not that I recall.

19    Q.      You could have, but you don't remember?

20    A.      I don't remember saying that.

21    Q.      Okay.  Did you ever tell him that his people actually

22             loved him?

23    A.      I do not remember that.

24    Q.      Okay.  Did his people love him?

1    A.    He was "Good Time Charlie."

2    Q.    What does that mean?

3    A.    Charlie always had a joke.

4    Q.    Okay.  So, he was always happy?

5          MR. MCLAFFERTY:  Objection.

6    Q.    Not grumpy?

7          MR. MCLAFFERTY:  Objection.

8    A.    Charlie had a relationship with his people where he

9          would joke with them.  However, when it came down to

10         actually performing the function --

11   Q.    He got grumpy?

12         MR. MCLAFFERTY:  Objection.

13   A.    I'm not saying he got grumpy.  He couldn't respond to

14         the questions.

15   Q.    He got negative?

16   A.    Couldn't respond to the questions.

17   Q.    All right.  So, he came in happy, telling jokes.  Then

18         all of a sudden, he got negative?

19         MR. MCLAFFERTY:  Objection.

20   A.    That's not what I'm saying.

21   Q.    What are you saying?

22   A.    What I'm saying is that Charlie was everyone's buddy.

23         However, when it came time for a business question or

24         a performance issue, Charlie could not respond.