# EXHIBIT 3

Pursuant to Local Rule 5.3(A), exhibits attached hereto have been redacted to protect the personal privacy of individuals, including dates of birth and social security numbers.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHARLES ROBINSON, )
)
Plaintiff, )
v. ) Civil Action No. 04-11964-NG
)
TELESECTOR RESOURCES GROUP, INC. D/B/A )
VERIZON SERVICES GROUP, )
)
Defendant. )

## AFFIDAVIT OF HENRY PILAT

I, Henry Pilat, hereby depose and say:

1. I was born on _____ 1956.

2. I am currently employed by Verizon Communications Inc. as an Area Operations Manager, also known as a second-level manager. During 2000 and 2001 I was employed as an Area Operations Manager in Verizon's National Markets Center – Complex Services Department center located at 6 Bowdoin Square, Boston, Massachusetts (the "NMC"). At that time I reported to Director Patrick Stevens.

3. In or around April 2000, I interviewed Charles Robinson for a Team Leader position in the NMC. I reviewed Mr. Robinson's resume, which summarized his 30 years of experience at Verizon. I was initially concerned that Mr. Robinson did not have any recent management experience. Mr. Robinson, however, convinced me that because he had managed a crew early in his career, he could handle the position.

4. At the end of the interview, I offered Mr. Robinson the Team Leader position. Mr. Robinson did not interview with any other Verizon personnel for the Team Leader job. I was the sole person involved in the decision to select Mr. Robinson for the Team Leader position. At the

Redacted

time I decided to offer Mr. Robinson the position, I knew that Mr. Robinson had been with Verizon for over 30 years.

5. The purpose of the NMC was to process requests for service primarily from Competitive Local Exchange Carriers ("CLECs") seeking to use Verizon's networks and facilities in order to service their (the CLECs') customers. CLECs provided telecommunications services similar to those provided by Verizon, namely voice and data services to residential and commercial customers. Verizon was required to lease to the CLECs parts of Verizon's networks and facilities in order to permit the CLECs to compete with Verizon. In addition, the NMC processed requests from Verizon Advanced Data Inc. ("VADI") to provide DSL (digital subscriber line) service to Verizon customers in a manner that paralleled the orders placed by CLECs. VADI was created as a condition of the merger of Bell Atlantic Corp. and GTE that formed Verizon in June 2000. VADI was thus in competition with the CLECs.

6. In summary, upon receiving a service order request from a CLEC (or VADI), the NMC service representative would initially validate the information received. The representative reviewed the information from the CLEC (or VADI), and contacted the CLEC for missing or incomplete information (for example, the CLEC may be seeking service that Verizon could not provide or omitted the type of service needed). The representative would also verify (using a system known as LIVEWIRE) that the CLEC was seeking service to a valid address within the maximum distance to a Verizon Central Office housing the necessary network equipment. Next, the representative would perform a "loop qualification" to determine if facilities (such as cable and open switching equipment) existed in the field to service the request. Loop qualifications were typically performed automatically upon initial input of the service order, but occasionally had to be performed manually by the representative by accessing another Verizon system,

REQUEST/NET. Assuming the representative was able to verify all the necessary information, he or she would then begin inputting the service order information into one of several Service Order Provisioning Systems ("SOP").

7. Different SOP systems existed for different states or areas serviced by the NMC. None of the SOP systems were identical, and thus a valid entry in one system might be invalid in another. In addition, each of the SOP systems had very specific formats for data entry in a given field. Further, during 2000 and into 2001, the SOP systems lacked many up-front edits or guides to advise the user of input errors. Consequently, data entries were regularly rejected by the system, and the service representative would often be advised by the system of an error only after typing in all of the requested data, requiring the representative to go back to search for the invalid entry to resolve the problem. If unable to resolve the issue, the representative would go to a Team Leader for assistance.

8. If the order was properly processed in the appropriate SOP system, the representative would receive confirmation that the order was being "assigned." This meant that the SOP system data entry was successful. The SOP system then transmitted the service order through several other Verizon systems to the appropriate field personnel to coordinate installation of the necessary equipment, either at a Verizon central office or at the site of the CLEC's or VADI's customer. Once the SOP system "assigned" the order, the CLEC or VADI was sent a Firm Order Commitment ("FOC") which confirmed the order and advised the CLEC or VADI of the date by which the equipment installation or other necessary actions would take place. NMC representatives were required to process CLEC or VADI orders so that a FOC was issued to the CLEC or VADI within 24 to 72 hours of receipt of all required information. On average, a service representative processed between 30 and 35 service orders per day.

9.  At the time Mr. Robinson was hired by me in April 2000, the NMC had approximately 80 service representatives. By early 2001, the NMC had grown to 160 service representatives managed directly by 12 Team Leaders, one of whom was Mr. Robinson. Mr. Robinson and six other Team Leaders reported directly to me, with the remainder reporting to second-level manager Claudia D'Amato. As a Team Leader, Mr. Robinson directly supervised approximately 15 service representatives.

10. One of Mr. Robinson's job duties included answering questions from his service representatives regarding SOP data entry. On several occasions, Mr. Robinson told me that he typically responded to those questions by stating "Pretend I'm not here – what would you do?" On several occasions in reaction to that response representatives turned to other Team Leaders and myself for answers.

11. In or around September 2001, the NMC terminated the services of the 42 temporary hires, reducing its service representative ranks by approximately 26%, from approximately 160 to 118. Eleven of the 42 temporary employee found other employment within Verizon, while 31 temporary employees were terminated.

12. In late June or early July 2001, I was advised by my Director, Patrick Stevens, that the NMC would need to eliminate one Team Leader position. In July 2001 Claudia D'Amato and I discussed the relative performance of the Team Leaders and compared the Team Leaders against each other based on (1) our review of the Team Leaders' resumes created for the reduction in force process and on (2) our personal knowledge of the Team Leaders. Ultimately, D'Amato and I determined that Mr. Robinson was the least valuable of the Team Leaders. We did not consider employee's dates of birth, ages, length of service, and personnel files in the selection process. At no time did I consider Mr. Robinson's age in this decision or any employment decision relating to

Mr. Robinson. Nor am I aware of any facts to suggest that Claudia D'Amato considered Mr. Robinson's age in deciding not to select Mr. Robinson for one of the remaining Team Leader positions.

13. On or about July 30, 2001, I told Mr. Robinson that he had not been selected for one of the available Team Leader positions. Mr. Robinson did not request my assistance in seeking a new position within Verizon.

14. Throughout 2000 and into 2001, I heard discussions among employees of consolidations and reductions in force throughout Verizon, related to the merger of Bell Atlantic and GTE that formed Verizon. I also heard from Team Leaders and other employees on a number of occasions speculation regarding possible separation packages.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 19 DAY OF OCTOBER, 2005.

Henry Pilat